affected or impaired thereby; and (b) to the fullest extent possible, the provisions of this Article VIII (including, without limitation, each such portion of this Article VIII containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

## ARTICLE IX.
## MISCELLANEOUS

**Section 9.1.    Place of Meetings**. If the place of any meeting of stockholders, the Board or committee of the Board for which notice is required under these Bylaws is not designated in the notice of such meeting, such meeting shall be held at the principal business office of the Corporation; provided, however, if the Board has, in its sole discretion, determined that a meeting shall not be held at any place, but instead shall be held by means of remote communication pursuant to Section 9.5 hereof, then such meeting shall not be held at any place.

**Section 9.2.    Fixing Record Dates**.

(a)    In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting. If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the Business Day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the Business Day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for the adjourned meeting.

(b)    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

(c)    In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which date shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board. If no record date has been fixed by the Board, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board is otherwise required, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its

17

principal place of business, or the Secretary. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board and prior action by the Board is otherwise required, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board adopts the resolution taking such prior action.

### Section 9.3.    Means of Giving Notice.

(a)    Notice to Directors. Whenever under applicable law, the Certificate of Incorporation or these Bylaws notice is required to be given to any Director, such notice shall be given either (i) in writing and sent by hand delivery, through the United States mail, or by a nationally recognized overnight delivery service for next day delivery, (ii) by means of facsimile telecommunication or other form of electronic transmission, or (iii) by oral notice given personally or by telephone. A notice to a Director will be deemed given as follows: (i) on the date of delivery if delivered personally, or if by facsimile, upon written confirmation of receipt by facsimile, e-mail or otherwise, (ii) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier service or (iii) on the earlier of confirmed receipt or the fifth Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.

(b)    Notice to Stockholders. Whenever under applicable law, the Certificate of Incorporation or these Bylaws notice is required to be given to any stockholder, such notice may be given (i) in writing and sent either by hand delivery, through the United States mail, or by a nationally recognized overnight delivery service for next day delivery, or (ii) by means of a form of electronic transmission consented to by the stockholder, to the extent permitted by, and subject to the conditions set forth in, Section 232 of the DGCL. A notice to a stockholder shall be deemed given as follows:  (i) if given by hand delivery, when actually received by the stockholder, (ii) if sent through the United States mail with postage and fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation, on the earlier of confirmed receipt or the fifth Business Day following the date of mailing, (iii) if sent for next day delivery by a nationally recognized overnight delivery service with fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation, on the first Business Day following the date of dispatch, and (iv) if given by a form of electronic transmission consented to by the stockholder to whom the notice is given and otherwise meeting the requirements set forth above, (A) if by facsimile transmission, when directed to a number at which the stockholder has consented to receive notice, (B) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice, (C) if by a posting on an electronic network together with separate notice to the stockholder of such specified posting, upon the later of (1) such posting and (2) the giving of such separate notice, and (D) if by any other form of electronic transmission, when directed to the stockholder. A stockholder may revoke such stockholder's consent to receiving notice by means of electronic communication by giving written notice of such revocation to the Corporation. Any such consent shall be deemed revoked if (1) the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent and (2) such inability becomes known to the Secretary or an Assistant Secretary or to the Corporation's transfer agent, or other person

18

responsible for the giving of notice; provided, however, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

(c)     Electronic Transmission. "*Electronic transmission*" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process, including but not limited to transmission by telex, facsimile telecommunication, electronic mail, telegram and cablegram.

(d)     Notice to Stockholders Sharing Same Address. Without limiting the manner by which notice otherwise may be given effectively by the Corporation to stockholders, any notice to stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these Bylaws shall be effective if given by a single written notice to stockholders who share an address if consented to by the stockholders at that address to whom such notice is given. A stockholder may revoke such stockholder's consent by delivering written notice of such revocation to the Corporation. Any stockholder who fails to object in writing to the Corporation within 60 days of having been given written notice by the Corporation of its intention to send such a single written notice shall be deemed to have consented to receiving such single written notice.

(e)     Exceptions to Notice Requirements. Whenever notice is required to be given, under the DGCL, the Certificate of Incorporation or these Bylaws, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting which shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given. In the event that the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

Whenever notice is required to be given by the Corporation, under any provision of the DGCL, the Certificate of Incorporation or these Bylaws, to any stockholder to whom (1) notice of two consecutive annual meetings of stockholders and all notices of stockholder meetings or of the taking of action by written consent of stockholders without a meeting to such stockholder during the period between such two consecutive annual meetings, or (2) all, and at least two payments (if sent by first-class mail) of dividends or interest on securities during a 12-month period, have been mailed addressed to such stockholder at such stockholder's address as shown on the records of the Corporation and have been returned undeliverable, the giving of such notice to such stockholder shall not be required. Any action or meeting which shall be taken or held without notice to such stockholder shall have the same force and effect as if such notice had been duly given. If any such stockholder shall deliver to the Corporation a written notice setting forth such stockholder's then current address, the requirement that notice be given to such stockholder shall be reinstated. In the event that the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate

19

need not state that notice was not given to persons to whom notice was not required to be given pursuant to Section 230(b) of the DGCL. The exception in subsection (1) of the first sentence of this paragraph to the requirement that notice be given shall not be applicable to any notice returned as undeliverable if the notice was given by electronic transmission.

**Section 9.4.    Waiver of Notice**.  Whenever any notice is required to be given under applicable law, the Certificate of Incorporation, or these Bylaws, a written waiver of such notice, signed before or after the date of such meeting by the person or persons entitled to said notice, or a waiver by electronic transmission by the person entitled to said notice, shall be deemed equivalent to such required notice.  All such waivers shall be kept with the books of the Corporation. Attendance at a meeting shall constitute a waiver of notice of such meeting, except where a person attends for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

**Section 9.5.    Meeting Attendance via Remote Communication Equipment**.

(a)    Stockholder Meetings.  If authorized by the Board in its sole discretion, and subject to such guidelines and procedures as the Board may adopt, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication:

(i)    participate in a meeting of stockholders; and

(ii)    be deemed present in person and vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (A) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (B) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (C) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such votes or other action shall be maintained by the Corporation.

(b)    Board Meetings.  Unless otherwise restricted by applicable law, the Certificate of Incorporation, or these Bylaws, members of the Board or any committee thereof may participate in a meeting of the Board or any committee thereof by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other.  Such participation in a meeting shall constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

**Section 9.6.    Dividends**.    The Board may from time to time declare, and the Corporation may pay, dividends (payable in cash, property or shares of the capital stock of the

20

Corporation) on the Corporation's outstanding shares of capital stock, subject to applicable law and the Certificate of Incorporation.

**Section 9.7.    Reserves**. The Board may set apart out of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve.

**Section 9.8.    Contracts and Negotiable Instruments**. Except as otherwise provided by applicable law, the Certificate of Incorporation or these Bylaws, any contract, bond, deed, lease, mortgage or other instrument may be executed and delivered in the name and on behalf of the Corporation by such officer or officers or other employee or employees of the Corporation as the Board may from time to time authorize. Such authority may be general or confined to specific instances as the Board may determine. The Chairman, the Chief Executive Officer, the President or any Vice President may execute and deliver any contract, bond, deed, lease, mortgage or other instrument in the name and on behalf of the Corporation. Subject to any restrictions imposed by the Board, the Chairman, Chief Executive Officer, President or any Vice President may delegate powers to execute and deliver any contract, bond, deed, lease, mortgage or other instrument in the name and on behalf of the Corporation to other officers or employees of the Corporation under such person's supervision and authority, it being understood, however, that any such delegation of power shall not relieve such officer of responsibility with respect to the exercise of such delegated power.

**Section 9.9.    Fiscal Year**. The fiscal year of the Corporation shall be fixed by the Board.

**Section 9.10.    Seal**. The Board may adopt a corporate seal which shall be in such form as the Board determines. The seal may be used by causing it or a facsimile thereof to be impressed, affixed or otherwise reproduced.

**Section 9.11.    Books and Records**. The books and records of the Corporation may be kept within or outside the State of Delaware at such place or places as may from time to time be designated by the Board.

**Section 9.12.    Resignation**. Any Director, committee member or officer may resign by giving notice thereof in writing or by electronic transmission to the Chairman, the President or the Secretary. The resignation shall take effect at the time specified therein, or at the time of receipt of such notice if no time is specified or the specified time is earlier than the time of such receipt. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**Section 9.13.    Surety Bonds**. Such officers, employees and agents of the Corporation (if any) as the Chairman, Chief Executive Officer, President or the Board may direct, from time to time, shall be bonded for the faithful performance of their duties and for the restoration to the Corporation, in case of their death, resignation, retirement, disqualification or removal from office, of all books, papers, vouchers, money and other property of whatever kind in their possession or under their control belonging to the Corporation, in such amounts and by such surety companies as the Chairman, Chief Executive Officer, President or the Board may

21

determine.  The premiums on such bonds shall be paid by the Corporation and the bonds so furnished shall be in the custody of the Secretary.

**Section 9.14.  Securities of Other Corporations**.  Powers of attorney, proxies, waivers of notice of meeting, consents in writing and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the Chairman, Chief Executive Officer, President or any Vice President.  Any such officer may, in the name of and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation in which the Corporation may own securities, or to consent in writing, in the name of the Corporation as such holder, to any action by such corporation, and at any such meeting or with respect to any such consent shall possess and may exercise any and all rights and power incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed.  The Board may from time to time confer like powers upon any other person or persons.

**Section 9.15.  Amendments**.  The Board shall have the power to adopt, amend, alter or repeal the Bylaws.  The Bylaws also may be adopted, amended, altered or repealed by the stockholders.

**Exhibit 3**

**FORM OF**

**WARRANT**

---

**MRS. FIELDS' ORIGINAL COOKIES, INC.**

**Warrant for the Purchase of Common Stock**

[No. 001]                                    [_____] Common Stock

FOR VALUE RECEIVED, MRS. FIELDS' ORIGINAL COOKIES, INC. (the "*Company*"), a corporation organized under the laws of the State of Delaware, hereby certifies that Capricorn Investors III, L.P. (the "*Holder*") is entitled, subject to the provisions of this Warrant, to purchase from the Company, at any time or from time to time during the Exercise Period (as hereinafter defined) an aggregate of [_____][1] fully paid and nonassessable Warrant Shares (as hereinafter defined), at an exercise price per Warrant Share equal to the Exercise Price (as hereinafter defined). The aggregate number of Warrant Shares to be received upon the exercise of this Warrant and the Exercise Price are subject to adjustment from time to time as hereinafter set forth.

Section 1. <u>Definitions</u>. Unless otherwise defined herein, capitalized terms shall have the meaning ascribed to them in the Stockholders Agreement. The following additional terms, as used herein, have the following respective meanings:

---

[1] Number of shares such that 12.5% ownership position received by Capricorn at Effective Date plus Warrant Shares equals 30% of the Fully Diluted Common Stock of the Company as of the Effective Date.

1

"*Additional Shares*" means Common Stock other than Common Stock issued upon the exercise of any Warrant.

"*Affiliate*" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.

"*Appraiser*" means an investment banking firm of recognized international standing.

"*Common Stock*" means the authorized shares of common stock, par value $0.01 per share, of the Company, and any shares into which such Common Stock may thereafter be converted or changed.

"*Convertible Securities*" means, to the extent exercisable or convertible during the Exercise Period, any rights to subscribe for, or any rights or options to purchase, Common Stock, or any shares or other securities convertible into or exchangeable for Common Stock.

"*Current Market Price*" means for Common Stock the current market price of such Common Stock as determined in accordance with Section 7(c).

"*Exercise Period*" means the period from and including the Issuance Date to and including 5:00 p.m. (New York City time) on the second anniversary of the Issuance Date.

"*Exercise Price*" means, with respect to any Warrant Share, $[___]² (the "Initial Sum") plus interest on the Initial Sum at a rate of 10.47% compounded semi-annually from the Issuance Date to the date of exercise with respect to such Warrant Share (as adjusted as set forth herein).

"*Fully Diluted Common Stock*" means, at any time, the then outstanding Common Stock plus (without duplication) all Common Stock issuable, whether at such time or upon the passage of time or the occurrence of future events, upon the exercise, conversion or exchange of all then-outstanding rights, warrants, options, convertible securities or exchangeable securities or indebtedness, or other rights exercisable for or convertible or exchangeable into, directly or indirectly, Common Stock, and securities convertible or exchangeable into Common Stock, whether at the time of issuance or upon the passage of time or the occurrence of some future event.

"*Issuance Date*" means _____, 2008.

"*Permitted Transferee*" means, with respect to the Holder, (i) any Affiliate of the Holder, (ii) a donee of Shares who is a member of the family of the Holder or any trust for the

---

² The sum of (I) (A) the principal amount plus accrued and unpaid interest outstanding on the Old Notes at the Effective Date before giving effect to the Restructuring Transactions, minus (B) $140 million divided by (II) 18.875%, divided by (III) the aggregate number of Warrant Shares initially issuable upon exercise of the Warrants.

2

benefit of any such family member, (iii) a transferee of Warrant Shares who receives such Warrant Shares by will or the laws of descent and distribution, (iv) any general partner of the Holder or (v) any limited partner of the Holder listed on Schedule 1.1 hereto, provided, however, that any Permitted Transferee that receives Warrant Shares pursuant to this clause (v) of this definition shall be prohibited from making further transfers pursuant to clauses (i) or (iv) of this definition. For purposes of this definition, the word "family" shall include any spouse, lineal ancestor or descendant, brother or sister.

"**Person**" means an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, syndicate, person, trust, association, organization or other entity, including any governmental authority, and including any successor, by merger or otherwise, of any of the foregoing.

"**Stockholders Agreement**" means the Stockholders Agreement, dated as of _____, between the Company , the stockholders of the Company signatory thereto and the Holder.

"**Transfer**" means, with respect to this Warrant, any sale, assignment, hypothecation, lien, encumbrance, transfer, distribution or other disposition thereof or of a participation therein, or other conveyance of legal or beneficial interest therein, whether voluntarily or by operation of law, or any agreement or commitment to do any of the foregoing.

"**Warrant Shares**" means the Common Stock of the Company deliverable upon exercise of this Warrant, as adjusted from time to time.

Section 2. Exercise of Warrant. This Warrant may be exercised in whole or in part, at any time or from time to time, during the Exercise Period, by presentation and surrender hereof to the Company at its principal office at the address set forth on the signature page hereof (or at such other address as the Company may hereafter notify the Holders in writing), with the Purchase Form annexed hereto duly executed and accompanied by proper payment of that portion of the Exercise Price represented by the number of Warrant Shares specified in such form being exercised. Such payment may be made, at the option of the Holder, (a) by cash, certified or bank cashier's check or wire transfer in an amount equal to the product of (i) the Exercise Price times (ii) the number of Warrant Shares as to which this Warrant is being exercised or (b) by receiving from the Company the number of Warrant Shares equal to (i) the number of Warrant Shares as to which this Warrant is being exercised minus (ii) the number of Warrant Shares having a value, based on the Current Market Price on the trading day immediately prior to the date of such exercise, equal to the product of (x) the Exercise Price times (y) the number of Warrant Shares as to which this Warrant is being exercised. If this Warrant should be exercised in part only, the Company shall, upon surrender of this Warrant, execute and deliver a new Warrant evidencing the rights of the Holder to purchase the balance of the Warrant Shares purchasable hereunder. Upon receipt by the Company of this Warrant and such Purchase Form, together with the applicable portion of the Exercise Price, at such office, in proper form for exercise, the Holder shall be deemed to be the holder of record of the Warrant Shares, notwithstanding that the share register of the Company shall then be closed or that certificates representing such Warrant Shares shall not then be actually delivered to the Holder.

3

The Company shall pay any and all documentary, stamp or similar issue taxes payable in respect of the issue of the Warrant Shares.

Section 3.   Due Authorization; Reservation of Shares.

(a)   The Company represents and warrants that this Warrant has been duly authorized, executed and delivered by the Company and is a valid and binding agreement of the Company and entitles the Holder hereof or its Permitted Transferees to purchase Warrant Shares upon payment to the Company of the Exercise Price applicable to such Warrant Shares. The Company hereby agrees that at all times after the Issuance Date there shall be reserved for issuance and delivery by the Company, upon exercise of this Warrant, shares of Common Stock of the Company from time to time issuable or deliverable upon exercise of this Warrant. All such Warrant Shares shall be duly authorized (and, if newly-issued, when issued upon such exercise), shall be validly issued, fully paid and nonassessable, free and clear of all liens, security interests, charges and other encumbrances or restrictions on sale and free and clear of all preemptive rights, other than those arising under the Stockholders Agreement.

(b)   The Company represents and warrants that the execution and delivery by it of this Warrant does not require any action by or in respect of, or filing with, any U.S. or foreign governmental body, agency or official and do not contravene or constitute a default under or violation of (i) any provision of applicable law or regulation or (ii) the certificate of incorporation or by-laws of the Company, or any material agreement, judgment, injunction, order, decree or other instrument binding upon the Company.

Section 4.   Fractional Shares.   The Company may issue fractional shares, as appropriate, upon the exercise of this Warrant.

Section 5.   Exchange, Transfer, Assignment or Loss of Warrant.   Subject to Section 10 hereof, this Warrant is exchangeable, without expense, at the option of the Holder, upon presentation and surrender hereof to the Company for other Warrants of different denominations, entitling the Holder or Holders thereof to purchase in the aggregate the same number of Warrant Shares.   Upon surrender of this Warrant to the Company, with the Assignment Form annexed hereto duly executed and funds sufficient to pay any transfer tax, the Company shall, without charge, execute and deliver a new Warrant or Warrants in the name in such instrument of assignment or transfer and, if the Holder's entire interest is not being assigned or transferred, in the name of the Holder, and this Warrant shall promptly be cancelled. This Warrant may be divided or combined with other Warrants that carry the same rights upon presentation hereof at the office of the Company, together with a written notice specifying the names and denominations in which new Warrants are to be issued and signed by the Holder hereof. The term *"Warrant"* as used herein includes any Warrants into which this Warrant may be divided or for which it may be exchanged. Upon receipt by the Company of (i) evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Warrant, (ii) satisfactory security against loss by bond or otherwise and (iii) upon surrender and cancellation of this Warrant, if mutilated, the Company shall execute and deliver a new Warrant of like tenor and date.

4

Section 6. <u>Rights of the Holder</u>. The Holder shall not, by virtue hereof, be entitled to any rights of a stockholder of the Company, either at law or equity, and the rights of the Holder are limited to those expressed in this Warrant and the Stockholders Agreement.

Section 7. <u>Anti-dilution Provisions and Other Adjustments; Purchase Right</u>. The number of Warrant Shares which may be purchased upon the exercise hereof shall be subject to change or adjustment as follows:

(a) <u>Stock Dividends, Splits, Combinations, Subdivision, Consolidation Reclassifications, etc.</u> If the Company at any time (i) shall declare a dividend or make a distribution on its Common Stock payable in shares in its capital stock (whether shares of Common Stock or of shares of any other class), (ii) shall subdivide shares of its Common Stock into a greater number of shares, (iii) shall combine or have combined or effect a consolidation of its outstanding Common Stock into a smaller number of shares or (iv) shall issue by reclassification of its Common Stock (including any such reclassification in connection with a consolidation or merger in which the Company is the continuing company), other securities of the Company, the Holder shall be entitled to purchase the aggregate number and kind of shares in the share capital of the Company and other securities which, if the Warrant had been exercised immediately prior to such event, such Holder would have owned upon such exercise and been entitled to receive by virtue of such dividend, distribution, subdivision, combination, consolidation or reclassification. Such adjustment shall be made successively whenever any event listed above shall occur.

(b) <u>Additional Issuances</u>. Except for the issuance of options or warrants to employees, consultants or managers of the Company pursuant to the Management Incentive Plan, if the Company at any time shall issue any Additional Shares or any Convertible Securities (excluding any such issuance for which the number of Warrant Shares purchasable hereunder shall have been adjusted pursuant to subsection (a) of this <u>Section 7</u>) (the "***Additional Securities***") which are exercisable or convertible for Additional Shares without consideration or for consideration per share less than the Fair Market Value (defined below) for such Additional Securities, then the Exercise Price shall forthwith be lowered to a price equal to the product of (i) the difference between the issue price and the Fair Market Value of the Additional Shares times (ii) the quotient of (A) the aggregate number of Additional Shares so issued or issuable over (B) the number of shares of Common Stock outstanding immediately prior to the issuance of such Additional Shares or Convertible Securities. For purposes of this Section 7(b), the "Fair Market Value" means the value of the Additional Securities as determined by the Board of Directors of the Company in good faith.

(c) <u>Distribution of Evidences of Indebtedness or Assets</u>. If the Company at any time shall fix a record date for the making of a distribution or dividend to all holders of its Common Stock (including any such distribution to be made in connection with a consolidation or merger in which the Company is to be the continuing company) of evidences of its indebtedness or assets (excluding cash distributions or dividends and dividends paid in or distributions of capital stock of the Company for which the number of Warrant Shares purchasable hereunder shall have been adjusted pursuant to subsection (a) of this <u>Section 7</u>) the Exercise Price after such record date shall be determined by decreasing the Exercise Price in effect hereunder immediately prior to such record date by the fair market value (as determined in the good faith,

5

reasonable judgment of the Board of Directors of the Company and described in a statement mailed by certified mail to the Holder) of the portion of the assets or evidences of indebtedness so to be distributed to a holder of one share of Common Stock. Such adjustment shall become effective immediately after such record date. Such adjustment shall be made whenever such a record date is fixed; and in the event that such distribution is not so made, the Exercise Price shall again be adjusted to be the Exercise price that was in effect immediately prior to such record date.

(d)     Determination of Market Price. For the purpose of any computation under Section 2, Section 4 or subsection (b) of this Section 7, absent agreement between the Company and the Holder, the Current Market Price per share of Common Stock on any record date shall be determined in the following manner:

(i)  If the Common Stock is traded in the public markets, the Current Market Price per share of Common Stock shall be equal to the average price of the Common Stock for the five-day trading period immediately preceding the date on which such valuation is required; or

(ii)     If the Common Stock is not traded in the public markets, the Current Market Price per share of Common Stock shall be the average of the prices determined by an Appraiser engaged for such purpose by the Holder, at its own expense, and an Appraiser engaged for such purpose by the Company, at its own expense, provided that the difference between such prices is less than 10%. If the difference between such prices is equal to or greater than 10%, the Company and the Holder will instruct the Appraisers to jointly designate a third Appraiser, which such third Appraiser shall determine the Current Market Price by selecting either the price determined by the Appraiser selected by the Holder or the price determined by the Appraiser selected by the Company. In the determination of such Current Market Price, the Holder and the Company will take all actions reasonably necessary to facilitate such determination and the Company shall provide reasonable access to each of the Appraisers to the books and records of the Company so as to allow such Appraisers to conduct due diligence examinations in scope and duration as are customary in valuations of this kind. All expenses of the third Appraiser shall be paid by the party whose Appraiser's price determination is not selected by the third Appraiser.

(e)     Shares Other Than Common Stock. In the event that at any time, as a result of an adjustment made pursuant to subsection (a) of this Section 7, the Holder shall become entitled to receive any shares of capital stock of the Company other than Common Stock, thereafter the number of such other shares so receivable upon exercise of this Warrant shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions with respect to the Common Stock contained in this Section 7, and the provisions of this Warrant with respect to the Common Stock shall apply on like terms to any such other shares.

6

(f)    Notice of Certain Actions.  In the event that at any time:

(i)    the Company shall authorize the distribution to all holders of its Common Stock of evidences of its indebtedness or assets (including cash distributions or dividends but excluding dividends paid in or distributions of the Company, share capital for which the number of Warrant Shares purchasable hereunder shall have been adjusted pursuant to subsection (a) of this Section 7); or

(ii)    the Company shall authorize any capital reorganization or reclassification of the Common Stock (other than a subdivision, consolidation or combination of the outstanding Common Stock and other than a change in par value of the Common Stock) or of any consolidation, amalgamation or merger to which the Company is a party, or of the conveyance or transfer of the properties and assets of the Company substantially as an entirety; or

(iii)    there shall be a voluntary or involuntary dissolution, liquidation or winding-up of the Company;

then the Company shall or shall cause to be mailed by certified mail to the Holder, at least 10 days prior to the applicable record or effective date hereinafter specified, a notice describing such issuance, distribution, reorganization, reclassification, consolidation, merger, conveyance, transfer, dissolution, liquidation, winding-up or other action and stating (x) the date as of which the holders of Common Stock of record entitled to receive any such Convertible Securities or distributions are to be determined or (y) the date on which any such consolidation, amalgamation, merger, conveyance, transfer, dissolution, liquidation or winding-up is expected to become effective and the date as of which it is expected that holders of Common Stock of record shall be entitled to exchange or convert their shares of Common Stock for securities or other property, if any, deliverable upon such reorganization, reclassification, consolidation, merger, amalgamation, conveyance, transfer, dissolution, liquidation or winding-up.

(g)    Common Stock Defined.  Whenever reference is made in this Section 7 to the issue of shares of Common Stock, the term "*Common Stock*" shall include any equity securities of any class of the Company hereinafter authorized which shall not be limited to a fixed or determinable amount in respect of the right of the holders thereof to participate in dividends or distributions of assets upon the voluntary or involuntary liquidation, dissolution or winding up of the Company.  However, subject to the provisions of Section 9 hereof, shares issuable upon exercise hereof shall include only Warrant Shares as of the Issuance Date or shares of any class or classes resulting from any reclassification or reclassifications thereof or as a result of any corporate reorganization as provided for in Section 9 hereof.

Section 8.  Officers' Certificate.  Whenever the number of Warrant Shares purchasable hereunder or Exercise Price shall be adjusted as required by the provisions of Section 7, the Company shall forthwith file in the custody of its Secretary or an Assistant Secretary at its principal office an officers' certificate showing the adjusted number of Warrant Shares purchasable hereunder and the Exercise Price determined as herein provided, setting forth in reasonable detail the facts requiring such adjustment and the manner of computing such adjustment.  Each such officers' certificate shall be signed by the chairman, president or chief

7

financial officer of the Company and by the secretary or any assistant secretary of the Company. Each such officers' certificate shall be made available at all reasonable times for inspection by the Holder and the Company shall, forthwith after each such adjustment, mail a copy, by certified mail, of such certificate to the Holder at the address provided to the Company by the Holder.

Section 9.    Reclassification, Reorganization, Consolidation or Merger. In case of any Reorganization Transaction (as hereinafter defined), the Company shall, as a condition precedent to such transaction, cause effective provisions to be made so that the Holder shall have the right thereafter, by exercising this Warrant, to purchase the kind and amount of shares and other securities and property receivable upon such Reorganization Transaction by a holder of the number of shares of Common Stock that might have been received upon exercise of this Warrant immediately prior to such Reorganization Transaction. Any such provision shall include provision for adjustments in respect of such shares and other securities and property that shall be as nearly equivalent as may be practicable to the adjustments provided for in this Warrant. The foregoing provisions of this Section 9 shall similarly apply to successive Reorganization Transactions. For purposes of this Section 9, "**Reorganization Transaction**" shall mean (excluding any transaction covered by Section 7) any reclassification, capital reorganization or other change of outstanding Common Stock of the Company (other than a subdivision or combination of the outstanding Common Stock and other than a change in the par value of the Common Stock) or any consolidation, amalgamation or merger of the Company with or into another corporation (other than a merger with a subsidiary in which merger the Company is the continuing company and that does not result in any reclassification, capital reorganization or other change of outstanding shares of Common Stock of the class issuable upon exercise of this Warrant) or any sale, lease, transfer or conveyance to another corporation of all or substantially all of the assets of the Company.

Section 10.    Transfer Restrictions. The Holder shall not, directly or indirectly, Transfer this Warrant, other than a Transfer to a Permitted Transferee.

Section 11.    Waiver of Jury Trial. EACH OF THE COMPANY AND THE HOLDER HEREBY AGREES TO WAIVE ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THE ISSUANCE PURCHASE AGREEMENT, THIS WARRANT, ANY DEALINGS RELATING TO THE SUBJECT MATTER THEREOF, THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR THE RELATIONSHIP THAT IS BEING ESTABLISHED HEREUNDER OR THEREUNDER. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including, without limitation, contract claims, tort claims, breach of duty claims and all other common law and statutory claims. Each of the Company and the Holder acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this Warrant, and that each will continue to rely on this waiver in their related future dealings. Each of the Company and the Holder further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A WRITTEN WAIVER SPECIFICALLY REFERRING TO

THIS SECTION 11 AND EXECUTED BY EACH OF THE COMPANY AND THE HOLDER), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS WARRANT OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATED THERETO. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

Section 12.     Availability of Information. The Company shall make available to the Holder any and all information, and provide access to any and all information, that is provided or made available to stockholders of the Company pursuant to the Stockholders Agreement.

Section 13.     Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

Section 14.     Governing Law. This Warrant and the rights and obligations of the parties hereunder shall be construed in accordance with and governed by the laws of the State of Delaware without regard to principles of conflicts of laws.

9

**IN WITNESS WHEREOF,** the Company has duly caused this Warrant to be executed by and attested by their duly authorized officers and to be dated as of _____, 2008.

**MRS. FIELDS' ORIGINAL COOKIES, INC.**

By: _____
Name: _____
Title: _____

Address:_____
Attention:_____
Fax: _____

10

Schedule 1.1

HOLDER LIMITED PARTNERS

## PURCHASE FORM

Dated _____, _____

The undersigned hereby irrevocably elects to exercise the within Warrant to the extent of purchasing _____ shares of Common Stock and hereby makes payment of _____ in payment of the exercise price thereof.

## INSTRUCTIONS FOR REGISTRATION OF STOCK

Name_____
(please typewrite or print in block letters)

Address_____

Signature_____

## ASSIGNMENT FORM

FOR VALUE RECEIVED, _____ hereby sells, assigns and transfers unto

Name_____

(please typewrite or print in block letters)

Address_____

its right to purchase _____ shares of Common Stock represented by this Warrant and does hereby irrevocably constitute and appoint _____ Attorney, to transfer the same on the books of the Company, with full power of substitution in the premises.

Date_____, _____

Signature_____

**Exhibit 4**

**INDENTURE,**

dated as of _____, 2008,

among

**MRS. FIELDS FAMOUS BRANDS, LLC**

and

**MRS. FIELDS FINANCING COMPANY, INC.,**

as Issuers,

**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**

as Trustee,

and

**THE GUARANTORS NAMED HEREIN,**

as Guarantors

**10% Senior Secured Notes due 2014**

## CROSS-REFERENCE TABLE

| TIA Section | Indenture Section |
|---|---|
| 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | 7.10 |
| (a)(4) | N.A. |
| (a)(5) | 7.10 |
| (b) | 7.03; 7.08; 7.10 |
| (c) | N.A. |
| 311(a) | 7.03; 7.11 |
| (b) | 7.03; 7.11 |
| 312(a) | 2.06 |
| (b) | 7.07; 11.03 |
| (c) | 11.03 |
| 313(a) | 7.06 |
| (b) | 7.06 |
| (c) | 7.06 |
| (d) | 7.06 |
| 314(a) | 4.06; 4.23 |
| (b) | 12.02 |
| (c)(1) | 4.06; 11.04 |
| (c)(2) | 11.04 |
| (c)(3) | 4.06 |
| (d) | 12.03 |
| (e) | 11.05 |
| (f) | N.A. |
| 315(a) | 7.01(b) |
| (b) | 7.05 |
| (c) | 7.01(a) |
| (d) | 7.01(c) |
| (e) | 6.11 |
| 316(a)(last sentence) | 2.10 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| (c) | 9.04 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.05 |
| 318(a) | 11.01 |
| (b) | N.A. |
| (c) | 11.01 |

N.A. means Not Applicable

NOTE:  This Cross-Reference Table shall not, for any purpose, be deemed to be a part of this Indenture.

## TABLE OF CONTENTS

**Page**

### ARTICLE ONE
### DEFINITIONS AND INCORPORATION BY REFERENCE

| | | |
|---|---|---|
| SECTION 1.01. | Definitions | 1 |
| SECTION 1.02. | Incorporation by Reference of Trust Indenture Act | 32 |
| SECTION 1.03. | Rules of Construction | 33 |

### ARTICLE TWO
### THE NOTES

| | | |
|---|---|---|
| SECTION 2.01. | Form and Dating | 34 |
| SECTION 2.02. | Title and Terms | 34 |
| SECTION 2.03. | Execution and Authentication | 35 |
| SECTION 2.04. | Registrar and Paying Agent | 36 |
| SECTION 2.05. | Obligations of Paying Agent | 36 |
| SECTION 2.06. | Holder Lists | 37 |
| SECTION 2.07. | Transfer and Exchange | 37 |
| SECTION 2.08. | Replacement Notes | 38 |
| SECTION 2.09. | Outstanding Notes | 38 |
| SECTION 2.10. | Treasury Notes; When Notes Are Disregarded | 38 |
| SECTION 2.11. | Temporary Notes | 39 |
| SECTION 2.12. | Cancellation | 39 |
| SECTION 2.13. | CUSIP Numbers | 39 |
| SECTION 2.14. | Deposit of Moneys | 39 |
| SECTION 2.15. | Book-Entry Provisions for Global Notes | 40 |
| SECTION 2.16. | Transfers of Global Notes and Physical Notes | 41 |
| SECTION 2.17. | Payment of Interest; Interest Rights; Preserved | 41 |
| SECTION 2.18. | Computation of Interest | 42 |
| SECTION 2.19. | Additional Notes | 42 |

### ARTICLE THREE
### REDEMPTION AND PREPAYMENT

| | | |
|---|---|---|
| SECTION 3.01. | Optional Redemption | 43 |
| SECTION 3.02. | Selection of Notes to be Redeemed | 43 |
| SECTION 3.03. | Notice of Redemption | 43 |
| SECTION 3.04. | Effect of Notice of Redemption | 44 |
| SECTION 3.05. | Deposit of Redemption Price | 45 |
| SECTION 3.06. | Notes Redeemed in Part | 45 |
| SECTION 3.07. | Mandatory Prepayment | 45 |

ARTICLE FOUR
COVENANTS

SECTION 4.01.    Payment of Notes ................................................................................. 46
SECTION 4.02.    Maintenance of Office or Agency .................................................... 46
SECTION 4.03.    Corporate Existence ............................................................................ 46
SECTION 4.04.    Payment of Taxes and Other Claims ............................................. 47
SECTION 4.05.    Maintenance of Properties and Insurance .................................... 47
SECTION 4.06.    Compliance Certificate; Notice of Default .................................... 47
SECTION 4.07.    Waiver of Stay, Extension or Usury Laws ..................................... 48
SECTION 4.08.    Limitation on Incurrence of Additional Indebtedness .............. 48
SECTION 4.09.    Limitation on Sale and Leaseback Transactions .......................... 49
SECTION 4.10.    Limitation on Restricted Payments ................................................ 49
SECTION 4.11.    Repurchase Upon Change of Control ............................................ 52
SECTION 4.12.    [Reserved] .............................................................................................. 54
SECTION 4.13.    Limitation on Asset Sales ................................................................. 54
SECTION 4.14.    Limitation on Dividend and Other Payment Restrictions Affecting
                 Restricted Subsidiaries ...................................................................... 57
SECTION 4.15.    Limitation on Issuances and Sales of Capital Stock of Subsidiaries ............. 59
SECTION 4.16.    Limitation on Liens ............................................................................ 60
SECTION 4.17.    Limitations on Transactions with Affiliates ................................. 60
SECTION 4.18.    Additional Subsidiary Guarantees ................................................. 62
SECTION 4.19.    Impairment of Security Interest ...................................................... 63
SECTION 4.20.    Real Estate Mortgages and Recordings ......................................... 63
SECTION 4.21.    Conduct of Business ........................................................................... 64
SECTION 4.22.    Activities of MFFC ............................................................................. 64
SECTION 4.23.    Reports to Holders .............................................................................. 64
SECTION 4.24.    Payments for Consent ........................................................................ 67

ARTICLE FIVE
SUCCESSOR CORPORATION

SECTION 5.01.    Merger, Consolidation and Sale of Assets ..................................... 67
SECTION 5.02.    Successor Entity Substituted ............................................................ 69

ARTICLE SIX
DEFAULT AND REMEDIES

SECTION 6.01.    Events of Default ................................................................................ 70
SECTION 6.02.    Acceleration ......................................................................................... 72
SECTION 6.03.    Other Remedies ................................................................................... 73
SECTION 6.04.    Waiver of Past Defaults ..................................................................... 73
SECTION 6.05.    Control by Majority ............................................................................ 73
SECTION 6.06.    Limitation on Suits ............................................................................. 73
SECTION 6.07.    Rights of Holders to Receive Payment .......................................... 74
SECTION 6.08.    Collection Suit by Trustee ................................................................. 74
SECTION 6.09.    Trustee May File Proofs of Claim ................................................... 74

iv

SECTION 6.10.   Priorities .................................................................................................75
SECTION 6.11.   Undertaking for Costs ...............................................................................75
SECTION 6.12.   Restoration of Rights and Remedies...........................................................76
SECTION 6.13.   Rights and Remedies Cumulative ...............................................................76
SECTION 6.14.   Delay or Omission Not Waiver ...................................................................76

## ARTICLE SEVEN
### TRUSTEE

SECTION 7.01.   Duties of Trustee .......................................................................................76
SECTION 7.02.   Rights of Trustee .......................................................................................77
SECTION 7.03.   Individual Rights of Trustee........................................................................79
SECTION 7.04.   Trustee's Disclaimer ..................................................................................79
SECTION 7.05.   Notice of Default........................................................................................80
SECTION 7.06.   Reports by Trustee to Holders ....................................................................80
SECTION 7.07.   Compensation and Indemnity .....................................................................80
SECTION 7.08.   Replacement of Trustee..............................................................................81
SECTION 7.09.   Successor Trustee by Merger, Etc ...............................................................82
SECTION 7.10.   Eligibility; Disqualification ........................................................................83
SECTION 7.11.   Preferential Collection of Claims Against Issuers .........................................83
SECTION 7.12.   Trustee as Paying Agent.............................................................................83
SECTION 7.13.   Co-Trustees and Separate Trustees .............................................................83
SECTION 7.14.   Form of Documents Delivered to Trustee.....................................................84

## ARTICLE EIGHT
### SATISFACTION AND DISCHARGE OF INDENTURE

SECTION 8.01.   Legal Defeasance and Covenant Defeasance ................................................85
SECTION 8.02.   Satisfaction and Discharge..........................................................................88
SECTION 8.03.   Survival of Certain Obligations ...................................................................88
SECTION 8.04.   Acknowledgment of Discharge by Trustee....................................................88
SECTION 8.05.   Application of Trust Moneys .......................................................................89
SECTION 8.06.   Repayment to the Issuers; Unclaimed Money ...............................................89
SECTION 8.07.   Reinstatement.............................................................................................90

## ARTICLE NINE
### AMENDMENTS, SUPPLEMENTS AND WAIVERS

SECTION 9.01.   Without Consent of Holders ........................................................................90
SECTION 9.02.   With Consent of Holders..............................................................................91
SECTION 9.03.   Compliance with TIA .................................................................................92
SECTION 9.04.   Revocation and Effect of Consents...............................................................92
SECTION 9.05.   Notation on or Exchange of Notes................................................................93
SECTION 9.06.   Trustee to Sign Amendments, Etc................................................................93
SECTION 9.07.   Conformity with Trust Indenture Act............................................................93

ARTICLE TEN
GUARANTEE

SECTION 10.01.    Guarantee ..................................................................................................94
SECTION 10.02.    Release of a Guarantor. ..............................................................................96
SECTION 10.03.    Limitation of Guarantor's Liability ............................................................96
SECTION 10.04.    Guarantors May Consolidate, etc., on Certain Terms ..................................97
SECTION 10.05.    Contribution ...............................................................................................98
SECTION 10.06.    Evidence of Guarantee................................................................................98
SECTION 10.07.    Waiver of Stay, Extension or Usury Laws ...................................................98

ARTICLE ELEVEN
MISCELLANEOUS

SECTION 11.01.    Trust Indenture Act Controls.......................................................................99
SECTION 11.02.    Notices .......................................................................................................99
SECTION 11.03.    Communications by Holders with Other Holders.......................................100
SECTION 11.04.    Certificate and Opinion as to Conditions Precedent...................................100
SECTION 11.05.    Statements Required in Certificate or Opinion ...........................................101
SECTION 11.06.    Rules by Trustee, Paying Agent, Registrar ................................................101
SECTION 11.07.    Legal Holidays ..........................................................................................101
SECTION 11.08.    Governing Law ..........................................................................................101
SECTION 11.09.    No Adverse Interpretation of Other Agreements ........................................102
SECTION 11.10.    No Recourse Against Others.......................................................................102
SECTION 11.11.    Successors..................................................................................................102
SECTION 11.12.    Duplicate Originals ....................................................................................102
SECTION 11.13.    Severability ...............................................................................................102
SECTION 11.14.    Waiver of Jury Trial ...................................................................................102

ARTICLE TWELVE
SECURITY

SECTION 12.01.    Grant of Liens ...........................................................................................103
SECTION 12.02.    Recording and Opinions ............................................................................104
SECTION 12.03.    Release of Collateral ..................................................................................105
SECTION 12.04.    Disposition of Certain Collateral without Requesting Release....................106
SECTION 12.05.    Specified Releases of Collateral .................................................................107
SECTION 12.06.    Withdrawal of Net Cash Proceeds to Fund a Mandatory Prepayment ........109
SECTION 12.07.    Withdrawal of Net Cash Proceeds to Fund a Net Proceeds Offer ...............109
SECTION 12.08.    Withdrawal of Trust Monies Pursuant to Section 4.13. ...............................109
SECTION 12.09.    Release upon Satisfaction or Defeasance of all Outstanding
                  Obligations................................................................................................110
SECTION 12.10.    Form and Sufficiency of Release ................................................................111
SECTION 12.11.    Senior Secured Facilities............................................................................111
SECTION 12.12.    Purchaser Protected....................................................................................112
SECTION 12.13.    Authorization of Actions to Be Taken by the Trustee Under the
                  Collateral Agreements................................................................................112

vi

SECTION 12.14.  Authorization of Receipt of Funds by the Trustee Under the
Collateral Agreements..................................................................................113

Exhibit A    —    Form of Note.......................................................................................... A-1
Exhibit B    —    Form of Legend for Global Notes...........................................................B-1

NOTE:            This Table of Contents shall not, for any purpose, be deemed to be
part of this Indenture.

INDENTURE, dated as of _____, 2008, among Mrs. Fields Famous Brands, LLC, a Delaware limited liability company (as more fully defined below, the "*Company*"), Mrs. Fields Financing Company, Inc., a Delaware corporation (the "*Co-Issuer*" and, together with the Company, the "*Issuers*"), the Guarantors (as herein defined) and The Bank of New York Mellon Trust Company, N.A., as Trustee (in such capacity, the "*Trustee*").

WITNESSETH:

WHEREAS, the Issuers, the Parent and certain of their Subsidiaries filed for reorganization under Chapters 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"); and

WHEREAS by order, dated _____, 2008, the Bankruptcy Court has confirmed the Company's plan of reorganization (the "Plan") in accordance with Section 1129 of the Bankruptcy Code and such Plan has become effective as of _____, 2008; and

WHEREAS, as part of the Plan, the Company has agreed, inter alia, to issue $_____ aggregate principal amount of 10% Senior Secured Notes due 2014 (the "*Notes*") to holders of the Issuers' existing 11½% Senior Secured Notes due 2011 (the "*11½% Notes*") and 9% Senior Secured Notes due 2011 (the "*9% Notes*" and together with the 11% Notes, the *Existing Notes*"); and

WHEREAS, the Issuers and the Guarantors (with respect to the Guarantees) have duly authorized the creation of the issue of Notes; and, to provide therefor, the Issuers and the Guarantors have duly authorized the execution and delivery of this Indenture; and

WHEREAS, all things necessary to make the Notes (as herein defined) and Guarantees, when each are duly issued and executed by the Issuers and the Guarantors, as applicable, and authenticated and delivered hereunder, the valid obligations of each of the Issuers and the Guarantors, respectively, and to make this Indenture a valid and binding agreement of each of the Issuers and the Guarantors, have been done.

NOW, THEREFORE, each party hereto agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders:

**ARTICLE ONE**
**DEFINITIONS AND INCORPORATION BY REFERENCE**

SECTION 1.01.  *Definitions*.

"*Acceleration Notice*" has the meaning set forth in *Section 6.02*.

"*Acquired Indebtedness*" means Indebtedness of a Person or any of its Subsidiaries existing at the time such Person becomes a Restricted Subsidiary of the Issuers or at the time it merges or consolidates with or into an Issuer or any of their Restricted Subsidiaries or assumed in connection with the acquisition of assets from such Person and in each case not incurred by such Person in connection with, or in anticipation or contemplation of, such Person becoming a

Restricted Subsidiary of the Issuers or such acquisition, merger or consolidation and which Indebtedness is without recourse to the Issuers or any of their Subsidiaries or to any of their respective properties or assets other than the Person or the assets to which such Indebtedness related prior to the time such Person became a Restricted Subsidiary of the Issuers or the time of such acquisition, merger or consolidation.

"*Additional Notes*" has the meaning set forth in *Section 2.02*.

"*Adjusted Net Assets*" of a Guarantor at any date means the amount by which the fair value of the assets and property of such Guarantor exceeds the total amount of liabilities, including, without limitation, contingent liabilities (after giving effect to all other fixed and contingent liabilities incurred or assumed on such date), but excluding liabilities under any Guarantee, of such Guarantor at such date.

"*Affiliate*" means, with respect to any specified Person, any other Person who directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; and the terms "*controlling*" and "*controlled*" have meanings correlative of the foregoing. A Person shall not be deemed an "Affiliate" of the Parent, the Issuers or any of their Restricted Subsidiaries solely as a result of such Person being a joint venture partner of the Parent, the Issuers or any of their Subsidiaries.

"*Affiliate Transaction*" has the meaning set forth in *Section 4.17*.

"*Agent*" means any Registrar, Paying Agent or co-Registrar.

"*Agent Members*" has the meaning set forth in *Section 2.15* and means, with respect to DTC, Euroclear or Clearstream, a Person who has an account with DTC, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"*Applicable Procedures*" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of DTC, Euroclear and Clearstream that apply to such transfer or exchange.

"*Asset Acquisition*" means (1) an Investment by the Parent or any Restricted Subsidiary of the Parent in any other Person pursuant to which such Person shall become a Restricted Subsidiary of the Parent, the Issuers or any Restricted Subsidiary of the Issuers, or shall be merged with or into an Issuer or any Restricted Subsidiary of the Parent and/or the Issuers, or (2) the acquisition by an Issuer or any Restricted Subsidiary of the Issuers of the assets of any Person (other than a Restricted Subsidiary of the Issuers) which constitute all or substantially all of the assets of such Person or comprise any division or line of business of such Person or any other properties or assets of such Person other than in the ordinary course of business.

"*Asset Sale*" means any direct or indirect sale, issuance, conveyance, transfer, lease (other than operating leases entered into in the ordinary course of business), assignment or other transfer for value by (x) the Parent, the Issuers or any of their respective Restricted Subsidiaries

2

(including any Sale and Leaseback Transaction) to any Person other than the Issuers or a Guarantor or (y) a Foreign Restricted Subsidiary to the Issuers or a Wholly-Owned Subsidiary of the Issuers of:

      (1)    any Capital Stock of any Restricted Subsidiary of the Issuers or the Parent (other than any issuance pursuant to *clause (2)* or *(3)* of *Section 4.15*); or

      (2)    any other property or assets of the Parent, the Issuers or any Restricted Subsidiary of the Company or the Parent;

*provided, however*, that asset sales or other dispositions shall not include:

      (a)    a transaction or series of related transactions for which the Parent or its Restricted Subsidiaries receive aggregate consideration of less than $1.5 million;

      (b)    the sale, lease, conveyance, disposition or other transfer of all or substantially all of the assets (determined on a consolidated basis) of the Issuers as permitted under *Section 5.01*;

      (c)    a transfer of assets between or among the Parent, the Issuers and their respective Restricted Subsidiaries;

      (d)    an issuance of Equity Interests by a Restricted Subsidiary of the Company to the Company or to a Restricted Subsidiary of the Company, or by a Restricted Subsidiary or the Parent which is not also a Restricted Subsidiary of the Company to the Parent;

      (e)    any Restricted Payment permitted by *Section 4.10* and transfer made in compliance with *Section 4.10*;

      (f)    sales or other dispositions of inventory, products, services, accounts receivable or other current assets in the ordinary course of business;

      (g)    the granting of a Permitted Lien and the exercise by any Person in whose favor a Permitted Lien is granted of any of its rights in respect of that Permitted Lien;

      (h)    the sale or other disposition of cash and Cash Equivalents;

      (i)    the consummation of a Permitted Investment;

      (j)    the sale, disposal, replacement or abandonment of used, worn out, obsolete or surplus equipment or other property or assets that are no longer used or useful in the business of the Parent, the Issuers or their respective Restricted Subsidiaries (including, without limitation, the dissolution of any Subsidiary of the Issuers to the extent permitted pursuant to this Indenture);

3

(k)    the sale or discount, in each case without recourse, of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof;

(l)    the good faith surrender or waiver of contract rights or the settlement, release or surrender of claims of any kind;

(m)    the sale or other disposal of property or assets pursuant to the exercise of any remedies pursuant to any agreements or other security documents relating to any Indebtedness permitted under this Indenture; and

(n)    the licensing or grant of rights or interests in intellectual property in the ordinary course of business or to the extent that any such license or grant does not prohibit the Issuers and their Restricted Subsidiaries from otherwise using such intellectual property or require the Issuers and their Restricted Subsidiaries to pay any fees for any such use.

"*Asset Sale Mandatory Prepayment Amount*" shall have the meaning set forth in Section 3.07.

"*Asset Sale Mandatory Prepayment Date*" shall have the meaning set forth in Section 3.07.

"*Attributable Debt*" in respect of a Sale and Leaseback Transaction means, as at the time of determination, the present value (discounted at the interest rate borne by the Notes) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such Sale and Leaseback Transaction (including any period for which such lease has been extended); *provided* that if such Sale and Leaseback Transaction results in a Capitalized Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of such term.

"*Authenticating Agent*" has the meaning set forth in *Section 2.02*.

"*Bankruptcy Code*" means the Bankruptcy Reform Act of 1978, as amended, and codified as 11 U.S.C. §§101 *et seq.*

"*Board of Directors*" means, as to any Person, the board of directors (or similar governing body) of such Person or any duly authorized committee thereof.

"*Board Resolution*" means, with respect to any Person, a copy of a resolution certified by the Secretary or an Assistant Secretary of such Person to have been duly adopted by the Board of Directors of such Person and to be in full force and effect on the date of such certification.

"*Business Day*" means a day that is not a Legal Holiday.

"*Capital Expenditures*" means, for any period, all direct or indirect (by way of acquisition of securities of a Person or the expenditure of cash or the transfer of property or the incurrence of

4

Indebtedness) expenditures in respect of the purchase or other acquisition of fixed or capital assets determined in conformity with GAAP.

"*Capital Stock*" means:

(1)    with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, including each class of Common Stock and Preferred Stock of such Person and all options, warrants and other rights to purchase or acquire any of the foregoing; and

(2)    with respect to any Person that is not a corporation, any and all partnership, membership or other equity interests of such Person and all options, warrants and other rights to purchase or acquire any of the foregoing;

but excluding from all of the foregoing any debt securities convertible into Capital Stock, regardless of whether such debt securities include any right of participation with Capital Stock.

"*Capitalized Lease Obligation*" means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under GAAP and, for purposes of this definition, the amount of such obligations at any date shall be the capitalized amount of such obligations at such date, determined in accordance with GAAP.

"*Cash Equivalents*" means:

(1)    marketable direct obligations issued by, or unconditionally guaranteed by, the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof;

(2)    marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's;

(3)    commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-2 from S&P and at least P-2 from Moody's;

(4)    certificates of deposit or bankers' acceptances maturing within one year from the date of acquisition thereof issued by any bank organized under the laws of the United States of America or any state thereof or the District of Columbia or any U.S. branch of a foreign bank having at the date of acquisition thereof combined net capital and surplus of not less than $250.0 million and a Thomson Bank Watch Rating of "B" or better;

5

(5)      repurchase obligations with a term of not more than seven days for underlying securities of the types described in *clause (1)* above entered into with any bank meeting the qualifications specified in *clause (4)* above;

(6)      investments in money market funds which invest substantially all their assets in securities of the types described in *clauses (1)* through *(5)* above;

(7)      investments made by the Foreign Restricted Subsidiaries in local currencies in instruments issued by or with entities in such jurisdictions having correlative and comparable attributes to the foregoing; and

(8)      deposits in any currency available for withdrawal on demand with any commercial bank that is organized under the laws of any country in which any Restricted Subsidiary maintains its chief executive office or is engaged in the Related Business, *provided* that all such deposits are made in such accounts in the ordinary course of business.

"*Change of Control*" means the occurrence of one or more of the following events:

(1)      any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), other than one or more Permitted Holders, is or becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that for purposes of this *clause (1)* such person shall be deemed to have "beneficial ownership" of all shares that any such person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Parent;

(2)      Continuing Directors shall cease for any reason to constitute a majority of the Board of Directors of the Parent then in office;

(3)      the Parent shall fail to hold 100% of the Capital Stock of the Company;

(4)      the approval by the holders of Capital Stock of the Parent or the Company of a plan for the liquidation or dissolution of the Parent or the Company; or

(5)      the merger or consolidation of the Parent with or into another Person or the merger of another Person with or into the Parent, or the sale of all or substantially all the assets of the Parent (determined on a consolidated basis) to another Person (other than, in all such cases, a Person that is controlled by one or more of the Permitted Holders), other than a transaction following which (A) in the case of a merger or consolidation transaction, holders of securities that represented 100% of the Voting Stock of the Parent immediately prior to such transaction (or other securities into which such securities are converted as part of such merger or consolidation transaction) own directly or indirectly at least a majority of the voting power of the Voting Stock of the surviving Person in such merger or consolidation transaction immediately after such transaction or have the right or ability by voting power, contract or otherwise to elect or designate for election a majority of the Board of Directors of the Parent and (B) in the case of a sale of

6

assets transaction, each transferee becomes an obligor in respect of the Notes and a Subsidiary of the transferor of such assets.

"*Change of Control Offer*" has the meaning set forth in *Section 4.11*.

"*Change of Control Payment Date*" has the meaning set forth in *Section 4.11*.

"*Clearstream*" means Clearstream Banking, société anonyme.

"*Collateral*" shall mean collateral as such term is defined in the Security Agreement, all property mortgaged under the Mortgages and any other property, whether now owned or hereafter acquired, upon which a Lien securing the Obligations is granted or purported to be granted under any Collateral Agreement.

"*Collateral Account*" means the collateral account established by the Trustee pursuant to *Article Twelve* hereof.

"*Collateral Agreements*" means, collectively, the Security Agreement, the Pledge Agreement, the Trademark Security Agreement, each Control Agreement (as defined in the Security Agreement) and each Mortgage, in each case, as the same may be in force from time to time in accordance with its terms.

"*Common Stock*" of any Person means any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such Person's common stock, whether outstanding on the Issue Date or issued after the Issue Date, and includes, without limitation, all series and classes of such common stock.

"*Company*" means Mrs. Fields Famous Brands, LLC, a Delaware limited liability company, until a successor Person shall have become such pursuant to the applicable provisions of the Indenture, and thereafter "Company" shall mean such successor Person.

"*Competitive Business*" has the meaning set forth in Section 4.23.

"*Consolidated EBITDA*" means, with respect to any Person, for any period, the sum (without duplication) of:

        (1)     Consolidated Net Income; and

        (2)     to the extent Consolidated Net Income has been reduced thereby (without duplication):

                (a)     all income taxes of such Person and its Restricted Subsidiaries paid or accrued in accordance with GAAP for such period;

                (b)     Consolidated Interest Expense, amortization expense and depreciation expense; and

7

(c)    Consolidated Non-cash Charges less any non-cash items increasing Consolidated Net Income for such period, all as determined on a consolidated basis for such Person and its Restricted Subsidiaries in accordance with GAAP.

"*Consolidated Fixed Charge Coverage Ratio*" means, with respect to any Person, the ratio of Consolidated EBITDA of such Person during the four consecutive full fiscal quarters (the "*Four Quarter Period*") most recently ending on or prior to the date of the transaction or event giving rise to the need to calculate the Consolidated Fixed Charge Coverage Ratio for which financial statements are available (the "*Transaction Date*") to Consolidated Fixed Charges of such Person for the Four Quarter Period. In addition to and without limitation of the foregoing, for purposes of this definition, "Consolidated EBITDA" and "Consolidated Fixed Charges" shall be calculated after giving effect on a pro forma basis for the period of such calculation to:

(1)    the incurrence or repayment of any Indebtedness of such Person or any of its Restricted Subsidiaries or the issuance or redemption or other repayment of any Preferred Stock by such Person or any of its Restricted Subsidiaries (and, in each case, the application of the proceeds thereof) giving rise to the need to make such calculation and any incurrence or repayment of other Indebtedness or the issuance or redemption or other repayment of any Preferred Stock (and, in each case, the application of the proceeds thereof), occurring during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date, as if such incurrence or repayment, as the case may be (and the application of the proceeds thereof), occurred on the first day of the Four Quarter Period; and

(2)    any Asset Sale or other disposition of a company or business or assets out of the ordinary course of business or Asset Acquisition (including, without limitation, any Asset Acquisition giving rise to the need to make such calculation as a result of such Person or one of its Restricted Subsidiaries (including any Person who becomes a Restricted Subsidiary as a result of any such Asset Acquisition) incurring, assuming or otherwise being liable for Acquired Indebtedness) during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date, as if such Asset Sale or other disposition or Asset Acquisition (including the incurrence, assumption or liability for any such Indebtedness or Acquired Indebtedness and also including any Consolidated EBITDA associated with the assets that are the subject of such Asset Sale or other disposition or Asset Acquisition) occurred on the first day of the Four Quarter Period; *provided* that the Consolidated EBITDA of any Person acquired shall be included only to the extent includible pursuant to the definition of "Consolidated Net Income." If such Person or any of its Restricted Subsidiaries directly or indirectly guarantees Indebtedness of a third Person, the preceding sentence shall give effect to the incurrence of such guaranteed Indebtedness as if such Person or any Restricted Subsidiary of such Person had directly incurred or otherwise assumed such guaranteed Indebtedness.

8

Furthermore, in calculating "Consolidated Fixed Charges" for purposes of determining the denominator (but not the numerator) of this "Consolidated Fixed Charge Coverage Ratio":

(a)    interest on outstanding Indebtedness determined on a fluctuating basis as of the Transaction Date (including Indebtedness actually incurred on the Transaction Date) and which will continue to be so determined thereafter shall be deemed to have accrued at a fixed rate per annum equal to the rate of interest on such Indebtedness in effect on the Transaction Date; and

(b)    notwithstanding *clause (a)* above, interest on Indebtedness determined on a fluctuating basis, to the extent such interest is covered by agreements relating to Interest Swap Obligations, shall be deemed to accrue at the rate per annum resulting after giving effect to the operation of such agreements.

"*Consolidated Fixed Charges*" means, with respect to any Person for any period, the sum, without duplication, of:

(1)    Consolidated Interest Expense (excluding amortization or write-off of deferred financing costs and debt issuance costs of such Person and its consolidated Restricted Subsidiaries during such period and any premium or penalty paid in connection with redeeming or retiring Indebtedness of such Person and its consolidated Restricted Subsidiaries prior to the stated maturity thereof pursuant to the agreements governing such Indebtedness); *plus*

(2)    the product of (x) the amount of all dividend payments on any series of Preferred Stock of such Person (other than dividends paid in Qualified Capital Stock) or, to the extent permitted under this Indenture, its Restricted Subsidiaries paid in cash during such period to any Person other than such Person or any of its Restricted Subsidiaries *times* (y) a fraction, the numerator of which is one and the denominator of which is one minus the then current effective consolidated federal, state and local tax rate of such Person, expressed as a decimal.

"*Consolidated Indebtedness Ratio*" means, as to any date of determination, the ratio of the principal amount of Net Indebtedness of the Parent and its Restricted Subsidiaries as of such date, determined on a consolidated basis for the Parent and its Restricted Subsidiaries in accordance with GAAP, to the Consolidated EBITDA of the Parent with respect to the four most recently completed fiscal quarters of such Person through such date.

"*Consolidated Interest Expense*" means, with respect to any Person for any period, the aggregate of the interest expense of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, as determined in accordance with GAAP, and including, without duplication, (a) all amortization of debt discount, (b) the interest component of Capitalized Lease Obligations paid, accrued and/or scheduled to be paid or accrued by such Person and its Restricted Subsidiaries during such period, and (c) net cash costs under all Interest Swap Obligations, *excluding, however,* any amount of such interest expense of any Restricted Subsidiary if (A) the net income of such Restricted Subsidiary is excluded in the calculation of Consolidated Net Income pursuant to *clause (4)* of the definition thereof (but only in the same

9

proportion as the net income of such Restricted Subsidiary is excluded from the calculation of Consolidated Net Income pursuant to *clause (4)* of the definition thereof) or (B) on or prior to the Issue Date, money has been set aside for the payment of such interest and at the time of determination is held to secure such payment thereof.

"*Consolidated Net Income*" means, with respect to any Person, for any period, the aggregate net income (or loss) of such Person and its Restricted Subsidiaries for such period on a consolidated basis, determined in accordance with GAAP; *provided, however*, that there shall be excluded therefrom, without duplication:

(1)     after-tax gains and losses from Asset Sales or abandonments or reserves relating thereto;

(2)     after-tax items classified as extraordinary or nonrecurring gains or losses;

(3)     gains and losses due solely to fluctuations in currency values and the related tax effects according to GAAP;

(4)     only for purposes of calculating cumulative Consolidated Net Income for purposes of *Section 4.10*, the net income of any Restricted Subsidiary of the referent Person to the extent that the declaration of dividends or similar distributions by that Restricted Subsidiary of that income is restricted by a contract, operation of law or otherwise;

(5)     the net income of any other Person, other than a Restricted Subsidiary of the referent Person, except to the extent of cash dividends or distributions paid to the referent Person or to a Restricted Subsidiary of the referent Person by such Person;

(6)     any restoration to income of any material contingency reserve, except to the extent that provision for such reserve was made out of Consolidated Net Income accrued at any time following the Issue Date;

(7)     income or loss attributable to discontinued operations (including, without limitation, operations disposed of during such period whether or not such operations were classified as discontinued); and

(8)     in the case of a successor to the referent Person by consolidation or merger or as a transferee of the referent Person's assets, any earnings of the successor corporation prior to such consolidation, merger or transfer of assets;

(9)     any gain or loss, net of taxes, realized upon the termination of any employee pension benefit plan;

(10)    any gain arising from the acquisition of any securities, or the extinguishment, under GAAP, of any Indebtedness of such Person; and

(11)    transaction costs charged in connection with the Refinancing Transactions.

10

"*Consolidated Net Worth*" of the Company means the consolidated members' equity (or equivalent) of the Company, determined on a consolidated basis in accordance with GAAP, less (without duplication) amounts attributable to Disqualified Capital Stock of such Person.

"*Consolidated Non-cash Charges*" means, with respect to any Person, for any period, the aggregate depreciation, amortization and other non-cash expenses (including but not limited to stock-based compensation charges, impairment of goodwill, intangibles or fixed assets and non-cash restructuring charges) of such Person and its Restricted Subsidiaries reducing Consolidated Net Income of such Person and its Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP (excluding any such charges constituting an extraordinary item or loss or any such charge which requires an accrual of or a reserve for cash charges for any future period).

"*Continuing Directors*" means the collective reference to all members of the Board of Directors of the Parent who have (i) held office continuously since the Issue Date or (ii) assumed office after such date and whose appointment or nomination for election by the stockholders of the Parent was approved by a vote of a majority of the Continuing Directors in office immediately prior to such appointment or nomination.

"*Corporate Trust Office*" means the office of the Trustee at which the corporate trust business of the Trustee shall, at any particular time, be principally administered, which office is, at the date of this Indenture, located at _____, Attention: Corporate Trust Administration, or such other address as the Trustee may designate from time to time by notice to the Holders and the Issuers, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Holders and the Issuers).

"*Covenant Defeasance*" has the meaning set forth in *Section 8.01*.

"*Currency Agreement*" means any foreign exchange contract, currency swap agreement or other similar agreement or arrangement designed to protect the Company or any Restricted Subsidiary of the Company against fluctuations in currency values.

"*Custodian*" means any receiver, trustee, assignee, liquidator, sequestrator or similar official under any Bankruptcy Code.

"*Default*" means an event or condition the occurrence of which is, or with the lapse of time or the giving of notice or both would be, an Event of Default.

"*Defaulted Interest*" has the meaning set forth in Section 2.17.

"*Depository*" means DTC, its nominees and successors.

"*Disqualified Capital Stock*" means that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event (other than an event which would constitute an Asset Sale or a Change of Control), matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the

11

holder thereof (except in each case, upon the occurrence of an Asset Sale or a Change of Control) on or prior to the date which is 91 days after the Maturity Date of the Notes for cash or is convertible into or exchangeable for debt securities of the Issuers or their Subsidiaries at any time prior to such date; *provided* that any Capital Stock that would not constitute Disqualified Capital Stock but for the provisions thereof giving holders the right to require such Person to repurchase or redeem such Capital Stock upon the occurrence of an Asset Sale or a Change of Control occurring prior to the stated maturity of the notes shall not constitute Disqualified Capital Stock if the Asset Sale or Change of Control provisions applicable to such Capital Stock are no more favorable to the holders of such Capital Stock than the provisions contained in *Section 4.11* and *Section 4.13* and such Capital Stock specifically provides that such Person will not repurchase or redeem any such Capital Stock pursuant to such provisions prior to the Issuers' repurchase of such Notes as are required to be repurchased pursuant to such covenants.

"*Domestic Restricted Subsidiary*" means any Restricted Subsidiary of the Parent other than the Company that is not a Foreign Restricted Subsidiary.

"*DTC*" means The Depository Trust Company, its nominees and successors.

"*Equity Mandatory Prepayment Amount*" shall have the meaning set forth in Section 3.07.

"*Equity Mandatory Prepayment Date*" shall have the meaning set forth in Section 3.07.

"*Euroclear*" means Euroclear Bank S.A./N.V., as operator of the Euroclear system.

"*Event of Default*" has the meaning set forth in *Section 6.01*.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"*Fair Market Value*" means, with respect to any asset or property, the price which could be negotiated in an arm's length, free market transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction. Fair Market Value shall be determined by the Board of Directors of the Company acting reasonably and in good faith and if such value exceeds $5.0 million, shall be evidenced by a Board Resolution of the Board of Directors of the Company, delivered to the Trustee.

"*Foreign Restricted Subsidiary*" means any Foreign Subsidiary that is a Restricted Subsidiary.

"*Foreign Subsidiary*" means any Subsidiary of the Parent (x) which is organized under the laws of any jurisdiction outside of the United States of America, any political subdivision thereof or the District of Columbia, (y) which conducts the major portion of its business outside of the United States of America and (z) all or substantially all of the property and assets of which are located outside of the United States of America.

"*GAAP*" means accounting principles generally accepted in the United States set forth in the opinions and, as the case may be, pronouncements of the Accounting Principles Board of the

American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States, which are in effect from time to time.

"*Global Notes*" has the meaning set forth in *Section 2.01*.

"*Guarantee*" has the meaning set forth in *Section 10.01*.

"*Guarantor*" means (1) all Domestic Restricted Subsidiaries of the Company other than MFFC, (2) the Parent, and (3) each of the Company's or the Parent's Domestic Restricted Subsidiaries that in the future executes a supplemental indenture in which such Domestic Restricted Subsidiary agrees to be bound by the terms of this Indenture as a Guarantor; *provided*, that any Person constituting a Guarantor as described above shall cease to constitute a Guarantor when its respective Guarantee is released in accordance with the terms of this Indenture.

"*Holder*" means the Person in whose name a Note is registered on the registrar's books.

"*incur*" has the meaning set forth in *Section 4.08*.

"*Indebtedness*" means with respect to any Person, without duplication:

      (1)    all Obligations of such Person for borrowed money;

      (2)    all Obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

      (3)    all Capitalized Lease Obligations of such Person;

      (4)    all Obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations and all Obligations under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the ordinary course of business that are not overdue by 180 days or more or are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and any deferred purchase price represented by earn-outs consistent with the Company's past practice);

      (5)    all Obligations for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction, whether or not then due, but excluding Obligations with respect to letters of credit (including trade letters of credit) to the extent such Obligations are cash collateralized or such letters of credit secure Obligations (other than Obligations described in *clauses (1)*, *(2)* and *(3)* above) entered into in the ordinary course of business of such Person and such letters of credit are not drawn upon or, if drawn upon, to the extent any such drawing is reimbursed no later than three Business Days following receipt by such Person of a demand for reimbursement;

      (6)    guarantees and other contingent obligations in respect of Indebtedness referred to in *clauses (1)* through *(5)* above and *clause (8)* below;

(7)    all Obligations of any other Person of the type referred to in *clauses (1)* through *(6)* which are secured by any Lien on any property or asset of such Person, the amount of such Obligation being deemed to be the lesser of the Fair Market Value of such property or asset or the amount of the Obligation so secured;

(8)    all Interest Swap Obligations and all Obligations under Currency Agreements of such Person; and

(9)    all Disqualified Capital Stock issued by such Person with the amount of Indebtedness represented by such Disqualified Capital Stock being equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, but excluding accrued dividends, if any.

For purposes hereof, the "*maximum fixed repurchase price*" of any Disqualified Capital Stock which does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were purchased on any date on which Indebtedness shall be required to be determined pursuant to this Indenture, and if such price is based upon, or measured by, the Fair Market Value of such Disqualified Capital Stock, such Fair Market Value shall be determined reasonably and in good faith by the Board of Directors of the issuer of such Disqualified Capital Stock.

The amount of Indebtedness of any Person at any date shall be the amount that shall be attributable to such Indebtedness on a balance sheet of such Person at such date, all as determined on a consolidated basis for such Person and its Restricted Subsidiaries in accordance with GAAP, and the amount or principal amount of Indebtedness represented by guarantees and contingent obligations shall be the maximum principal amount thereof.

"*Indemnified Party*" has the meaning set forth in *Section 7.07*.

"*Indenture*" means this Indenture, as amended or supplemented from time to time in accordance with the terms hereof.

"*Indenture Documents*" means, collectively, this Indenture, the Notes, the Guarantees, and the Collateral Agreements.

"*Independent Financial Advisor*" means a nationally-recognized accounting, appraisal or investment banking firm which, in the judgment of the Board of Directors of the Guarantor, is independent and qualified to perform the task for which it is to be engaged.

"*Initial Notes*" means the Notes issued on the Issue Date.

"*Interest Payment Date*" means the stated maturity of an installment of interest on the Notes.

"*Interest Swap Obligations*" means the obligations of any Person pursuant to any arrangement with any other Person, whereby, directly or indirectly, such Person is entitled to receive from time to time periodic payments calculated by applying either a floating or a fixed rate of interest on a stated notional amount in exchange for periodic payments made by such

14

other Person calculated by applying a fixed or a floating rate of interest on the same notional amount and shall include, without limitation, interest rate swaps, caps, floors, collars and similar agreements, in each case, determined as if such agreement were terminated on the date such obligations were being determined for purposes of this Indenture.

"*Investment*" means, with respect to any Person, any direct or indirect loan or other extension of credit (including, without limitation, a guarantee) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or any purchase or acquisition for value by such Person of any Capital Stock, bonds, notes, debentures or other securities or evidences of Indebtedness issued by, any Person. "Investment" shall exclude extensions of trade credit by the Parent, the Issuers and their respective Restricted Subsidiaries on commercially reasonable terms in accordance with normal trade practices of the Parent, the Issuers and their respective Restricted Subsidiaries.

"*Issue Date*" means the date of original issuance of the Notes.

"*Issuers*" shall have the meaning set forth in the preamble to this Indenture.

"*Legal Defeasance*" has the meaning set forth in *Section 8.01*.

"*Legal Holiday*" has the meaning set forth in *Section 11.07*.

"*Lien*" means any lien, mortgage, deed of trust, pledge, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof and any agreement to give any security interest).

"*Mandatory Prepayment*" shall mean a mandatory prepayment of the Notes pursuant to Section 3.07.

"*Mandatory Prepayment Amount*" shall mean an Asset Sale Mandatory Prepayment Amount or an Equity Prepayment Amount, as applicable.

"*Mandatory Prepayment Date*" shall mean an Asset Sale Mandatory Prepayment Date or an Equity Mandatory Prepayment Date, as applicable.

"*Maturity Date*" means _____, 2014.

"*MFFC*" means the co-issuer of the Notes, Mrs. Fields Financing Company, Inc., a Delaware corporation and a wholly-owned subsidiary of the Company.

"*MFOC*" means Mrs. Fields' Original Cookies, Inc., a Delaware corporation.

"*Moody's*" means Moody's Investors Service, Inc.

"*Mortgages*" means the mortgages, deeds of trust, deeds to secure debt or other similar documents delivered by the Parent, the Issuers or any of their respective Domestic Restricted Subsidiaries pursuant to the terms of this Indenture which create, in favor of the Trustee, Liens on any fee interest in real property owned by the Parent, the Issuers or any such Domestic

15

Restricted Subsidiary, as the case may be, as collateral security for the payment obligations of the Issuers under this Indenture and the Notes or of such Domestic Restricted Subsidiary under its Guarantee, as the case may be.

"*Net Cash Proceeds*" means, (i) with respect to any Asset Sale, the proceeds in the form of cash or Cash Equivalents including payments in respect of deferred payment obligations when received in the form of cash or Cash Equivalents (other than the portion of any such deferred payment constituting interest) received by the Issuers or any of their Restricted Subsidiaries from such Asset Sale net of:

(1)     reasonable out-of-pocket expenses and fees relating to such Asset Sale (including, without limitation, legal, accounting and investment banking fees and sales commissions and severance and relocation costs and expenses);

(2)     all taxes and other costs and expenses actually paid or estimated by the Company (in good faith) to be payable in cash in connection with such Asset Sale;

(3)     in the case of an Asset Sale of Collateral, repayment of Indebtedness that is secured by the property or assets that are the subject of such Asset Sale and, in the case of any other Asset Sale, repayment of Indebtedness that is required to be repaid in connection with such Asset Sale;

(4)     amounts required to be paid to any Person (other than the Issuers or any of their Restricted Subsidiaries) owning a beneficial interest in the assets that are the subject of the Asset Sale and as permitted under this Indenture; and

(5)     appropriate amounts to be provided by the Issuers or any Restricted Subsidiary, as the case may be, as a reserve, in accordance with GAAP, against any liabilities associated with such Asset Sale and retained by the Issuers or any Restricted Subsidiary, as the case may be, after such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale;

in each case as determined by the Board of Directors of the Parent, in its reasonable good faith judgment evidenced by a Board Resolution; *provided, however*, that any reduction in such reserve within twelve months following the consummation of such Asset Sale will be treated for all purposes of this Indenture and the Notes as a new Asset Sale at the time of such reduction with Net Cash Proceeds equal to the amount of such reduction; *provided further, however*, that if, after the payment of all taxes with respect to such Asset Sale, the amount of further estimated taxes, if any, pursuant to *clause (2)* above exceeded the tax amount actually paid in cash in respect of such Asset Sale, the aggregate amount of such excess shall, at such time, constitute Net Cash Proceeds; and (ii) with respect to the issuance or sale of Capital Stock, or options, warrants or rights to purchase Capital Stock, or debt securities or Disqualified Capital Stock that has been converted into or exchanged for Capital Stock, the proceeds of such issuance or sale in the form of cash or Cash Equivalents, including payments in respect of deferred payment obligations, net of attorney's fees, accountant's fees and brokerage, consultation, underwriting

16

and other fees and expenses actually incurred in connection with such issuance or sale, conversion or exchange and net of any Consolidated Interest Expense attributable to any debt securities paid to the holders thereof prior to the conversion or exchange and net of taxes paid or payable as a result thereof.

"*Net Indebtedness*" means, with respect to any Person, at any date of determination, the excess, if any, of the amount of Indebtedness of such Person at such date over the amount of cash and Cash Equivalents of such Person at such date, all as determined on a consolidated basis for such Person and its Restricted Subsidiaries in accordance with GAAP.

"*Net Proceeds Offer*" shall have the meaning set forth in *Section 4.13*.

"*Net Proceeds Offer Amount*" has the meaning set forth in *Section 4.13*.

"*Net Proceeds Offer Payment Date*" has the meaning set forth in *Section 4.13*.

"*Net Proceeds Offer Trigger Date*" has the meaning set forth in *Section 4.13*.

"*NexCen Stock*" means the shares of Capital Stock of NexCen Brands, Inc., which were received by certain Restricted Subsidiaries of the Company as part of the consideration for the sales of certain assets of PTF, LLC (formerly Pretzel Time Franchising, LLC) and PMC, LLC (formerly Pretzelmaker Franchising, LLC) to subsidiaries of NexCen Brands, Inc. on August 7, 2007 and for the sale of substantially all of the assets of GACCF, LLC (formerly Great American Cookie Company Franchising, LLC) and GAMAN, LLC (formerly Great American Manufacturing, LLC) to subsidiaries of NexCen Brands, Inc. on January 29, 2008. Such sales are collectively called the "NexCen Transactions.

"*Non-Confidential Information*" has the meaning set forth in *Section 4.23*.

"*Non-Public Information*" has the meaning set forth in *Section 4.23*.

"*Non-U.S. Person*" means a Person who is not a U.S. person, as defined in Regulation S.

"*Obligations*" means all obligations for principal, premium, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"*Offering*" means the offering of the Notes hereunder.

"*Officer*" means, with respect to any Guarantor or either Issuer, the Chief Executive Officer, the President, the Chief Financial Officer or any Vice President of such Issuer or such Guarantor.

"*Officers' Certificate*" means, with respect to either Issuer or the Guarantor, a certificate signed by two Officers of such Issuer or such Guarantor, and delivered to the Trustee.

"*Opinion of Counsel*" means a written opinion of counsel who may be counsel for the Company or the Parent and who shall be reasonably acceptable to the Trustee, as applicable.

17

"*Parent*" means MFOC until a successor Person shall have become such pursuant to the applicable provisions of the Indenture, and thereafter "Parent" shall mean such successor Person.

"*Paying Agent*" has the meaning set forth in *Section 2.04*.

"*Permissive Terms*" has the meaning set forth in Section 12.1.

"*Permitted Holders*" means (i) any Person that is a party to the Stockholder Agreement and their respective Affiliates, including, one or more investment funds controlled, managed or advised by any of them and (ii) any Person that forms a group (within meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) with any Person mentioned in clause (i), *provided* that, in the case of clause (ii), a Person or Persons listed in clause (i) own a majority of the voting power of such group.

"*Permitted Indebtedness*" means, without duplication, each of the following:

(1)    Indebtedness under this Indenture and the Notes and the related Guarantees;

(2)    letters of credit issued on behalf of the Company or any of its Subsidiary Guarantors in the ordinary course consistent with past practice being deemed to have a principal amount equal to the maximum potential liability of the Company thereunder) in an aggregate principal amount at any time outstanding not to exceed $3.0 million;

(3)    other Indebtedness of the Parent, the Company and their respective Restricted Subsidiaries outstanding on the Issue Date other than the Existing Notes;

(4)    Interest Swap Obligations of the Company or any Restricted Subsidiary of the Company covering Indebtedness of the Company or any of its Restricted Subsidiaries; *provided, however*, that such Interest Swap Obligations are entered into for the purpose of fixing or hedging interest rates with respect to any fixed or variable rate Indebtedness that is permitted by this Indenture to be outstanding to the extent that the notional amount of any such Interest Swap Obligation does not exceed at the time of the incurrence thereof, the principal amount of Indebtedness to which such Interest Swap Obligation relates;

(5)    Indebtedness under Currency Agreements; *provided* that in the case of Currency Agreements which relate to Indebtedness, such Currency Agreements do not increase the Indebtedness of the Company and its Restricted Subsidiaries outstanding other than as a result of fluctuations in foreign currency exchange rates or by reason of fees, indemnities and compensation payable thereunder;

(6)    Indebtedness of a Domestic Restricted Subsidiary of the Company to the Company or to a Restricted Subsidiary of the Company for so long as such Indebtedness is held by the Company or a Restricted Subsidiary of the Company, in each case subject to no Lien held by a Person other than the Company or a Restricted Subsidiary of the Company or the holder of a Permitted Lien of the type described in *clause (15)* or *(28)* of the definition thereof; *provided* that if as of any date any Person other than the Company

18

or a Restricted Subsidiary of the Company owns or holds any such Indebtedness or a Person other than the holder of a Permitted Lien thereon of the type described in *clause (15)* or *(28)* of the definition thereof holds a Lien in respect of such Indebtedness, such date shall be deemed the date of incurrence of Indebtedness not constituting Permitted Indebtedness under this *clause (6)* by the issuer of such Indebtedness;

(7)     Indebtedness of a Foreign Restricted Subsidiary of the Parent to the Parent, the Company or a Domestic Restricted Subsidiary of the Company for so long as such Indebtedness is held by the Parent, the Company or a Domestic Restricted Subsidiary of the Company and is permitted to be made as a Permitted Investment under clause (16) of the definition thereof or the holder of a Permitted Lien thereon of the type described in *clause (15)* or *(28)* of the definition thereof, in each case subject to no Lien held by a Person other than the Parent, the Company or a Domestic Restricted Subsidiary of the Company or the holder of a Permitted Lien of the type described in *clause (15)* or *(28)* of the definition thereof; *provided* that if as of any date any Person other than the Parent, the Company or a Domestic Restricted Subsidiary of the Company owns or holds any such Indebtedness or a Person other than the holder of a Permitted Lien thereon of the type described in *clause (15)* or *(28)* of the definition thereof or holds a Lien in respect of such Indebtedness, such date shall be deemed the date of the incurrence of Indebtedness not constituting Permitted Indebtedness under this *clause (7)* by the issuer of such Indebtedness;

(8)     Indebtedness of a Foreign Restricted Subsidiary of the Parent to a Foreign Restricted Subsidiary of the Parent for so long as such Indebtedness is held by a Foreign Restricted Subsidiary of the Parent, in each case subject to no Lien held by a Person other than the Parent or a Foreign Restricted Subsidiary of the Parent or the holder of a Permitted Lien of the type described in *clause (15)* or *(17)* of the definition thereof; *provided* that if as of any date any Person other than a Foreign Restricted Subsidiary of the Parent owns or holds any such Indebtedness or any Person other than the holder of a Permitted Lien thereon of the type described in *clause (15)* or *(17)* of the definition thereof holds a Lien in respect of such Indebtedness, such date shall be deemed the date of the incurrence of Indebtedness not constituting Permitted Indebtedness under this *clause (8)* by the issuer of such Indebtedness;

(9)     Indebtedness of the Company to the Parent or a Restricted Subsidiary of the Parent or the Company for so long as such Indebtedness is held by the Parent or a Restricted Subsidiary of the Company or the Parent, in each case subject to no Lien other than a Permitted Lien of the type described in *clause (15)* or *(28)* of the definition thereof; *provided*, that (a) any such Indebtedness is subordinated, pursuant to a written agreement by the holder thereof, to the Company's Obligations under this Indenture and the Notes and (b) if as of any date any Person other than the Parent or a Restricted Subsidiary of the Company or the Parent owns or holds any such Indebtedness or any Person other than the holder of a Permitted Lien of the type described in *clause (15)* or *(28)* of the definition thereof, holds a Lien in respect of such Indebtedness, such date shall be deemed the date of incurrence of Indebtedness not constituting Permitted Indebtedness under this *clause (9)* by the Company;

(10)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Indebtedness is extinguished within five business days of incurrence;

(11)    Indebtedness of the Parent, the Company or any of their respective Restricted Subsidiaries represented by letters of credit for the account of the Parent, the Company or such Restricted Subsidiary, as the case may be, in order to provide security for performance bonds, bankers' acceptances, workers' compensation claims, surety and appeal bonds, payment obligations in connection with self-insurance or similar requirements and bank overdrafts incurred in the ordinary course of business;

(12)    Indebtedness represented by Capitalized Lease Obligations and Purchase Money Indebtedness of the Parent, the Company and their respective Restricted Subsidiaries incurred in the ordinary course of business (including Refinancings thereof that do not result in an increase in the aggregate principal amount of Indebtedness of such Person as of the date of such proposed Refinancing (plus the amount of any premium required to be paid under the terms of the instrument governing such Indebtedness and plus the amount of reasonable expenses incurred by the Company in connection with such Refinancing)) not to exceed $5.0 million at any time outstanding;

(13)    Refinancing Indebtedness;

(14)    Guarantees by the Parent, the Company or a Restricted Subsidiary of Indebtedness incurred by the Parent, the Company or a Restricted Subsidiary of the Company or the Parent so long as the incurrence of such Indebtedness by the Parent, the Company or any such Restricted Subsidiary is otherwise permitted by the terms of this Indenture;

(15)    Indebtedness of Foreign Restricted Subsidiaries of the Company, in an aggregate outstanding principal amount not to exceed $2.0 million;

(16)    Indebtedness arising from agreements of the Parent or a Subsidiary providing for the guarantee, indemnification, adjustment of purchase price or similar obligations, in each case, incurred in connection with the disposition of any business, assets or Subsidiary, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition; *provided*, that the maximum aggregate liability in respect of all such Indebtedness shall at no time exceed the gross proceeds actually received by the Parent or such Subsidiary in connection with such disposition;

(17)    Indebtedness of the Parent, the Company or any of their respective Restricted Subsidiaries to the extent the net proceeds thereof are promptly used to redeem the Notes in full or deposited to defease or discharge the Notes, in each case, in accordance with this Indenture;

(18)    the guarantee by the Parent, the Company or any of their respective Restricted Subsidiaries of operating store lease obligations of any franchisee or sublessee

20

of the Parent, the Company or any of their respective Restricted Subsidiaries in the ordinary course of business and consistent with past practice; *provided*, that the aggregate amount of such guarantees, when taken together with the Indebtedness and guarantees permitted to be incurred and made pursuant to *clause (19)* below, does not exceed $3.0 million outstanding at any time;

(19)    Indebtedness of the Parent, the Company or any Restricted Subsidiary of the Parent or the Company or the guarantee by the Parent, the Company or any Restricted Subsidiary of the Parent or the Company of Indebtedness incurred by franchisees in connection with the cost of purchasing a franchise or the cost of equipment in connection with the set-up of a franchise; *provided*, that the aggregate principal amount of such Indebtedness and guarantees, when taken together with the guarantees permitted to be made pursuant to *clause (18)* above, does not exceed $3.0 million outstanding at any time;

(20)    Indebtedness in the form of notes issued by the Parent in connection with the repurchase, redemption, acquisition or retirement of Capital Stock of the Parent in an aggregate principal amount not to exceed $500,000 at any time outstanding to the extent such repurchase, redemption, acquisition or retirement was permitted under *clause (5)* of the third sentence under *Section 4.10(b)* and the payment of such Indebtedness is subordinated in right of payment to the Notes;

(21)    Indebtedness under one or more Senior Secured Facilities so long as the aggregate principal amount of Indebtedness outstanding pursuant to this *clause (21)* at no time exceeds $10.0 million;

(22)    Acquired Indebtedness; and

(23)    additional Indebtedness of the Company and its Restricted Subsidiaries in an aggregate principal amount, when taken together with the amount of Indebtedness incurred pursuant to clause (15) and then outstanding, not to exceed $5.0 million at any time outstanding.

For purposes of determining compliance with *Section 4.08*, (i) in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Indebtedness described in *clauses (1)* through *(20)*, *(22)* and *(23)* above or is entitled to be incurred pursuant to the Consolidated Fixed Charge Coverage Ratio provisions of such covenant, the Company shall, in its sole discretion, classify (or later reclassify) such item of Indebtedness in any manner that complies with *Section 4.08*, (ii) the amount of Indebtedness issued at a price which is less than the principal amount thereof shall be equal to the original issue price of such Indebtedness, (iii) Indebtedness incurred in connection with, or in contemplation of, any transaction described in the definition of the term "Acquired Indebtedness" shall be deemed to have been incurred by the Parent, the Company or one of their respective Restricted Subsidiaries, as the case may be, at the time an acquired Person becomes such a Restricted Subsidiary (or is merged into the Parent, the Company or such a Restricted Subsidiary) or at the time of the acquisition of assets, as the case may be, and (iv) the maximum amount of Indebtedness that the Parent, the Company and their respective Restricted Subsidiaries may incur pursuant to *Section 4.08* shall not be deemed

21

to be exceeded, with respect to any outstanding Indebtedness, due solely to the result of fluctuations in the exchange rates of currencies. Accrual of interest, accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, and the payment of dividends on Disqualified Capital Stock in the form of additional shares of the same class of Disqualified Capital Stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Capital Stock for purposes of *Section 4.08*.

"*Permitted Investments*" means:

(1)    Investments by the Parent, the Company or any Restricted Subsidiary of the Parent or the Company in any Person that is or will become immediately after such Investment a Guarantor or that will merge or consolidate into the Parent, the Company or a Guarantor;

(2)    Investments in the Company by the Parent or any Restricted Subsidiary of the Parent or the Company; *provided* that any Indebtedness evidencing such Investment held by a Restricted Subsidiary of the Company shall satisfy the requirements of *clause (9)* of the definition of the term "Permitted Indebtedness;"

(3)    Investments by any Foreign Restricted Subsidiary of the Parent or the Company in any other Foreign Restricted Subsidiary of the Parent or the Company;

(4)    Investments in cash and Cash Equivalents;

(5)    loans and advances, including advances for travel and moving expenses, to employees, officers and directors of the Parent, the Company and their respective Restricted Subsidiaries in the ordinary course of business for bona fide business purposes not in excess of $1.0 million at any one time outstanding;

(6)    Currency Agreements and Interest Swap Obligations entered into in the ordinary course of the Company's or its Restricted Subsidiaries' businesses and otherwise in compliance with this Indenture;

(7)    surety and performance bonds and workers' compensation, utility, lease, tax, performance and similar deposits and prepaid expenses in the ordinary course of business;

(8)    any Investments received in compromise or resolution of (A) obligations of trade creditors or customers that were incurred in the ordinary course of business of the Parent, the Company or any of their respective Restricted Subsidiaries, including pursuant to any plan or reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (B) litigation, arbitration or other disputes with Persons who are not Affiliates;

(9)    Investments made by the Parent, the Company or their respective Restricted Subsidiaries as a result of an Asset Sale made in compliance with *Section 4.13*;

22

(10)    Investments made by the Parent, the Company or their respective Restricted Subsidiaries as a result of consideration received in connection with an Asset Sale made in compliance with *Section 4.13*;

(11)    Investments represented by guarantees that are otherwise permitted under this Indenture;

(12)    any Investment of assets the payment for which is Qualified Capital Stock of the Parent;

(13)    Advances to suppliers and customers in the ordinary course of business;

(14)    Investments acquired and cancelled pursuant to the Refinancing Transactions and any other Investments existing on the Issue Date; *provided* that the Parent shall have no Investments in any Subsidiary other than the Issuers or a Restricted Subsidiary of the Company on the Issue Date;

(15)    Investments received as a result of a foreclosure by the Parent, the Company or any of their respective Restricted Subsidiaries with respect to any secured Investment in default;

(16)    Investments in notes of employees, officers and directors issued to the Parent representing payment of the exercise price of options to purchase common stock of the Parent; and

(17)    additional Investments not to exceed $5.0 million at any time outstanding; *provided* that the Parent will not make any Investment in any Foreign Subsidiary that is not a Restricted Subsidiary of the Company.

"*Permitted Liens*" means the following types of Liens:

(1)    Liens for taxes, assessments or governmental charges or claims either (a) not delinquent or (b) contested in good faith by appropriate proceedings and as to which the Parent, the Company or any of their respective Restricted Subsidiaries shall have set aside on its books such reserves as may be required pursuant to GAAP;

(2)    statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law or pursuant to customary reservations or retentions of title incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made in respect thereof;

(3)    Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases,

23

government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(4)    Liens arising by reason of any judgment, decree or order of any court, but not giving rise to an Event of Default so long as such Lien is adequately bonded and any appropriate legal proceedings which may have been duly initiated for the review of such judgment, decree or order shall not have been finally terminated or the period within which such proceedings may be initiated shall not have expired;

(5)    survey exceptions, easements, rights-of-way, zoning restrictions and other similar charges or encumbrances in respect of real property not interfering in any material respect with the ordinary conduct of the business of the Parent, the Company or any of their respective Restricted Subsidiaries;

(6)    any interest or title of a lessor under any operating lease or any Capitalized Lease Obligation permitted pursuant to *clause (12)* of the definition of "Permitted Indebtedness" or Liens securing any such Capitalized Lease Obligation; *provided* that such Liens do not extend to any property or assets which is not leased property subject to such Capitalized Lease Obligation;

(7)    Liens securing Purchase Money Indebtedness permitted pursuant to *clause (12)* of the definition of "Permitted Indebtedness;" *provided, however,* that (a) such Indebtedness shall not exceed the cost of the property or assets acquired, together with, in the case where such property or assets include real property or fixtures, the cost of the construction thereof and improvements thereto, and shall not be secured by any property or assets of the Parent, the Company or any Restricted Subsidiary of the Parent or the Company other than such property so acquired or constructed, improvements and accessions thereto and proceeds thereof and (b) the Lien securing such Indebtedness shall be created within 180 days of such acquisition or construction or, in the case of a refinancing of such Indebtedness, within 180 days of such refinancing;

(8)    Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(9)    Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(10)    Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Parent, the Company or any of their respective Restricted Subsidiaries, including rights of offset and set-off;

(11)    Liens securing Interest Swap Obligations which Interest Swap Obligations relate to Indebtedness that is otherwise permitted under this Indenture;

24

(12)    Liens securing Indebtedness under Currency Agreements that are permitted under this Indenture;

(13)    Liens securing Acquired Indebtedness incurred in accordance with *Section 4.08*; *provided* that:

　　　　(a)    such Liens secured such Acquired Indebtedness at the time of and prior to the incurrence of such Acquired Indebtedness by the Parent, the Company or a Restricted Subsidiary of the Parent or the Company and were not granted in connection with, or in anticipation of, the incurrence of such Acquired Indebtedness by the Parent, the Company or such a Restricted Subsidiary; and

　　　　(b)    such Liens do not extend to or cover any property or assets of the Parent, the Company or of any of their respective Restricted Subsidiaries other than the property or assets that secured the Acquired Indebtedness prior to the time such Indebtedness became Acquired Indebtedness of the Parent, the Company or such a Restricted Subsidiary and are no more favorable to the lien holders than those securing the Acquired Indebtedness prior to the incurrence of such Acquired Indebtedness by the Company or such a Restricted Subsidiary;

(14)    Liens existing as of the Issue Date and securing Indebtedness permitted to be outstanding under *clause (3)* of the definition of the term "Permitted Indebtedness" to the extent and in the manner such Liens are in effect on the Issue Date and Liens on the NexCen Stock granted in connection with the NexCen Transactions;

(15)    Liens securing the Notes, this Indenture and the Guarantees;

(16)    Liens securing letters of credit permitted under *clause (2)* of the definition of the term "Permitted Indebtedness," *provided*, *however*, that such Lien is only secured by cash or Cash Equivalents;

(17)    Liens securing Indebtedness of Foreign Restricted Subsidiaries to the extent such Indebtedness is permitted under *clause (15)* of the definition of the term "Permitted Indebtedness"; *provided*, *however*, that no asset of the Parent, the Company or any Domestic Restricted Subsidiary shall be subject to any such Lien;

(18)    Liens in favor of the Company or a Domestic Restricted Subsidiary of the Company;

(19)    leases, subleases, licenses and sublicenses granted to others that do not materially interfere with the ordinary course of business of the Parent, the Company and their respective Restricted Subsidiaries;

(20)    banker's Liens, rights of setoff and similar Liens with respect to cash and Cash Equivalents on deposit in one or more bank accounts in the ordinary course of business; provided that such bank accounts are not cash collateral accounts;

25

(21)    Liens arising from the filing of Uniform Commercial Code financing statements regarding leases;

(22)    Liens securing obligations with respect to operating leases and guarantees thereof; provided that such Liens do not extend to or cover any property of the Parent, the Company or any of their respective Restricted Subsidiaries other than the property subject to such leases, any property or rights (including rights under subleases) relating to such leased property and the equity interests of the lessee in any such lease;

(23)    deposits made in the ordinary course of business to secure liability to insurance carriers;

(24)    rights of a licensor of intellectual property;

(25)    Liens arising out of conditional sale, title retention, consignment or similar arrangement for the sale of goods entered into by the Parent, the Company or any of their respective Restricted Subsidiaries in the ordinary course of business;

(26)    Liens incurred in the ordinary course of business of the Parent, the Company or any Restricted Subsidiary of the Company or the Parent with respect to Obligations that (a) are not incurred in connection with the borrowing of money (other than trade credit in the ordinary course of business) and (b) do not in the aggregate materially detract from the value of the property subject thereto;

(27)    Liens securing Senior Secured Facilities; and

(28)    Liens securing Refinancing Indebtedness which is incurred to Refinance any Indebtedness which has been secured by a Lien permitted under this Indenture and which has been incurred in accordance with *Section 4.08* of this Indenture; provided, however, that such Liens:  (i) are no less favorable to the Holders and are not more favorable to the lien holders with respect to such Liens than the Liens in respect of the Indebtedness being Refinanced; and (ii) do not extend to or cover any property or assets of the Parent, the Company or any of their respective Restricted Subsidiaries not securing the Indebtedness so Refinanced.

"*Permitted Senior Secured Debt Documentation*" has the meaning set forth in *Section 12.11*.

"*Person*" means an individual, partnership, corporation, limited liability company, unincorporated organization, trust or joint venture, or a governmental agency or political subdivision thereof.

"*Physical Notes*" has the meaning set forth in *Section 2.15*.

"*Plan*" has the meaning assigned to it in the preamble of this Indenture.

"*Pledge Agreement*" means the Pledge Agreement, dated as of the Issue Date, made by the Company and certain of the Guarantors in favor of the Trustee, as amended or supplemented from time to time in accordance with its terms.

"*Preferred Stock*" of any Person means any Capital Stock of such Person that has preferential rights to any other Capital Stock of such Person with respect to dividends or redemptions or upon liquidation.

"*Premises*" has the meaning set forth in *Section 4.20*.

"*principal*" of any Indebtedness (including the Notes) means the principal amount of such Indebtedness plus the premium, if any, on such Indebtedness.

"*pro forma*" means, with respect to any calculation made or required to be made pursuant to the terms of this Indenture, a calculation made in accordance with Article 11 of Regulation S-X under the Securities Act, as determined by the Board of Directors of the Company in consultation with its independent public accountants.

"*Purchase Money Indebtedness*" means Indebtedness of the Parent, the Company and their respective Restricted Subsidiaries incurred for the purpose of financing all or any part of the purchase price, or the cost of design, development, installation, construction or improvement, of property or equipment.

"*Qualified Capital Stock*" means any Capital Stock that is not Disqualified Capital Stock.

"*Recipient*" has the meaning set forth in *Section 4.23*.

"*Record Date*" means any of the Record Dates specified in the Notes, whether or not a Legal Holiday.

"*Redemption Date*" means, when used with respect to any Note to be redeemed, the date fixed for redemption pursuant to this Indenture and the Notes.

"*Redemption Price*" means, when used with respect to any Note to be redeemed, the price fixed for redemption pursuant to this Indenture and the Notes.

"*Reference Date*" has the meaning set forth in *Section 4.10*.

"*Refinance*" means, in respect of any security or Indebtedness, to refinance, extend, renew, refund, repay, prepay, redeem, defease or retire, or to issue a security or Indebtedness in exchange or replacement for, such security or Indebtedness in whole or in part. "*Refinanced*" and "*Refinancing*" shall have correlative meanings.

"*Refinancing Indebtedness*" means any Refinancing by the Parent, the Company or any Restricted Subsidiary of the Company or the Parent of Indebtedness incurred in accordance with *Section 4.08* (other than Permitted Indebtedness) or pursuant to *clause (1)*, *(3)* or *(13)* of the definition of Permitted Indebtedness, in each case that does not:

27

(1)    result in an increase in the aggregate principal amount of Indebtedness of such Person as of the date of such proposed Refinancing (plus accrued interest on the Indebtedness being Refinanced plus the amount of any premium required to be paid under the terms of the instrument governing such Indebtedness and plus the amount of reasonable expenses incurred by the Parent, the Company and their respective Restricted Subsidiaries in connection with such Refinancing);

(2)    create Indebtedness with: (a) a Weighted Average Life to Maturity that is less than the Weighted Average Life to Maturity of the Indebtedness being Refinanced; or (b) a final maturity earlier than the final maturity of the Indebtedness being Refinanced; *provided* that (x) if such Indebtedness being Refinanced is Indebtedness of the Company, then such Refinancing Indebtedness shall be Indebtedness solely of the Company or a Guarantor and (y) if such Indebtedness being Refinanced is subordinate or junior to the Notes or a Guarantee, then such Refinancing Indebtedness shall be subordinate to the Notes or the Guarantee at least to the same extent and in the same manner as the Indebtedness being Refinanced;

(3)    change any of the respective obligors on such Refinancing Indebtedness; or

(4)    affect the security, if any, for such Refinancing Indebtedness (except to the extent that less security is granted to holders of such Refinancing Indebtedness).

"*Refinancing Transactions*" means the refinancing transactions contemplated under the Plan.

"*Register*" has the meaning set forth in *Section 2.04*.

"*Registrar*" has the meaning set forth in *Section 2.04*.

"*Related Business*" means a retailer and franchisor of snack foods and a gift and branded retailer and any business or activity related to, arising from, or necessary, appropriate or incidental to the activities described above and logical extensions thereof.

"*Released Interests*" has the meaning set forth in *Section 12.05*.

"*Released Trust Monies*" has the meaning set forth in *Section 12.08*.

"*Replacement Assets*" has the meaning set forth in *Section 4.13*.

"*Restricted Payment*" has the meaning set forth in *Section 4.10*.

"*Restricted Subsidiary*" of any Person means any Subsidiary of such Person which at the time of determination is not an Unrestricted Subsidiary.

"*Sale and Leaseback Transaction*" means any direct or indirect arrangement with any Person or to which any such Person is a party, providing for the leasing to the Parent, the Company or a Restricted Subsidiary of the Parent or the Company of any property, whether

28

owned by the Parent, the Company or such Restricted Subsidiary at the Issue Date or later acquired, which has been or is to be sold or transferred by the Parent, the Company or such Restricted Subsidiary to such Person or to any other Person from whom funds have been or are to be advanced by such Person on the security of such Property.

"*SEC*" means the Securities and Exchange Commission.

"*Secured Parties*" has the meaning set forth in the Security Agreement.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Security Agreement*" means the Security Agreement, dated as of the Issue Date, made by the Company and the Guarantors in favor of the Trustee, as amended or supplemented from time to time in accordance with its terms.

"*Senior Debt Administration Agent*" has the meaning set forth in *Section 12.08*.

"*Senior Obligations*" has the meaning set forth in *Section 12.08*.

"*Senior Secured Facilities*" means any agreements by the Company and/or one or more Restricted Subsidiaries of the Company providing for the making of loans, the issuance of letters of credit and/or the creation of bankers' acceptances, which Indebtedness may be secured by a Lien or Liens on the accounts receivable and inventory of the Company and/or its Restricted Subsidiaries which Liens may be senior in priority to the Liens securing the Notes and the Guarantees and which Indebtedness must be incurred pursuant to clause (21) of the definition of Permitted Indebtedness.

"*Significant Subsidiary*" with respect to any Person, means any Restricted Subsidiary of such Person that satisfies the criteria for a "significant subsidiary" set forth in Rule 1.02(w) of Regulation S-X under the Exchange Act.

"*Special Record Date*" for the payment of any Defaulted Interest means a date fixed by the Trustee pursuant to Section 2.17.

"*S&P*" means Standard & Poor's Ratings Group.

"*Stockholder Agreement*" means the agreement described in Section 8.4 of the Joint Packaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code of Mrs.' Fields Original Cookies, Inc. and Certain Subsidiaries, dated August [ ], 2008.

"*Subsidiary*" with respect to any Person, means:

      (1)     any corporation of which the outstanding Capital Stock having at least a majority of the votes entitled to be cast in the election of directors under ordinary circumstances shall at the time be owned, directly or indirectly, by such Person or one or more Subsidiaries of such Person (or any combination thereof); or

(2)    any other Person of which at least a majority of the voting interest under ordinary circumstances is at the time, directly or indirectly, owned by such Person or one or more Subsidiaries of such Person (or any combination thereof).

"*Surviving Entity*" shall have the meaning set forth in *Section 5.01*.

"*TCBY*" means TCBY Systems, LLC, a Delaware limited liability company and a direct Wholly-Owned Subsidiary of the Company.

"*TIA*" means the Trust Indenture Act of 1939 (15 U.S.C. SS 77aaa-77bbbb) as amended, as in effect on the date of this Indenture.

"*Trademark Security Agreement*" means the Trademark Security Agreement, dated as of the Issue Date, made by certain of the Guarantors in favor of the Trustee, as amended or supplemented from time to time in accordance with its terms.

"*Trigger Amount*" means, as of any date of determination, the excess, if any, of $10.0 million over the aggregate amount of Net Cash Proceeds that have not been applied as of such date of determination for the making of a Net Proceeds Offer.

"*Trust Monies*" means all cash and Cash Equivalents received:

(1)    all Net Cash Proceeds; or

(2)    proceeds of any sale or other disposition of all or any part of the Collateral by or on behalf of the Trustee or any collection, recovery, receipt, appropriation or other realization of or from all or any part of the Collateral by or on behalf of the Trustee pursuant to this Indenture or any of the Collateral Agreements or otherwise;

*provided, however*, that Trust Monies shall in no event include any property deposited with the Trustee for any redemption, legal defeasance or covenant defeasance of Notes, for the satisfaction and discharge of this Indenture or to pay the purchase price of Notes pursuant to a Change of Control Offer.

"*Trust Officer*" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"*Trustee*" means the party named as such in this Indenture until a successor replaces it in accordance with the provisions of this Indenture and thereafter means such successor.

"*Unrestricted Subsidiary*" of any Person means:

(1)     any Subsidiary of such Person that at the time of determination shall be or continue to be designated an Unrestricted Subsidiary by the Board of Directors of such Person in the manner provided below; and

(2)     any Subsidiary of an Unrestricted Subsidiary.

The Board of Directors of the Company may designate any Subsidiary (including any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary unless such Subsidiary owns any Capital Stock of, or owns or holds any Lien on any property of, the Parent, the Company or any other Subsidiary of the Company or the Parent that is not a Subsidiary of the Subsidiary to be so designated, *provided* that:

(1)     the Issuers certify to the Trustee that such designation complies with *Section 4.10*; and

(2)     each Subsidiary to be so designated and each of its Subsidiaries has not, at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness pursuant to which the lender has recourse to any of the assets of the Issuers or any of their Restricted Subsidiaries.

For purposes of making the determination of whether any such designation of a Subsidiary as an Unrestricted Subsidiary complies with *Section 4.10*, the portion of the Fair Market Value of the net assets of such Subsidiary of the Issuers at the time that such Subsidiary is designated as an Unrestricted Subsidiary that is represented by the interest of the Issuers and their Restricted Subsidiaries in such Subsidiary, in each case as determined in good faith by the Board of Directors of the Company, or, if less, the amount of the value of the Investment in such Subsidiary when made, shall be deemed to be an Investment. Such designation will be permitted only if such Investment would be permitted at such time under *Section 4.10*.

The Board of Directors of the Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary only if:

(1)     immediately after giving effect to such designation, the Issuers are able to incur at least $1.00 of additional Indebtedness (other than Permitted Indebtedness) in compliance with *Section 4.08*; and

(2)     immediately before and immediately after giving effect to such designation, no Default or Event of Default shall have occurred and be continuing.

Any such designation by the Board of Directors shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the Board Resolution giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing provisions.

31

"*U.S. Government Obligations*" means direct obligations of, and obligations guaranteed by, the United States of America for the payment of which the full faith and credit of the United States of America is pledged.

"*U.S. Legal Tender*" means such coin or currency of the United States which, as at the time of payment, shall be immediately available legal tender for the payment of public and private debts.

"*Valuation Date*" shall have the meaning set forth in *Section 12.05*.

"*Voting Stock*" means, with respect to any Person, securities of any class or classes of Capital Stock in such Person entitling the holders thereof (whether at all times or only so long as no senior class of stock has voting power by reason of any contingency) to vote in the election of members of the Board of Directors of such Person.

"*Warrants*" means the warrants to purchase shares of Capital Stock of the Parent issued pursuant to the Plan.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years obtained by dividing (a) the then outstanding aggregate principal amount of such Indebtedness into (b) the sum of the total of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payment of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) which will elapse between such date and the making of such payment.

"*Wholly-Owned Subsidiary*" of any Person means any Restricted Subsidiary of such Person of which all the outstanding Capital Stock (other than in the case of a Foreign Restricted Subsidiary, directors' qualifying shares or an immaterial amount of shares required to be owned by other Persons pursuant to applicable law) are owned by such Person or any Wholly-Owned Subsidiary of such Person.

SECTION 1.02.   *Incorporation by Reference of Trust Indenture Act.*

Whenever this Indenture refers to a provision of the TIA, such provision is incorporated by reference in, and made a part of, this Indenture.  The following TIA terms used in this Indenture have the following meanings:

"*indenture securities*" means the Notes.

"*indenture security holder*" means a Holder.

"*indenture to be qualified*" means this Indenture.

"*indenture trustee*" or "*institutional trustee*" means the Trustee.

"*obligor*" on the indenture securities means each of the Issuers or any other obligor on the Notes.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule and not otherwise defined herein have the meanings assigned to them therein.

SECTION 1.03.    *Rules of Construction.*

Unless the context otherwise requires:

(1)    a term has the meaning assigned to it;

(2)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3)    "or" is not exclusive;

(4)    words in the singular include the plural, and words in the plural include the singular;

(5)    "herein," "hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(6)    when the words "includes" or "including" are used herein, they shall be deemed to be followed by the words "without limitation";

(7)    all references to Sections or Articles refer to Sections or Articles of this Indenture unless otherwise indicated;

(8)    unless otherwise defined or the context otherwise requires, terms for which meanings are provided in this Indenture shall have such meanings when used in each other Indenture Document;

(9)    unless the context otherwise requires, any reference to a statute, rule or regulation refers to the same (including any successor statute, rule or regulation thereto) as it may be amended from time to time;

(10)    provisions apply to successive events and transactions;

(11)    the principal amount of any non-interest bearing or other discount security at any date shall be the principal amount thereof that would be shown on a balance sheet of the issuer dated such date prepared in accordance with GAAP;

(12)    unless otherwise expressly provided herein, the principal amount of any Preferred Stock shall be greater of (i) the maximum liquidation value of such Preferred Stock of (ii) the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock.

## ARTICLE TWO
## THE NOTES

SECTION 2.01.   *Form and Dating*.

The Initial Notes and the Additional Notes and the Trustee's certificate of authentication thereon shall be substantially in the form of *Exhibit A* hereto. The Notes may have notations, legends or endorsements required by law, stock exchange rule or DTC rule or usage. The Issuers and the Trustee shall approve the form of the Notes and any notation, legend or endorsement on them. Each Note shall be dated the date of its authentication.

The terms and provisions contained in the forms of the Notes annexed hereto as *Exhibit A*, shall constitute, and are hereby expressly made, a part of this Indenture and, to the extent applicable, the Issuers, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

The Initial Notes shall be issued initially in the form of one or more permanent global notes in registered form, substantially in the form set forth in *Exhibit A* (the "*Global Notes*"), deposited with the Trustee, as custodian for DTC, duly executed by the Issuers and authenticated by the Trustee as hereinafter provided and shall bear the legend set forth in *Exhibit B*.

The aggregate principal amount of any Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC, as hereinafter provided.

The definitive Notes shall be typed, printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner permitted by the rules of any securities exchange on which the Notes may be listed, all as determined by the Officer executing such Notes, as evidenced by their execution of such Notes.

SECTION 2.02.   *Title and Terms*.

The aggregate principal amount of Notes which may be authenticated and delivered under this Indenture is limited to $50.0 million plus the amount by which Noteholder Cash (as defined in the Plan) is less than $90.0 million except for Additional Notes and Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to *Section 2.07*, *2.08*, *2.09*, *2.15*, *8.05*, or *9.05* or in connection with a Change of Control Offer or am Asset Sale Offer pursuant to *Section 4.11* or *4.13*. On the Issue Date, the Issuers shall not issue an aggregate principal amount of Notes in excess of $50.0 million plus the amount by which Noteholder Cash (as defined in the Plan) is less than $90.0 million.

The Notes shall be known and designated as the 10% Senior Secured Notes due 2014. Their final maturity date shall be _____, 2014 and they shall bear interest at the applicable rates per annum specified below from the Issue Date in the case of the Initial Notes or from the applicable date of issuance in the case of Additional Notes or from the most recent Interest Payment Date to which interest has been paid or duly provided for, as the case may be, regardless of when issued, payable semiannually in arrears on _____ and _____,

34

commencing _____, 2009, until the principal thereof is paid or made available for payment. Interest so payable shall be, (a) for the two-year period following the Issue Date, payable in cash at the rate of 10% per annum or, at the Company's option when authorized by a Board Resolution, payable by the issuance of additional Notes at the rate of 12% per annum with other terms identical to the Initial Notes (other than with respect to the date of issuance) in such principal amount as shall equal the interest payment that is then due ("*Additional Notes*") or in a combination of Cash and Additional Notes at the respective rates applicable to such forms of payment; and (b) thereafter until the principal thereof is paid or made available for payment, payable in cash at the rate of 10% per annum.  The Notes issued on the Issue Date and any Additional Notes shall be treated as a single class for all purposes under this Indenture.

The principal of (and premium, if any) and interest on the Notes shall be payable at the office or agency of the Issuer in the Borough of Manhattan, The City of New York maintained for such purpose and at any other office or agency maintained by the Issuers for such purpose or, in the case of a Global Note, shall be paid by wire transfer of immediately available funds or Additional Notes, as determined by the Company pursuant to *Section 2.19* hereof, to the accounts specified by the Holders of the Notes; *provided, however,* that at the option of the Issuers payment of interest payable in cash may be made by check mailed to the address of the Person entitled thereon and as such address shall appear in the Register.

The Notes shall be subject to repurchase by the Issuers pursuant to a Change of Control Offer or an Asset Sale Offer as provided in Sections 4.11 and 4.13.

The Notes shall be redeemable as provided in *Article Three*.

The Notes shall be subject to defeasance and covenant defeasance as provided in *Article Twelve*.

The "issue price" and "yield to maturity" of a Note for U.S. federal income tax purposes shall be determined by the Issuers and shall be binding on all Holders and persons holding beneficial interests in the Notes.

SECTION 2.03.    *Execution and Authentication.*

An Officer (who shall have been duly authorized by all requisite corporate actions) shall sign the Notes for each of the Issuers by manual or facsimile signature.

If an Officer whose signature is on a Note was an Officer at the time of such execution but no longer holds that office or position at the time the Trustee authenticates the Note, the Note shall nevertheless be valid.

A Note shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Note.  The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee shall authenticate (i) Initial Notes for original issue in the aggregate principal amount not to exceed $50,000,000 plus the amount by which Noteholder Cash (as defined in the Plan) is less than $90.0 million; and (ii) subject to compliance with *Sections 2.02* and *2.19*,

Additional Notes upon written orders of the Issuers in the form of an Officers' Certificate, which Officers' Certificate shall, in the case of any issuance of Additional Notes, certify that such issuance is in compliance with *Sections 2.02* and *2.19*. In addition, each Officers' Certificate shall specify the amount of Notes to be authenticated and the date on which the Notes are to be authenticated, whether the Notes are to be Initial Notes or Additional Notes, and shall further specify the amount of such Notes to be issued as Global Notes or Physical Notes. All Notes issued under this Indenture shall vote and consent together on all matters as one class and no series of Notes shall have the right to vote or consent as a separate class on any matter.

The Trustee may appoint an authenticating agent (the "*Authenticating Agent*") reasonably acceptable to the Issuers to authenticate Notes. Unless otherwise provided in the appointment, an Authenticating Agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such Authenticating Agent. An Authenticating Agent has the same rights as an Agent to deal with the Issuers and Affiliates of the Issuers.

The Notes shall be issuable in fully registered form only, without coupons, in denominations of $1.00 in principal amount and any integral multiple thereof.

SECTION 2.04.    *Registrar and Paying Agent.*

Each Issuer shall maintain an office or agency which shall initially be the office of the Trustee in the Borough of Manhattan, The City of New York, where (a) Notes may be presented or surrendered for registration of transfer or for exchange (the "*Registrar*"), (b) Notes may be presented or surrendered for payment (the "*Paying Agent*") and (c) notices and demands to or upon the Issuers in respect of the Notes and this Indenture may be served. The Registrar shall keep a register of the Notes and of their transfer and exchange (the "*Register*"). The Issuers, upon prior written notice to the Trustee, may have one or more co-Registrars and one or more additional Paying Agents reasonably acceptable to the Trustee. The term "*Paying Agent*" includes any additional Paying Agent. Neither the Issuers nor any Affiliate of the Issuers may act as Paying Agent.

The Issuers shall enter into an appropriate agency agreement with any Agent not a party to this Indenture, which agreement shall incorporate the provisions of the TIA and implement the provisions of this Indenture that relate to such Agent. The Issuers shall notify the Trustee in writing, in advance, of the name and address of any such Agent and otherwise be reasonably satisfactory to the Trustee. If either Issuer fails to maintain a Registrar or Paying Agent, or fails to give the foregoing notice, the Trustee shall act as such.

The Issuers initially appoint the Trustee as Registrar, Paying Agent and agent for service of demands and notices in connection with the Notes. The Paying Agent or Registrar may resign upon thirty (30) days' written notice to the Issuers.

SECTION 2.05.    *Obligations of Paying Agent.*

The Issuers shall require each Paying Agent other than the Trustee to agree in writing that such Paying Agent shall hold separate and apart from, and not commingle with any other properties, for the benefit of the Holders or the Trustee, all assets held by the Paying Agent for

the payment of principal of, or interest on, the Notes (whether such assets have been distributed to it by the Issuers or any other obligor on the Notes), and the Issuers and the Paying Agent shall notify the Trustee in writing of any Default by the Issuers (or any other obligor on the Notes) in making any such payment.  The Issuers at any time may require a Paying Agent to distribute all assets held by it to the Trustee and account for any assets disbursed and the Trustee may at any time during the continuance of any payment Default, upon written request to a Paying Agent, require such Paying Agent to distribute all assets held by it to the Trustee and to account for any assets distributed.  Upon receipt by the Trustee of all assets that shall have been delivered by the Issuers to the Paying Agent, the Paying Agent shall have no further liability for such assets.

SECTION 2.06.  *Holder Lists*.

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of the Holders and shall otherwise comply with TIA Section 312(a).  If the Trustee is not the Registrar, the Issuers shall furnish or cause the Registrar to furnish to the Trustee before each Record Date and at such other times as the Trustee may request in writing a list as of such date and in such form as the Trustee may reasonably request of the names and addresses of the Holders, which list may be conclusively relied upon by the Trustee.

SECTION 2.07.  *Transfer and Exchange*.

Subject to the provisions of *Section 2.15*, when Notes are presented to the Registrar or a co-Registrar with a request to register the transfer of such Notes or to exchange such Notes for an equal principal amount of Notes of other authorized denominations, the Registrar or co-Registrar shall register the transfer or make the exchange as requested; *provided, however,* that the Notes presented or surrendered for registration of transfer or exchange shall be duly endorsed or accompanied by a written instrument of transfer in form satisfactory to the Issuers and the Registrar or co-Registrar, duly executed by the Holder thereof or his attorney duly authorized in writing and such other documents as the Registrar or Co-Registrar may reasonably require.  To permit registrations of transfers and exchanges, the Issuers shall issue and the Trustee shall authenticate Notes at the Registrar's or co-Registrar's request.  No service charge shall be made for any registration of transfer or exchange, but the Issuers or the Trustee may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchanges or transfers pursuant to *Section 2.11, 3.06, 4.11* or *4.13,* in which event the Issuers shall be responsible for the payment of such taxes).

The Registrar or co-Registrar shall not be required to register the transfer or exchange of any Note (i) during a period beginning at the opening of business fifteen (15) days before the mailing of a notice of redemption of Notes and ending at the close of business on the day of such mailing and (ii) selected for redemption in whole or in part pursuant to *Article Three,* except the unredeemed portion of any Note being redeemed in part.

Any Holder of a Global Note shall, by acceptance of such Global Note, agree that transfers of beneficial interests in such Global Note may be effected only through DTC, in accordance with this Indenture and the Applicable Procedures.

37

SECTION 2.08.    *Replacement Notes.*

If a mutilated Note is surrendered to the Trustee or if the Holder of a Note claims in writing that the Note has been lost, destroyed or wrongfully taken, then, in the absence of written notice to the Issuers upon their request or the Trustee that such Note has been acquired by a protected purchaser, the Issuers shall issue and the Trustee shall authenticate a replacement Note of like tenor and principal amount and bearing a number not contemporaneously outstanding if the Trustee's requirements are met.  Except with respect to mutilated Notes, if required by the Trustee or the Issuers, such Holder must provide an affidavit of lost certificate and an indemnity bond or other indemnity, sufficient in the judgment of both the Issuers and the Trustee, to protect the Issuers, the Trustee or any Agent from any loss which any of them may suffer if a Note is replaced.  The Issuers may charge such Holder for its reasonable out-of-pocket expenses in replacing a Note, including reasonable fees and expenses of its counsel and of the Trustee and its counsel.  In case any mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Issuers in their discretion may pay such Note instead of issuing a new Note in replacement thereof.  Every replacement Note shall constitute an additional obligation of the Issuers, entitled to the benefits of this Indenture.

SECTION 2.09.    *Outstanding Notes.*

Notes outstanding at any time are all the Notes that have been authenticated by the Trustee except those cancelled by it, those delivered to it for cancellation and those described in this *Section 2.09* as not outstanding.  Subject to the provisions of *Section 2.10*, a Note does not cease to be outstanding because the Issuers or any of their Affiliates holds the Note.

If a Note is replaced pursuant to *Section 2.08* (other than a mutilated Note surrendered for replacement), it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a *bona fide* purchaser.  A mutilated Note ceases to be outstanding upon surrender of such Note and replacement thereof pursuant to *Section 2.08*.

If on a Redemption Date or the Maturity Date the Paying Agent holds U.S. Legal Tender or U.S. Government Obligations sufficient to pay all of the principal and interest due on the Notes payable on that date and is not prohibited from paying such money to the Holders thereof pursuant to the terms of this Indenture, then on and after that date such Notes cease to be outstanding and interest on them ceases to accrue.

SECTION 2.10.    *Treasury Notes; When Notes Are Disregarded.*

In determining whether the Holders of the required principal amount of Notes have concurred in any direction or consent, Notes owned by the Issuers or any of their Affiliates shall be considered as though they are not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction or consent, only Notes which a Trust Officer of the Trustee actually knows are so owned shall be so considered.  Notes so owned which have been pledged in good faith may be regarded as outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not one of the Issuers or any other obligor upon the Notes or any Affiliate of the Issuers or of such other obligor.  The Issuers shall notify the Trustee, in writing

38

(which notice shall constitute actual notice for purposes of the foregoing sentence), when one of them or any of their Affiliates repurchases or otherwise acquires Notes, of the aggregate principal amount of such Notes so repurchased or otherwise acquired.

SECTION 2.11.    *Temporary Notes.*

Until definitive Notes are ready for delivery, the Issuers may prepare and execute and the Trustee shall authenticate temporary Notes upon receipt of a written order of the Issuers in the form of an Officers' Certificate. The Officers' Certificate shall specify the amount of temporary Notes to be authenticated and the date on which the temporary Notes are to be authenticated. Temporary Notes shall be substantially in the form of definitive Notes but may have variations that the Issuers consider appropriate for temporary Notes. Without unreasonable delay, the Issuers shall prepare and the Trustee shall authenticate upon receipt of a written order of the Issuers pursuant to *Section 2.03* definitive Notes in exchange for temporary Notes. Until so exchanged, the temporary Notes shall be entitled to the same benefits under this Indenture as definitive Notes.

SECTION 2.12.    *Cancellation.*

The Issuers at any time may deliver Notes previously authenticated hereunder which the Issuers have acquired in any lawful manner, to the Trustee for cancellation. The Registrar and the Paying Agent shall forward to the Trustee any Notes surrendered to them for transfer, exchange or payment. The Trustee, or at the direction of the Trustee, the Registrar or the Paying Agent, and no one else, shall cancel all Notes surrendered for transfer, exchange, payment or cancellation. Subject to *Section 2.08*, the Issuers may not issue new Notes to replace Notes that they have paid or delivered to the Trustee for cancellation. If the Issuers shall acquire any of the Notes, such acquisition shall not operate as a redemption or satisfaction of the Indebtedness represented by such Notes unless and until the same are surrendered to the Trustee for cancellation pursuant to this *Section 2.12*. The Trustee shall dispose of all cancelled Notes in accordance with customary procedures or, at the written request of the Issuers, shall return the same to the Issuers.

SECTION 2.13.    *CUSIP Numbers.*

A "*CUSIP*" number shall be printed on the Notes, and the Trustee shall use the CUSIP number in notices of redemption, purchase or exchange as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness or accuracy of the CUSIP number printed in the notice or on the Notes and that reliance may be placed only on the other identification numbers printed on the Notes. The Issuers shall promptly notify the Trustee of any change in the CUSIP number.

SECTION 2.14.    *Deposit of Moneys.*

Prior to 11:00 a.m. New York City time on each Interest Payment Date and the Maturity Date, the Issuers shall deposit with the Paying Agent U.S. Legal Tender sufficient to make cash payments, if any, due on such Interest Payment Date or the Maturity Date, as the case may be.

SECTION 2.15.    *Book-Entry Provisions for Global Notes.*

(a)    The Global Notes initially shall (i) be registered in the name of DTC or the nominee of DTC, (ii) be delivered to the Trustee as custodian for DTC and (iii) bear legends as set forth in *Exhibit B*.

Members of, or participants in, DTC ("*Agent Members*") shall have no rights under this Indenture with respect to any Global Note held on their behalf by DTC, or the Trustee as its custodian, or under any Global Note, and DTC may be treated by the Issuers, the Trustee and any agent of the Issuers or the Trustee as the absolute owner of the Global Note for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Issuers, the Trustee or any agent of the Issuers or the Trustee from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Note.

(b)    Transfers of the Global Notes shall be limited to transfers in whole, but not in part, to DTC, its successors or their respective nominees. Interests of beneficial owners in the Global Notes may be transferred or exchanged in accordance with the Applicable Procedures of DTC. In addition, certified Notes in registered form set forth in Exhibit A (the "Physical Notes") shall be transferred to all beneficial owners in exchange for their beneficial interests in the Global Notes if (i) DTC notifies the Issuers that it is unwilling or unable to continue as Depository for the Global Notes and a successor Depository is not appointed by the Issuers within ninety (90) days of such notice or (ii) an Event of Default has occurred and is continuing and the Registrar has received a request from DTC to issue Physical Notes.

(c)    Any beneficial interest in one of the Global Notes that is transferred to a person who takes delivery in the form of an interest in another Global Note shall, upon transfer, cease to be an interest in such Global Note and become a beneficial interest in such other Global Note and, accordingly, shall thereafter be subject to all transfer restrictions, if any, and other procedures applicable to a beneficial interest in such other Global Notes for as long as it remains such an interest.

(d)    In connection with any transfer or exchange of a portion of the beneficial interest in the Global Note to beneficial owners pursuant to *paragraph (b)* of this *Section 2.15*, the Registrar shall (if one or more Physical Notes are to be issued) reflect on its books and records the date and a decrease in the principal amount of the Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note to be transferred, and the Issuers shall execute, and the Trustee shall authenticate and deliver, one or more Physical Notes of like tenor and aggregate principal amount.

(e)    In connection with the transfer of an entire Global Note to beneficial owners pursuant to *paragraph (b)* of this *Section 2.15*, the Global Notes shall be deemed to be surrendered to the Trustee for cancellation, and the Issuers shall execute, and the Trustee shall authenticate and deliver, to each beneficial owner identified by DTC in exchange for its beneficial interest in the Global Notes, an equal aggregate principal amount of Physical Notes of authorized denominations.