books of the Registrar and shall be sufficiently given to such Holder if so mailed within the time prescribed.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders. If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it.

SECTION 11.03. *Communications by Holders with Other Holders.*

Holders may communicate pursuant to TIA Section 312(b) with other Holders with respect to their rights under this Indenture, any Collateral Agreement, any Guarantee or the Notes. The Issuers, the Trustee, the Registrar and any other Person shall have the protection of TIA Section 312(c).

SECTION 11.04. *Certificate and Opinion as to Conditions Precedent.*

Upon any request or application by the Issuers or any Guarantor to the Trustee to take any action under this Indenture or any Collateral Agreement, the Issuers shall furnish to the Trustee upon request:

(1) an Officers' Certificate, in form and substance reasonably satisfactory to the Trustee, stating that, in the opinion of the signers, all conditions precedent to be performed by the Issuers or the applicable Guarantor (as the case may be), if any, provided for in this Indenture or any Collateral Agreement relating to the proposed action have been complied with; and

(2) an Opinion of Counsel stating that, in the opinion of such counsel, all such conditions precedent to be performed by the Issuers or the applicable Guarantor (as the case may be), if any, provided for in this Indenture or any Collateral Agreement relating to the proposed action have been complied with.

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such eligible and qualified Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Officer of an Issuer may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any certificate or opinion of counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of an Issuer stating the information on which counsel is relying unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

SECTION 11.05. *Statements Required in Certificate or Opinion.*

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture or any Collateral Agreement, other than the Officers' Certificate required by *Section 4.06*, shall include:

(1)     a statement that the Person making such certificate or opinion has read such covenant or condition;

(2)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)     a statement that, in the opinion of such Person, he has made such examination or investigation as is reasonably necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4)     a statement as to whether or not, in the opinion of each such Person, such condition or covenant has been complied with.

Notwithstanding any provision of this Indenture, any Note or any Collateral Agreement to the contrary, any Opinion of Counsel delivered hereunder may contain such qualifications, assumptions and limitations as are customary for such opinions.

SECTION 11.06. *Rules by Trustee, Paying Agent, Registrar.*

The Trustee may make reasonable rules in accordance with the Trustee's customary practices for action by or at a meeting of Holders. The Paying Agent or Registrar may make reasonable rules for its functions.

SECTION 11.07. *Legal Holidays.*

A *"Legal Holiday"* used with respect to a particular place of payment is a Saturday, a Sunday or a day on which banking institutions in New York, New York or at such place of payment are not required to be open. If a payment date is a Legal Holiday at such place, payment may be made at such place on the next succeeding day that is not a Legal Holiday, and no interest shall accrue for the intervening period.

SECTION 11.08. *Governing Law.*

THIS INDENTURE, THE NOTES AND THE GUARANTEES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AS APPLIED TO CONTRACTS MADE AND PERFORMED WITHIN THE

STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS. EACH OF THE PARTIES HERETO AGREES TO SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE.

SECTION 11.09. *No Adverse Interpretation of Other Agreements.*

This Indenture may not be used to interpret another indenture, loan or debt agreement of the Issuers or any of their Subsidiaries. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

SECTION 11.10. *No Recourse Against Others.*

A past, present or future director, officer, employee, stockholder or incorporator, as such, of the Issuers, any Guarantor or of the Trustee shall not have any liability for any obligations of the Issuers or the Guarantors under the Notes, the Guarantees, the Collateral Agreements or this Indenture or for any claim based on, in respect of or by reason of such obligations or their creation. Each Holder, by accepting a Note, waives and releases all such liability. Such waiver and release are part of the consideration for the issuance of the Notes.

SECTION 11.11. *Successors.*

All agreements of the Issuers and the Guarantors in this Indenture, the Notes, and the Guarantees shall bind their successors. All agreements of the Trustee in this Indenture shall bind their respective successors.

SECTION 11.12. *Duplicate Originals.*

All parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together shall represent the same agreement.

SECTION 11.13. *Severability.*

In case any one or more of the provisions in this Indenture, the Notes or in the Guarantees shall be held invalid, illegal or unenforceable, in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions shall not in any way be affected or impaired thereby, it being intended that all of the provisions hereof shall be enforceable to the full extent permitted by law.

SECTION 11.14. *Waiver of Jury Trial.*

EACH OF THE ISSUERS AND THE GUARANTORS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS INDENTURE, THE NOTES, THE GUARANTEES, THE COLLATERAL AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED BY THIS INDENTURE.

**ARTICLE TWELVE**
**SECURITY**

SECTION 12.01. *Grant of Liens*.

(a)　　To secure the due and punctual payment of the principal of, premium, if any, and interest on the Notes and amounts due hereunder and under the Guarantees when and as the same shall be due and payable, whether on an Interest Payment Date, by acceleration, Mandatory Prepayment, purchase, repurchase, redemption or otherwise, and interest on the overdue principal of, premium, if any, and interest (to the extent permitted by law), if any, on the Notes and the performance of all other Obligations of the Issuers and the Guarantors to the Holders or the Trustee under this Indenture, the Collateral Agreements, the Guarantees and the Notes, the Issuers and the Guarantors hereby covenant to cause the Collateral Agreements to be executed and delivered concurrently with this Indenture. The Collateral Agreements shall provide for the grant by the Issuers and Guarantors party thereto to the Trustee security interests in the Collateral.

(b)　　On the Issue Date there shall be established and, at all times hereafter until the Obligations of the Issuers under this Indenture, the Notes and the Collateral Agreements are discharged or defeased in accordance with this Indenture, there shall be maintained by the Company with the Trustee, the Collateral Account. The Collateral Account shall be established and maintained with the Trustee at its Corporate Trust Office and designated in the name of the Company, subject to the security interest in favor of the Trustee. All Trust Monies shall be deposited in the Collateral Account and thereafter shall be held by and under the control of the Trustee for its benefit and for the benefit of the Holders as a part of the Collateral and, upon any entry upon or sale or other disposition of the Collateral or any part thereof pursuant to any of the Collateral Agreements, said Trust Monies shall be applied in accordance with Section 6.10 hereof; but prior to any such entry, sale or other disposition, all or any part of the Trust Monies held by the Trustee may be withdrawn, and shall be released, paid or applied by the Trustee in accordance with the terms of this *Article Twelve*.

(c)　　Each Holder, by its acceptance of a Note, consents and agrees to the terms of each Collateral Agreement, as the same may be in effect or may be amended from time to time in accordance with their respective terms, and authorizes and directs the Trustee to enter into the Collateral Agreements and to perform its obligations and exercise its rights thereunder in accordance therewith. The Issuers shall, and shall cause each of their Domestic Restricted Subsidiaries to, do or cause to be done all such actions and things as may be necessary or proper, or as may be required by the provisions of the Collateral Agreements, to assure and confirm to the Trustee the security interests in the Collateral contemplated hereby and by the Collateral Agreements, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes and Guarantees secured hereby, according to the intent and purpose herein and therein expressed. The Parent and the Issuers shall, and shall cause each of their respective Domestic Restricted Subsidiaries to, take any and all actions required or as may be requested by the Trustee to cause the Collateral Agreements to create and maintain, as security for the Obligations contained in this Indenture, the Notes, the Collateral Agreements and the Guarantees valid and enforceable, perfected (except as expressly provided herein or therein) security interests or Liens in and on all the Collateral, in favor of the Trustee,

103

superior to and prior to the rights of all third Persons, and subject to no other Liens, in each case, except as expressly provided herein or therein.

SECTION 12.02. *Recording and Opinions.*

(a)    The Parent and the Issuers shall, and shall cause each of their respective Domestic Restricted Subsidiaries to, take or cause to be taken all action required to perfect, maintain, preserve and protect the security interests and Liens in the Collateral granted by the Collateral Agreements, including (i) the filing of financing statements, continuation statements, collateral assignments and any instruments of further assurance, in such manner and in such places as may be required by law to preserve and protect fully the rights of the Holders and the Trustee under this Indenture and the Collateral Agreements to all property comprising the Collateral, and (ii) the delivery of the certificates evidencing the securities pledged under the Security Agreement or the Pledge Agreement, duly endorsed in blank, it being understood that concurrently with the execution of this Indenture, Parent, the Issuers and their respective Domestic Restricted Subsidiaries have delivered financing statements for filing by the Trustee or its agents. The Issuers shall from time to time promptly pay all financing and continuation statement recording and/or filing fees, charges and recording and similar taxes relating to this Indenture, the Collateral Agreements and any amendments hereto or thereto and any other instruments of further assurance required pursuant hereto or thereto.

(b)    The Issuers shall furnish to the Trustee, at such time as required by TIA Section 314(b) and, as reasonably requested by the Trustee, promptly after the execution and delivery of any other instrument of further assurance or amendment granting, perfecting, protecting, preserving or making effective a security interest or Lien pursuant to any Collateral Agreement, an Opinion of Counsel either (i) stating that, in the opinion of such counsel, this Indenture and the Collateral Agreements, financing statements and fixture filings then executed and delivered, as applicable, and all other instruments of further assurance or amendment then executed and delivered have been properly recorded, registered and filed, and all certificates evidencing securities pledged to the Trustee for the benefit of itself and the Holders under the Security Agreement or the Pledge Agreement have been delivered and duly endorsed in blank, to the extent necessary to perfect the security interests and Liens created by this Indenture and the Collateral Agreements and reciting the details of such action or referring to prior Opinions of Counsel in which such details are given, and stating that as to such Collateral Agreements and such other instruments, such recording, registering, filing and delivery are the only recordings, registerings, filings and deliveries necessary to perfect such security interest or Lien and that no re-recordings, re-registerings, re-filings or re-deliveries are necessary to maintain such perfection, and further stating that all financing statements and continuation statements have been executed and filed, and all such certificates have been delivered, that are necessary fully to preserve and protect the rights of and perfect such security interests and Liens of the Trustee for the benefit of itself and the Holders, under the Collateral Agreements or (ii) stating that, in the Opinion of such Counsel, no such action is necessary to perfect any security interest created under this Indenture, the Notes or any of the Collateral Agreements as intended by this Indenture, the Notes or any such Collateral Agreement.

(c)    Annually, within three months after _____ of each year and beginning with the year 2009, the Issuers shall furnish to the Trustee, an Opinion of Counsel, dated as of such

104

date, either (i) stating that:  (A) in the opinion of such counsel, action has been taken with respect to the registering, recording, filing, re-recording, re-registering and refiling of this Indenture, and all supplemental indentures, financing statements, continuation statements and other documents, and delivery of all certificates, as are then necessary to perfect or continue the perfection of the security interests and Liens created by the Collateral Agreements and reciting the details of such action or referring to prior Opinions of Counsel in which such details are given; and (B) based on relevant laws as in effect on the date of such Opinion of Counsel, all financing statements, continuation statements and other documents have been executed and filed that are necessary as of such date and during the succeeding twenty-four (24) months fully to maintain, perfect or continue the perfection of such security interests and Liens under the Collateral Agreements with respect to the Collateral and to maintain, preserve, and protect the rights of the Holders and the Trustee hereunder and under the Collateral Agreements or (ii) stating that, in the opinion of such counsel, no such action is then necessary to perfect or continue the perfection of such security interests and Liens.

SECTION 12.03. *Release of Collateral.*

(a)    The Trustee shall not at any time release Collateral from the security interests and Liens created by the Collateral Agreements unless such release is in accordance with the provisions of this Indenture and the applicable Collateral Agreements.

(b)    At any time when a Default or an Event of Default shall have occurred and be continuing, no release of Collateral pursuant to the provisions of this Indenture and the Collateral Agreements shall be effective as against the Holders.

(c)    The release of any Collateral from the terms of the Collateral Agreements shall not be deemed to impair the security under this Indenture in contravention of the provisions hereof if and to the extent the Collateral is released pursuant to this Indenture and the Collateral Agreements. Except as provided by *Section 12.04* below, to the extent applicable, the Issuers and the Guarantors shall comply with TIA Section 314(d) relating to the release of property from the security interests created by this Indenture and the Collateral Agreements. Any certificate or opinion required by TIA Section 314(d) may be made by an Officer of the Issuers, except in cases where TIA Section 314(d) requires that such certificate or opinion be made by an independent Person, which Person shall be an independent engineer, appraiser or other expert selected or approved by the Trustee in the exercise of reasonable care. A Person is "independent" if such Person (a) is in fact independent, (b) does not have any direct financial interest or any material indirect financial interest in the Issuers or in any Affiliate of the Issuers and (c) is not an officer, employee, promoter, underwriter, trustee, partner or director or person performing similar functions to any of the foregoing for the Issuers. The Trustee shall be entitled to receive and conclusively rely upon a certificate provided by any such Person confirming that such Person is independent within the foregoing definition.

(d)    Notwithstanding any provision to the contrary herein, Collateral comprised of accounts receivable, inventory or (prior to the occurrence and during the continuance of an Event of Default) the proceeds of the foregoing shall be subject to release upon sales of such inventory and collection of the proceeds of such accounts receivable in the ordinary course of business. If requested in writing by the Issuers, the Trustee shall execute and deliver such documents,

instruments or statements and to take such other action as the Issuers may reasonably request to evidence or confirm that the Collateral falling under this *Section 12.03* and *Section 12.04* below has been released from the Liens of each of the Collateral Agreements.

SECTION 12.04. *Disposition of Certain Collateral without Requesting Release.*

(a)    In the case of transactions permitted by *Section 12.04(c)* hereof, the Issuers and the Guarantors shall deliver to the Trustee, within 15 days after the end of each of the six-month periods ended on June 30 and December 31 in each year, an Officers' Certificate to the effect that all transactions effected pursuant to *Section 12.04(c)* hereof during the preceding six-month period were made in the ordinary course of business and that all proceeds therefrom were used by the Issuers and the Guarantors as permitted herein. The Issuers shall provide the Trustee with a copy of any exemption granted by the SEC and promptly inform the Trustee of any rescission or termination of, or amendment to such exemption.

(b)    The fair value of Collateral released from the Liens granted under the Collateral Agreements pursuant to *Section 12.04(c)* hereof shall not be considered in determining whether the aggregate fair value of Collateral released from the Liens granted under the Collateral Agreements in any calendar year exceeds the 10% threshold specified in Section 314(d)(1) of the TIA; provided that the Issuers' and the Guarantors' right to rely on this sentence at any time is conditioned upon the Issuers and the Guarantors having furnished to the Trustee all certificates described in *Section 12.04(a)* hereof that were required to be furnished to the Trustee at or prior to such time.

(c)    As long as the Issuers and the Guarantors are in compliance with the provisions of *Section 12.04(a)* hereof, the Issuers and the Guarantors may, pursuant to and in accordance with this Indenture and the Collateral Agreements, without requesting the release or consent of the Trustee:

(i)    sell or dispose of in the ordinary course of business free from the Liens granted under the Collateral Agreements, any machinery, equipment, furniture, apparatus, tools or implements, materials or supplies or other similar property ("*Subject Property*") which, in its reasonable opinion, may have become obsolete, worn-out, surplus or no longer used in the conduct of its businesses or the operation granted under the Collateral Agreement upon replacing the same with, or substituting for the same, new Subject Property constituting Collateral not necessarily of the same character but being of at least equal value and utility as the Subject Property so disposed of as long as such new Subject Property becomes subject to the Liens granted under the Collateral Agreements, which new subject Property shall without further action become Collateral subject to the Liens granted under the Collateral Agreements;

(ii)    abandon, sell, assign, transfer, license or otherwise dispose of in the ordinary course of business any personal property the use of which is no longer necessary or desirable in the proper conduct of the business of the Parent and/or the Issuers and the maintenance of its earnings and is not material to the conduct of the business of the Issuers and their Subsidiaries taken as a whole or the Parent and its Subsidiaries taken as a whole, as the case may be;

106

(iii)     [intentionally omitted]

(iv)     sell, transfer or otherwise dispose of inventory in the ordinary course of business;

(v)     sell, collect, liquidate, factor or otherwise dispose of Accounts (as defined in the Security Agreement) and accounts receivable in the ordinary course of business; and

(vi)     make cash payments (including for the scheduled repayment of Indebtedness) from cash that is at any time part granted under the Collateral in the ordinary course of business that are not otherwise prohibited by this Indenture or any Collateral Agreement.

(d)     To the extent the Issuers have not complied with *Section 12.04(a)* hereof, the Issuers shall not dispose of or transfer (by lease, assignment, sale or otherwise), in any transaction or any series of related transactions, Collateral pursuant to the provisions of *Section 12.04(c)* hereof with a fair value equal to 10% or more of the aggregate outstanding principal amount of the Notes (as determined in the good faith judgment of the Issuers and, if required by the TIA, an independent appraiser).

SECTION 12.05. *Specified Releases of Collateral.*

(a)     The Issuers and the Guarantors shall be entitled to obtain a full release of items of Collateral (the "*Released Interests*") from the security interests and Liens created by this Indenture, the Notes and the Collateral Agreements upon compliance with the conditions precedent set forth in *Section 4.13, 8.01* or *8.02* of this Indenture and the applicable Collateral Agreements. So long as no Default or Event of Default exists, upon the request of the Issuers or any Guarantor and the furnishing of each of the items required by *Section 12.04(b)*, the Trustee shall forthwith take such action (at the request of and the expense of the Issuers or such Guarantor, without recourse or warranty and without any representation of any kind), including the delivery of appropriate UCC-3 termination statements, to release and reconvey to such Issuer or such Guarantor all of the Released Interests, and shall deliver such Released Interests in its possession to such Issuer or such Guarantor.

(b)     So long as no Default or Event of Default exists, the Issuers and the Guarantors shall be entitled to obtain a release of, and the Trustee shall release, the Released Interests upon compliance with the condition precedent that such Issuer or such Guarantor shall have satisfied all applicable conditions precedent to any such release set forth in this Indenture and the applicable Collateral Agreements as set forth in an Officers' Certificate and an Opinion of Counsel delivered to the Trustee and shall have delivered to the Trustee the following, as applicable:

(i)     in connection with release of Collateral resulting from an Asset Sale under *Section 4.13*, notice from the Issuers requesting the release of Released Interests: (A) describing the proposed Released Interests (other than with respect to an Asset Sale for which the consideration is Replacement Assets, in which case such notice shall include a statement that the Fair Market Value of such Replacement Assets is at least

107

equal to the Fair Market Value of such Released Interests); (B) specifying the estimated value of such Released Interests on a date within sixty (60) days of such notice (the "*Valuation Date*"); (C) stating that the purchase price received is at least equal to the fair market value of the Released Interests (other than with respect to an Asset Sale for which the consideration is Replacement Assets, in which case such notice shall include a statement that the Fair Market Value of such Replacement Assets is at least equal to the Fair Market Value of such Released Interests); (D) stating that the release of such Released Interests, taking into account any concurrent replacement of such assets, would not be expected to interfere in any material respect with the Trustee's ability to realize the value of the remaining Collateral and shall not impair in any material respect the maintenance and operation of the remaining Collateral; and (E) certifying that such Asset Sale complies with the terms and conditions of this Indenture with respect thereto and the applicable Collateral Agreements with respect thereto;

(ii)    in connection with release of Collateral resulting from an Asset Sale under *Section 4.13*, an Officers' Certificate of the Company or the Parent, as the case may be stating that (A) such Asset Sale covers only the Released Interests and complies with the terms and conditions of this Indenture with respect to Asset Sales; (B) there is no Default or Event of Default in effect or continuing on the date thereof, the Valuation Date or the date of such Asset Sale; (C) the release of the Collateral shall not result in a Default or Event of Default under this Indenture; and (D) all conditions precedent in this Indenture relating to the release in question have been or shall be complied with.

(iii)    in connection with release of Collateral resulting from an Asset Sale under *Section 4.13*, the Net Cash Proceeds and other non-cash consideration from the Asset Sale required to be delivered to the Trustee pursuant to this Indenture;

(iv)    to the extent required by the TIA, an Officers' Certificate of the Issuers and an Opinion of Counsel certifying that all conditions precedent to the release of the Released Interests have been met and that such release complies with the terms and conditions of this Indenture and the applicable Collateral Agreements; and

(v)    all applicable certificates, opinions and other documentation required by the TIA or this Indenture, if any.

If the Parent, the Issuers or any Domestic Restricted Subsidiary engages in any direct or indirect sale, issuance, conveyance, transfer, lease, assignment or other transfer for value of any Collateral of the type described in *clause (a), (c), (d), (e), (f), (g), (h), (i), (j)* or *(k)* of the proviso to the definition of the term "Asset Sale," the Liens of the Trustee on such Collateral shall automatically terminate and be released without any action by the Trustee, and the Trustee shall, at the sole cost and expense of the Parent, the Issuers or such Domestic Restricted Subsidiary, as the case may be, execute and deliver to the Parent, the Issuers or such Domestic Restricted Subsidiary such documents, without any representation, warranty or recourse of any kind whatsoever, as the Parent, such Issuer or such Domestic Restricted Subsidiary shall reasonably request to effect or evidence such termination.

SECTION 12.06. *Withdrawal of Net Cash Proceeds to Fund a Mandatory Prepayment.*

To the extent that any Trust Monies consist of Net Cash Proceeds described in Section 3.07, such Trust Monies shall be withdrawn and shall be utilized by the Trustee to make a Mandatory Prepayment for the Issuers pursuant to Section 3.07:

SECTION 12.07. *Withdrawal of Net Cash Proceeds to Fund a Net Proceeds Offer.*

To the extent that any Trust Monies consist of Net Cash Proceeds of Collateral received by the Trustee pursuant to the provisions of Sections 4.13 and 12.01(b) hereof and a Net Proceeds Offer has been made in accordance therewith, such Trust Monies may be withdrawn by the Company and shall be paid by the Trustee to the Paying Agent for application in accordance with Section 4.13 hereof upon receipt by the Trustee of the following:

(a)     An Officers' Certificate, dated not more than three Business Days prior to the Net Proceeds Offer Payment Date, stating:

(i)     that no Event of Default shall have occurred and be continuing after giving effect to such application;

(ii)     (x) that such Trust Monies constitute Net Cash Proceeds of Collateral, (y) that pursuant to and in accordance with Section 4.13 hereof, the Company has made an Net Proceeds Offer and (z) the amount of the Net Proceeds Offer Amount to be applied to the repurchase of the Notes pursuant to the Net Proceeds Offer;

(iii)     the Net Proceeds Offer Payment Date; and

(iv)     that all conditions precedent herein provided for relating to such application of Trust Monies have been complied with; and

(b)     All documentation, if any, required under TIA Section 314(d).

Upon compliance with the foregoing provisions of this Section 12.07, the Trustee shall apply the Trust Monies as directed and specified by such Company Notice, subject to Section 4.13 hereof.

SECTION 12.08. *Withdrawal of Trust Monies Pursuant to Section 4.13.*

In the event the Company intends to utilize Net Cash Proceeds of an Asset Sale of Collateral (the "Released Trust Monies") in a manner provided for in clause 3(b) of the first sentence of the first paragraph of Section 4.13, such Net Proceeds constituting Trust Monies may be withdrawn by the Company and shall be paid by the Trustee to the Company upon receipt by the Trustee of the following:

(a)     An Officers' Certificate of the Company which shall (i) refer to this Section 12.08, and (ii) describe with reasonable particularity the Replacement Assets to be invested in with respect to the Released Trust Monies and which shall certify that (i) such Trust Monies

constitute Net Cash Proceeds of Collateral, and (ii) all conditions precedent herein to such release have been complied with;

(b)     All documentation required under the TIA (including, without limitation, TIA Section 314(d));

(c)     If any Replacement Asset is Real Property, the Company or the appropriate Guarantor shall also deliver to the Trustee a Mortgage, policy of title insurance, survey and documents of the type described in Section 4.20, in each case in form and substance satisfactory to the Trustee;

(d)     If any Replacement Asset is personal property constituting Collateral, the Company or the appropriate Guarantor shall deliver to the Trustee:

(i)     a Collateral Agreement or an amendment to an existing Collateral Agreement and such financing statements and other instruments, if any, necessary to create and perfect the Lien of any applicable Collateral Agreement on such personal property interest; and

(ii)     evidence of payment or a closing statement indicating payments to be made by the Company or the appropriate Guarantor of all filing fees, recording charges and/or transfer taxes, if any, and other costs and expenses, including reasonable legal fees and disbursements of one counsel for the Trustee (and any local counsel), that may be incurred to validly and effectively subject the Replacement Asset to the Lien of any Collateral Agreement; and

(e)     An Opinion of Counsel substantially to the effect that:

(i)     all conditions precedent herein provided for relating to such application of Trust Monies have been complied with; and

(ii)     to the extent that such Replacement Assets constitute Collateral and were acquired with Net Cash Proceeds of Collateral, the relevant Collateral Agreements create a Lien in favor of the Trustee on such Replacement Assets and, to the extent that such Lien is a security interest in any such Replacement Assets that may be perfected under the relevant UCC, that such security interest in such Replacement Assets will be perfected upon consummation of such acquisition.

Upon compliance with the foregoing provisions, the Trustee shall apply the Released Trust Monies as directed and specified by the Company.

SECTION 12.09. *Release upon Satisfaction or Defeasance of all Outstanding Obligations.*

The Liens on, and pledges of, all Collateral will also be terminated and released without any action of the Trustee upon (i) payment in full of the principal of, premium, if any, on, accrued and unpaid interest on the Notes and all other Obligations hereunder, the Guarantees and the Collateral Agreements that are due and payable at or prior to the time such principal,

premium, if any, and accrued and unpaid interest are paid, (ii) a satisfaction and discharge of this Indenture as described above under *Section 8.02* and (iii) the occurrence of a legal defeasance or covenant defeasance as described above under *Section 8.01*. The Trustee shall, at the sole cost and expense of the Parent, the Issuers or such Domestic Restricted Subsidiary, execute and deliver to the Issuers, the Parent or such Domestic Restricted Subsidiary such documents, without any representation, warranty or recourse of any kind whatsoever, as such Parent, Issuer or such Domestic Restricted Subsidiary shall reasonably request to effect or evidence such termination.

SECTION 12.10. *Form and Sufficiency of Release.*

In the event that the Issuers or any Guarantor has sold, exchanged, or otherwise disposed of or proposes to sell, exchange or otherwise dispose of any portion of the Collateral that may be sold, exchanged or otherwise disposed of by such Issuer or such Guarantor, and such Issuer or such Guarantor requests the Trustee to furnish a written disclaimer, release or quit-claim of any interest in such property under this Indenture and the Collateral Agreements, the Trustee shall execute, acknowledge and deliver to the Issuers or such Guarantor (in proper form prepared by the Issuer or such Guarantor) such an instrument promptly after satisfaction of the conditions set forth herein for delivery of any such release. Notwithstanding the preceding sentence, all purchasers and grantees of any property or rights purporting to be released herefrom shall be entitled to rely upon any release executed by the Trustee hereunder as sufficient for the purpose of this Indenture and as constituting a good and valid release of the property therein described from the Lien of this Indenture or of the Collateral Agreements.

SECTION 12.11. *Senior Secured Facilities.*

(a)     The Trustee agrees that so long as no Default or Event of Default is continuing, substantially simultaneously with the Company's and/or any Restricted Subsidiaries' entering into one or more secured Senior Secured Facilities, upon the request of the Company, they shall, enter into a definitive intercreditor agreement and other related documentation (collectively, the "Permitted Senior Secured Debt Documentation") with the applicable lenders, administrative agent and/or collateral agent under such Senior Secured Facilities (the "Senior Debt Administrative Agent") to effectuate the priority of the Liens granted under such Senior Secured Facilities in accounts receivable and/or inventory of the Company and/or the Restricted Subsidiaries over the Liens of the Trustee with respect to the Collateral constituting accounts receivable and/or inventory of the Company and/or the Restricted Subsidiaries; *provided* that the terms of the Permitted Senior Secured Debt Documentation comply with the Permissive Terms (as such term is defined below).

(b)     As used in this Agreement, the term "Permissive Terms" shall mean:

(i)     that the aggregate principal amount of Indebtedness comprising Senior Secured Facilities shall not exceed $10.0 million at any one time outstanding;

(ii)     that notwithstanding the date, manner or order of attachment or perfection or the description of any Collateral or collateral constituting accounts receivables or inventory of the Company or the Restricted Subsidiaries or Liens covered or granted by

111

the Collateral Agreements or the security documents between the Company and/or any Restricted Subsidiary and the Senior Debt Administrative Agent, the Liens of the Trustee in such Collateral will be junior in priority to the Liens of the Senior Debt Administrative Agent in such Collateral;

(iii)    that upon receiving a written request by the Senior Debt Administrative Agent in connection with a foreclosure or other realization upon such assets, the Trustee will release its Liens in any Collateral constituting accounts receivable or inventory of the Company or the Restricted Subsidiaries upon any sale, lease, transfer or other disposition of such Collateral pursuant to the terms of the security document governing the applicable Senior Secured Facility (but subject to the rights of the Trustee in and to such Collateral and any proceeds thereof to the extent of any excess thereof over the amount of the Obligations owed by the Company and/or a Restricted Subsidiary under the Senior Secured Facilities (the "Senior Obligations")); and

(iv)    that the Trustee will refrain from contesting, bringing or joining in any action or proceeding contesting the validity, perfection or priority of the Lien of the Senior Debt Administrative Agent in the Collateral constituting accounts receivable or inventory of the Company or the Restricted Subsidiaries to the extent of the Senior Obligations.

SECTION 12.12. *Purchaser Protected.*

No purchaser or grantee of any property or rights purporting to be released herefrom shall be bound to ascertain the authority of the Trustee to execute the release or to inquire as to the existence of any conditions herein prescribed for the exercise of such authority; nor shall any purchaser or grantee of any property or rights permitted by this Indenture to be sold or otherwise disposed of by the Issuers be under any obligation to ascertain or inquire into the authority of the Issuers to make such sale or other disposition.

SECTION 12.13. *Authorization of Actions to Be Taken by the Trustee Under the Collateral Agreements.*

Subject to the provisions of the applicable Collateral Agreements, (a) the Trustee shall execute and deliver the Collateral Agreements and act in accordance with the terms thereof, (b) the Trustee may, in its sole discretion and without the consent of the Holders, take all actions it deems necessary or appropriate in order to (i) enforce any of the terms of the Collateral Agreements and (ii) collect and receive any and all amounts payable in respect of the Obligations of the Issuers and the Guarantors hereunder and under the Notes, the Guarantees and the Collateral Agreements and (c) the Trustee shall have power to institute and to maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Collateral by any act that may be unlawful or in violation of the Collateral Agreements or this Indenture, and suits and proceedings as the Trustee may deem expedient to preserve or protect its interests and the interests of the Holders in the Collateral (including the power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security

112

interest thereunder or be prejudicial to the interests of the Holders or the Trustee). Notwithstanding the foregoing, the Trustee may, at the expense of the Issuers, request the direction of the Holders with respect to any such actions and upon receipt of the written consent of the Holders of at least a majority in aggregate principal amount of the outstanding Notes, shall take such actions.

SECTION 12.14.  *Authorization of Receipt of Funds by the Trustee Under the Collateral Agreements*.

The Trustee is authorized to receive any funds for the benefit of itself and the Holders distributed under the Collateral Agreements to make further distributions of such funds to itself and the Holders in accordance with the provisions of *Section 6.11* and the other provisions of this Indenture.

## SIGNATURES

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed, all as of the date first written above.

MRS. FIELDS FAMOUS BRANDS, LLC

By: _____
      Name:
      Title:

MRS. FIELDS FINANCING COMPANY, INC.

By: _____
      Name:
      Title:

MRS. FIELDS ORIGINAL COOKIES, INC.

By: _____
      Name:
      Title:

GACCF, LLC

By: _____
      Name:
      Title:

MRS. FIELDS FRANCHISING, LLC

By: _____
      Name:
      Title:

PTF, LLC

By: _____
      Name:
      Title:

TCBY SYSTEMS, LLC

By: _____
       Name:
       Title:

MRS. FIELDS GIFTS, INC.

By: _____
       Name:
       Title:

THE MRS. FIELDS' BRAND, INC.

By: _____
       Name:
       Title:

GAMAN, LLC

By: _____
       Name:
       Title:

MRS. FIELDS COOKIES AUSTRALIA

By: _____
       Name:
       Title:

TCBY INTERNATIONAL, INC.

By: _____
       Name:
       Title:

TCBY OF TEXAS, INC.

By: _____
       Name:
       Title:

PMF, LLC

By: _____

      Name:

      Title:

TCBY OF SAUDI ARABIA, INC.

By: _____

      Name:

      Title:

TCBY OF MEXICO, INC.

By: _____

      Name:

      Title:

TCBY OF ARUBA, INC.

By: _____

      Name:

      Title:

TCBY OF UNITED KINGDOM, INC.

By: _____

      Name:

      Title:

TCBY OF PHILIPPINES, INC.

By: _____

      Name:

      Title:

TCBY OF QATAR, INC.

By: _____

      Name:

      Title:

3

TCBY OF ISRAEL, INC.

By: _____
      Name:
      Title:

TCBY OF PORTUGAL, INC.

By: _____
      Name:
      Title:

TCBY OF NETHERLANDS, INC.

By: _____
      Name:
      Title:

TCBY OF AUSTRALIA, INC.

By: _____
      Name:
      Title:

TCBY OF JORDAN, INC.

By: _____
      Name:
      Title:

TCBY OF KUWAIT, INC.

By: _____
      Name:
      Title:

TCBY OF TURKEY, INC.

By: _____
      Name:
      Title:

4

TCBY OF BOLIVIA, INC.

By: _____
      Name:
      Title:


TCBY OF COLOMBIA, INC.

By: _____
      Name:
      Title:


TCBY OF SOUTH AFRICA, INC.

By: _____
      Name:
      Title:


THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustee

By: _____
      Name:
      Title:

5

**EXHIBIT A**

## FORM OF NOTE

### MRS. FIELDS FAMOUS BRANDS, LLC
### MRS. FIELDS FINANCING COMPANY, INC.

### 10% SENIOR SECURED NOTES DUE 2014

CUSIP No.

No.                                                                                                      $

      Mrs. Fields Famous Brands, LLC, a Delaware limited liability company, and Mrs. Fields Financing, Inc., a Delaware corporation, for value received promise to pay to _____, or registered assigns, the principal sum of _____ DOLLARS ($[_____]) (such amount the *"principal amount"* of this Note) [IF THE SECURITY IS A GLOBAL NOTE, THEN INSERT --, or such other principal amount as may be set forth in the records of the Trustee as referred to in accordance with the Indenture,] on _____, 2014 and to pay interest thereon from the date of issuance thereof or from the most recent Interest Payment Date to which interest has been paid or duly provided for, payable in arrears semiannually on _____ and _____ in each year, commencing on _____, 2009, at the rate specified below, until the principal hereof is paid or made available for payment. Interest so payable shall be (a) for the two-year period following the Closing Date, payable in cash at the rate of 10% per annum or, at the Company's option when authorized by a Board Resolution, in kind at the rate of 12% per annum by the issuance of additional Notes with other terms identical to this Note (other than with respect to the date of issuance) in such principal amount as shall equal the interest payment that is then due (*"Additional Notes"*) or in a combination of Cash and Additional Notes at the respective rates applicable to such forms of payment; and (b) thereafter until the principal hereof is paid or made available for payment, payable in cash at the rate of 10% per annum. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest, which shall be the _____ or _____ (whether or not a Business Day), as the case may be, next preceding such Interest Payment Date. Any such interest not so punctually paid or duly provided for will forthwith cease to be payable to the Holder on the relevant Record Date and may either be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee in accordance with Section 2.17 of the Indenture, notice whereof shall be given to Holders of Notes not less than 10 days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of any securities exchange on which the Notes may be listed, and upon such notice as may be required by such exchange, all as more fully provided in said Indenture. Interest on this Note shall be computed on the basis set forth in the Indenture.

      Payment of the principal of (and premium, if any) and any such interest on this Note [IF THIS NOTE IS A GLOBAL NOTE, THEN INSERT -- shall be made by deposit of Additional Notes, in the case of interest payable in kind, or by wire transfer immediately available funds, in

the case of interest payable in cash, to the accounts specified by the Holder of this Note, provided, however,] [INSERT IF THE NOTE IS NOT A GLOBAL SECURITY -- will be made at the office or agency of the Issuers in the Borough of Manhattan, The City of New York, New York, maintained for such purpose and at any other office or agency maintained by the Issuer for such purpose, in Notes, in the case of interest payable in kind, or in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts, in the case of interest payable in cash; provided, however, that all payments of the principal (and premium, if any) and interest on Notes to the extent paid in cash, the Holders of which hold more than $5.0 million in principal amount and have given wire transfer instructions to the Issuer or its agent at least 10 Business Days prior to the applicable payment date, shall be made by wire transfer of immediately available funds to the accounts specified by such Holders in such instructions; provided, further,] that at the option of the Issuer payment of interest may be made by check mailed to the address of the Person entitled thereto at such address as shall appear in the Register.

In the event that this Note is considered not to be publicly offered for purposes of Treasury Regulation section 1.1275-3(b)(1), the holder has notice that this Note was issued, for federal income tax purposes, with original issue discount. For information on the issue price, the amount of original issue discount, the issue date and the yield to maturity of this Note for federal income tax purposes, the holder should contact:

_____
_____
_____
_____

Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon has been executed by the Trustee referred to on the reverse hereof by manual signature, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

Reference is made to the further provisions of this Note contained on the reverse side of this Note, which will for all purposes have the same effect as if set forth at this place.

IN WITNESS WHEREOF, the Issuers have caused this Note to be signed manually or by facsimile by its duly authorized officer.

MRS. FIELDS FAMOUS BRANDS, LLC

By: _____

Name:
Title:

A-2

MRS. FIELDS FINANCING COMPANY, INC.

By: _____

      Name:
      Title:

Dated: _____, _____

## TRUSTEE CERTIFICATE OF AUTHENTICATION

This is one of the 10% Senior Secured Notes due 2014 referred to in the within-mentioned Indenture.

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustee

Dated: _____, _____

By: _____
          Authorized Signatory

A-4

(REVERSE OF SECURITY)

**10% Senior Secured Note due 2014**

1.      *Paying Agent and Registrar.*

Initially, The Bank of New York Mellon Trust Company, N.A. (the "*Trustee*") will act as Paying Agent and Registrar.  The Issuers may change any Paying Agent, Registrar or co-Registrar without notice to the Holders.  The Company may act as Paying Agent or Registrar.

2.      *Indenture.*

The Notes and the Guarantees were issued under an Indenture, dated as of _____, 2008 (the "*Indenture*"), among the Issuers, the Guarantors named therein and the Trustee.  The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S. Code §§ 77aaa-77bbbb) (the "*TIA*"), as in effect on the date of the Indenture until such time as the Indenture is qualified under the TIA, and thereafter as in effect on the date on which the Indenture is qualified under the TIA. Notwithstanding anything to the contrary herein, the Notes are subject to all such terms, and Holders of Notes are referred to in the Indenture and the TIA for a statement of such terms.  The Notes are senior secured obligations of the Issuers.  Each Holder, by accepting a Note, agrees to be bound by all of the terms and provisions of the Indenture, as the same may be amended from time to time.  Capitalized terms herein are used as defined in the Indenture unless otherwise defined herein.

3.      *Optional Redemption.*

(a)      The Notes are subject to redemption at any time, at the option of the Company, in whole or in part, on not less than 30 nor more than 60 days' prior notice to the Holders by first-class mail, in amounts of $1.00 or an integral multiple thereof, at the following Redemption Prices (expressed as percentages of the principal amount), if redeemed during the 12-month period beginning _____ of the years indicated below:

| Year | Percentage |
|------|------------|
| 2008 | 103.0 % |
| 2009 | 103.0 % |
| 2010 | 101.5 % |
| 2011 and thereafter | 100.0 % |

(b)      *Notice of Redemption.*  Notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the Redemption Date to each Holder of Notes to be redeemed at such Holder's registered address.  If fewer than all of the Notes are to be redeemed, at any time, selection of Notes for redemption will be made by the Trustee in compliance with the requirements of the principal national securities exchange, if any, on which the Notes are listed, or, if the Notes are not so listed, on a pro rata basis, by lot or by such method as the Trustee deems to be fair and appropriate; *provided* that no partial redemption will reduce the principal amount of a Note not redeemed to a denomination of less than $1,000;

A-5

Except as set forth in the Indenture, if monies for the redemption of the Notes called for redemption shall have been deposited with the Paying Agent for redemption on such redemption date sufficient to pay such redemption price plus accrued and unpaid interest, if any. Notes called for redemption will cease to bear interest from and after such redemption date, and the only remaining right of the Holders of such Notes will be to receive payment of the redemption price plus accrued and unpaid interest, if any, as of the redemption date upon surrender to the Paying Agent of the Notes redeemed.

In the case of any redemption or repurchase of Notes in accordance with the Indenture, interest installments whose Stated Maturity is on or prior to the Redemption Date will be payable to the Holders of such Notes of record as of the close of business on the relevant Regular Record Date or Special Record Date referred to on the face hereof. Notes (or portions thereof) for whose redemption and payment provision is made in accordance with the Indenture shall cease to bear interest from and after the Redemption Date.

In the event of redemption or repurchase of this Note in accordance with the Indenture in part only, a new Note or Notes for the unredeemed portion hereof shall be issued in the name of the Holder hereof upon the cancellation hereof.

4.    *Mandatory Prepayments.*

Section 3.07 of the Indenture provides that a Mandatory Prepayment will be made from the Net Cash Proceeds of certain specified Asset Sales or of the exercise of the Warrants or the Net Cash Proceeds of certain issuances of capital stock.

5.    *Offers to Purchase.*

Sections 4.11 and 4.13 of the Indenture provide that upon the occurrence of a Change of Control and after certain Asset Sales and subject to further limitations contained therein, the Issuers will make an offer to purchase certain amounts of the Notes in accordance with the procedures set forth in the Indenture.

6.    *Collateral.*

The Indebtedness evidenced by this Note and the Indenture is secured by Liens granted to the Trustee under the Collateral Agreements. By accepting this Note, Holders acknowledge that the rights and remedies of the Trustee on each Holder's behalf are subject to and limited by the Intercreditor Agreement and, to the extent permitted by the Trust Indenture Act, Holders agree that they are bound by the terms of any Permissive Senior Secured Debt Documentation as if they were parties thereto and that their rights and remedies are subject to the waivers (including rights and remedies in any subsequent bankruptcy proceeding of the obligors on the Notes), restrictions and other agreements set forth in an intercreditor agreement constituting Permissive Senior Secured Debt Documentation for the benefit of the lenders under the Senior Secured Facility and their agents and representatives.

7.    *Denominations; Transfer; Exchange.*

The Notes are in registered form, without coupons, in denominations of $1.00 and integral multiples thereof. A Holder shall register the transfer of or exchange of Notes in accordance with the Indenture. The Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes, fees or similar governmental charges payable in connection therewith as permitted by the Indenture. The Registrar need not register the transfer of or exchange of any Notes or portions thereof selected for redemption.

8.    *Persons Deemed Owners.*

The registered Holder of a Note shall be treated as the owner of the Notes for all purposes.

9.    *Unclaimed Money.*

If money for the payment of principal or interest remains unclaimed for two years, the Trustee and the Paying Agent may pay the money without interest thereon back to the Issuers. After that, all liability of the Trustee and such Paying Agent with respect to such money shall cease.

10.    *Discharge Prior to Redemption or Maturity.*

If the Issuers at any time deposit with the Trustee U.S. Legal Tender or U.S. Government Obligations sufficient to pay the principal of and interest on the Notes to redemption or Maturity and comply with the other provisions of the Indenture relating thereto, the Issuers shall be deemed to have paid and discharged the entire Indebtedness represented by the outstanding 9% Notes, except for the rights of Holders to receive payments in respect of the principal of, and premium, if any, and interest, if any, on the Notes when such payments are due from the deposits referred to above.

11.    *Amendment; Supplement; Waiver.*

Subject to certain exceptions, the Indenture, the Notes or the Guarantees may be amended or supplemented with the written consent of the Holders of at least a majority in aggregate principal amount of the Notes then outstanding, and any existing Default or Event of Default or noncompliance with any provision may be waived with the written consent of the Holders of a majority in aggregate principal amount of the Notes then outstanding. Without consent of any Holder, the parties thereto may amend or supplement the Indenture, the Notes or the Guarantees to, among other things, cure any ambiguity, defect or inconsistency, provide for uncertificated Notes or Guarantees in addition to or in place of certificated Notes or Guarantees, comply with the TIA, or comply with Article Five of the Indenture or make any other change that does not adversely affect in any material respect the rights of any Holder of a Note.

12.    *Restrictive Covenants.*

The Indenture imposes certain limitations on the ability of the Issuers and the Restricted Subsidiaries to, among other things, incur additional Indebtedness or Liens, make payments in respect of their Capital Stock or certain Indebtedness, enter into transactions with Affiliates, enter into Sale and Leaseback Transactions, create dividend or other payment restrictions affecting Subsidiaries, merge or consolidate with any other Person, sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its assets or adopt a plan of liquidation. Such limitations are subject to a number of important qualifications and exceptions. The Issuers must annually report to the Trustee on compliance with such limitations.

13.    *Successors.*

When a successor assumes, in accordance with the Indenture, all the obligations of its predecessor under the Notes, the Guarantees and the Indenture, the predecessor will be released from those obligations.

14.    *Defaults and Remedies.*

If an Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding may declare all the Notes to be due and payable in the manner, at the time and with the effect provided in the Indenture. Holders of Notes may not enforce the Indenture except as provided in the Indenture. The Trustee is not obligated to enforce the Indenture or the Notes unless it has received indemnity satisfactory to it. The Indenture permits, subject to certain limitations therein provided, Holders of a majority in aggregate principal amount of the Notes then outstanding to direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Holders of Notes notice of any continuing Default or Event of Default (except a Default in payment of principal or interest) if it determines that withholding notice is in their interest.

15.    *Trustee Dealings with Issuers.*

Subject to the terms of the TIA and the Indenture, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuers, the Subsidiaries or their respective Affiliates as if it were not the Trustee.

16.    *No Recourse Against Others.*

No past, present or future stockholder, director, officer, employee or incorporator, as such, of the Issuers or the Guarantors shall have any liability for any obligation of the Issuers or the Guarantors under the Notes, the Guarantees, the Collateral Agreements or the Indenture or for any claim based on, in respect of or by reason of such obligations or their creation. Each Holder of a Note by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for the issuance of the Notes.

17.    *Guarantees.*

Payment of principal and interest (including interest on overdue principal and overdue interest, if lawful), is unconditionally guaranteed, jointly and severally, by each of the Guarantors.  In addition, the Obligations of the Co-Issuer under this Note and the Indenture are unconditionally guaranteed by the Company.  In the event of a default by the Co-Issuer in the payment of its Obligations, the Holders may institute legal proceedings directly against the Company to enforce the foregoing guarantee without first proceeding against the Co-Issuer.

18.    *Governing Law.*

THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN THIS NOTE, THE GUARANTEES, THE COLLATERAL AGREEMENTS AND THE INDENTURE, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS.

19.    *Waiver of Jury Trial.*

Each of the parties hereto and the holders (by their acceptance of the 9% note) hereby irrevocably waives, to the fullest extent permitted by law, any and all right to trial by jury in any action or proceeding arising out of or in connection with the indenture, this 9% note, the guarantees, the collateral agreements or the transactions contemplated by this indenture.

20.    *Abbreviations and Defined Terms.*

Customary abbreviations may be used in the name of a Holder of a Note or an assignee, such as:  TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

The Issuers will furnish to any Holder of a Note upon written request and without charge a copy of the Indenture.  Requests may be made to:  Mrs. Fields Famous Brands, LLC and Mrs. Fields Financing Company, Inc., 2855 East Cottonwood Parkway, Suite 400, Salt Lake City, Utah  84121-1050.

A-9

## FORM OF GUARANTEE

Each of the undersigned and their respective successors under the Indenture (collectively, the "*Guarantors*") has jointly and severally with each of the other Guarantors, irrevocably and unconditionally guaranteed, on a senior secured basis to the extent set forth in the Indenture, dated as of _____, 2008, by and among the Issuers, the Guarantors and The Bank of New York Mellon Trust Company, N.A., as Trustee (the "*Indenture*"), (i) the due and punctual payment of the principal of, premium, if any, and interest on the Notes, whether at maturity, by acceleration or otherwise, the due and punctual payment of interest on the overdue principal of and interest, if any, on the Notes, to the extent lawful, and the due and punctual performance of all other obligations of the Issuers to the Holders or the Trustee all in accordance with the terms set forth in Article Ten of the Indenture and (ii) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise. Capitalized terms used herein have the meanings assigned to them in the Indenture unless otherwise indicated.

THE OBLIGATIONS OF THE UNDERSIGNED TO HOLDERS OF THE NOTES AND TO THE TRUSTEE PURSUANT TO THIS NOTATION OF GUARANTEE (THE "*GUARANTEE*") AND THE INDENTURE ARE EXPRESSLY SET FORTH IN ARTICLE TEN OF THE INDENTURE AND REFERENCE IS HEREBY MADE TO THE INDENTURE FOR THE PRECISE TERMS OF THE GUARANTEE AND ALL OTHER PROVISIONS OF THE INDENTURE TO WHICH THE GUARANTEE RELATES. EACH HOLDER OF A NOTE, BY ACCEPTING THE SAME, (A) AGREES TO AND SHALL BE BOUND BY SUCH PROVISIONS AND (B) APPOINTS THE TRUSTEE ATTORNEY-IN-FACT FOR SUCH HOLDER FOR SUCH PURPOSES.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, each Guarantor has caused its Guarantee to be duly executed.

MRS. FIELDS ORIGINAL COOKIES, INC.

By:    _____

      Name:
      Title:

GACCF, LLC

By:    _____

      Name:
      Title:

MRS. FIELDS FRANCHISING, LLC

By: _____
      Name:
      Title:

PTF, LLC

By: _____
      Name:
      Title:

TCBY SYSTEMS, LLC

By: _____
      Name:
      Title:

MRS. FIELDS GIFTS, INC.

By: _____
      Name:
      Title:

THE MRS. FIELDS' BRAND, INC.

By: _____
      Name:
      Title:

GAMAN, LLC

By: _____
      Name:
      Title:

MRS. FIELDS COOKIES AUSTRALIA

By: _____
      Name:
      Title:

A-11

TCBY INTERNATIONAL, INC.

By: _____
       Name:
       Title:

MRS. FIELDS FINANCING COMPANY, INC.

By: _____
       Name:
       Title:

PMF, LLC

By: _____
       Name:
       Title:

TCBY OF SAUDI ARABIA

By: _____
       Name:
       Title:

TCBY OF MEXICO, INC.

By: _____
       Name:
       Title:

TCBY OF ARUBA, INC.

By: _____
       Name:
       Title:

TCBY OF UNITED KINGDOM, INC.

By: _____
       Name:
       Title:

A-12

TCBY OF PHILIPPINES, INC.

By: _____
       Name:
       Title:


TCBY OF QATAR, INC.

By: _____
       Name:
       Title:


TCBY OF ISRAEL, INC.

By: _____
       Name:
       Title:


TCBY OF PORTUGAL, INC.

By: _____
       Name:
       Title:


TCBY OF NETHERLAND, INC.

By: _____
       Name:
       Title:


TCBY OF AUSTRALIA, INC.

By: _____
       Name:
       Title:


TCBY OF JORDAN, INC.

By: _____
       Name:
       Title:

TCBY OF KUWAIT, INC.

By: _____
        Name:
        Title:


TCBY OF TURKEY, INC.

By: _____
        Name:
        Title:


TCBY OF BOLIVIA, INC.

By: _____
        Name:
        Title:


TCBY OF COLOMBIA, INC.

By: _____
        Name:
        Title:


TCBY OF SOUTH AFRICA, INC.

By: _____
        Name:
        Title:


TCBY OF TEXAS, INC.

By: _____
        Name:
        Title:


MRS. FIELDS FAMOUS BRANDS, LLC

By: _____
        Name:
        Title:


A-14

## ASSIGNMENT FORM

If you the Holder want to assign this Note, fill in the form below and have your signature guaranteed:

I or we assign and transfer this Note to:

_____

_____

(Print or type name, address and zip code and
social security or tax ID number of assignee)

and irrevocably appoint _____ agent to transfer this 9% Note on the books of the Issuers. The agent may substitute another to act for him.

Dated: _____    Signed: _____

(Sign exactly as your name
appears on the other side of this
Note)

Signature Guarantee: _____

A-15

## [OPTION OF HOLDER TO ELECT PURCHASE]

If you want to elect to have this Note purchased by the Issuers pursuant to Section 4.11 or 4.13 of the Indenture, check the appropriate box:

Section 4.11    ☐

Section 4.13    ☐

If you want to elect to have only part of this Note purchased by the Issuers pursuant to Section 4.11 or 4.13 of the Indenture, state the amount you elect to have purchased:

$ _____

Dated: _____    _____

NOTICE:  The signature on this assignment must correspond with the name as it appears upon the face of the within Note in every particular without alteration or enlargement or any change whatsoever and be guaranteed by the endorser's bank or broker.

Signature Guarantee: _____

A-16

**EXHIBIT B**

### FORM OF LEGEND FOR GLOBAL NOTES

Any Global Note authenticated and delivered hereunder shall bear a legend (which would be in addition to any other legends required in the case of a Restricted Security) in substantially the following form:

THIS CERTIFICATE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITORY OR A NOMINEE OF A DEPOSITORY OR A SUCCESSOR DEPOSITORY. THIS NOTE IS NOT EXCHANGEABLE FOR NOTES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITORY OR ITS NOMINEE EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS NOTE (OTHER THAN A TRANSFER OF THIS NOTE AS A WHOLE BY THE DEPOSITORY TO A NOMINEE OF THE DEPOSITORY OR BY A NOMINEE OF THE DEPOSITORY TO THE DEPOSITORY OR ANOTHER NOMINEE OF THE DEPOSITORY) MAY BE REGISTERED EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("*DTC*"), TO THE ISSUERS OR THEIR AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

**Exhibit 5**

**FORM OF**

**STOCKHOLDERS AGREEMENT**

**OF**

**MRS. FIELDS' ORIGINAL COOKIES, INC.**

Dated as of _____, 2008

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ............................................................................................ 1

    Section 1.1    Certain Defined Terms.......................................................... 1
    Section 1.2    Table of Definitions .............................................................. 6

ARTICLE II REPRESENTATIONS AND WARRANTIES OF THE
            STOCKHOLDERS ........................................................................ 7

    Section 2.1    Organization and Qualification............................................. 7
    Section 2.2    Authority .............................................................................. 7
    Section 2.3    No Conflict........................................................................... 7

ARTICLE III GOVERNANCE ...................................................................................... 8

    Section 3.1    Agreement to Vote............................................................... 8
    Section 3.2    Board of Directors................................................................ 8
    Section 3.3    Meetings............................................................................... 8
    Section 3.4    Quorum ................................................................................ 9
    Section 3.5    Nomination and Election of Directors ................................. 9
    Section 3.6    Removal of Directors; Vacancies ........................................ 9
    Section 3.7    Approval Required ............................................................... 10
    Section 3.8    Conflict of Interest .............................................................. 12
    Section 3.9    Director Compensation, Reimbursements and Insurance..... 12
    Section 3.10   Audit Committee.................................................................. 12
    Section 3.11   Compensation Committee.................................................... 12

ARTICLE IV CAPITALIZATION; BUDGETS; FUNDING....................................... 13

    Section 4.1    Initial Capitalization............................................................ 13
    Section 4.2    Budgets ................................................................................ 13
    Section 4.3    Status ................................................................................... 13

ARTICLE V FINANCIAL STATEMENTS .................................................................. 13

    Section 5.1    Financial Statements and Other Information ........................ 13

ARTICLE VI RESTRICTIONS ON TRANSFER ......................................................... 14

    Section 6.1    Legends ................................................................................ 14
    Section 6.2    Loss or Destruction of Share Certificates ........................... 14
    Section 6.3    Certain Restrictions on Transfer or Encumbrance............... 14
    Section 6.4    Improper Transfer or Encumbrance...................................... 15
    Section 6.5    Rights of First Offer............................................................. 15

**TABLE OF CONTENTS**
**(Continued)**

Page

Section 6.6      Right of Co-Sale on Transfers by Stockholders .................................. 17
Section 6.7      Drag-Along Right .................................................................................. 18
Section 6.8      Minority Transfer Rights ...................................................................... 20
Section 6.9      Transferees to Execute Agreement ....................................................... 21
Section 6.10     Fair Market Valuation Methodology .................................................... 21

ARTICLE VII OTHER AGREEMENTS .......................................................................... 22

Section 7.1      Right to Purchase New Securities ......................................................... 22
Section 7.2      Registration Rights ................................................................................ 24
Section 7.3      Further Assurances ................................................................................ 29
Section 7.4      Waiver of Fiduciary Duties; Corporate Opportunities .......................... 30
Section 7.5      Transactions Between the Company and the Stockholders or
                 Their Affiliates ..................................................................................... 30
Section 7.6      Public Announcements .......................................................................... 31

ARTICLE VIII GENERAL PROVISIONS ........................................................................ 31

Section 8.1      Termination ........................................................................................... 31
Section 8.2      Fees and Expenses ................................................................................ 31
Section 8.3      Amendment and Modification ............................................................... 31
Section 8.4      Waiver .................................................................................................. 31
Section 8.5      Notices .................................................................................................. 32
Section 8.6      Interpretation ........................................................................................ 32
Section 8.7      Entire Agreement .................................................................................. 32
Section 8.8      No Third-Party Beneficiaries ................................................................ 32
Section 8.9      Governing Law ...................................................................................... 32
Section 8.10     Submission to Jurisdiction .................................................................... 33
Section 8.11     Assignment; Successors ........................................................................ 33
Section 8.12     Enforcement .......................................................................................... 33
Section 8.13     Currency ............................................................................................... 34
Section 8.14     Severability ........................................................................................... 34
Section 8.15     Waiver of Jury Trial .............................................................................. 34
Section 8.16     Counterparts .......................................................................................... 34
Section 8.17     Facsimile Signature ............................................................................... 34
Section 8.18     Time of Essence .................................................................................... 34
Section 8.19     No Presumption Against Drafting Party ................................................ 34

**FORM OF**

**STOCKHOLDERS AGREEMENT**

**OF**

**MRS. FIELDS' ORIGINAL COOKIES, INC.**

STOCKHOLDERS AGREEMENT (this *"Agreement"*), dated as of _____, between Mrs. Fields' Original Cookies, Inc., a Delaware corporation (the *"Company"*), the stockholders of the Company signatory hereto from time to time (collectively, the *"Holders"*) and the holder of warrants to purchase common stock of the Company (the *"Warrantholder"* and together with the Holders, the *"Stockholders"*).

**RECITALS**

The Holders, collectively, are the owners of all of the issued and outstanding shares of the common stock, par value $0.01, of the Company (the *"Common Stock"*);

The Warrantholder is the holder of Warrants to purchase [ _____ ] shares of the Common Stock;

The Stockholders and the Company desire to provide certain rights and obligations of the Stockholders with respect to the governance of the Company and the disposition of the Common Stock as hereinafter provided.

**AGREEMENT**

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the parties hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

Section 1.1    Certain Defined Terms.    For purposes of this Agreement:

*"Affiliate"* means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.

*"Applicable Percentage"* means, with respect to any Stockholder as of any date, a percentage representing the number of Shares beneficially owned by such Stockholder as of such date, divided by the aggregate number of Shares then outstanding.

*"beneficial owner"* or *"beneficially own"* has the meaning given such term in Rule 13d-3 under the Exchange Act; provided, however, that for purposes of determining

beneficial ownership, (i) a Person shall be deemed to be the beneficial owner of any security that may be acquired by such Person, whether within 60 days or thereafter, upon the conversion, exchange or exercise of any warrants, options, rights or other securities and (ii) no Person shall be deemed to beneficially own any security solely as a result of such Person's execution of this Agreement.

"*Business Day*" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the place whose laws govern the construction of this Agreement.

"*Capricorn*" means the Stockholder identified as Capricorn on the attached Exhibit A.

"*Capricorn Directors*" means those Directors designated from time to time by Capricorn, the initial Capricorn Directors being identified on the attached Exhibit A.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time.

"*Committee Directors*" means the Directors designated from time to time by the Committee Stockholders, the initial Committee Directors being identified on the attached Exhibit A.

"*Committee Stockholders*" means the Stockholders identified as Committee Stockholders on the attached Exhibit A.

"*control*," including the terms "*controlled by*" and "*under common control with*," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise, including the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person.

"*Exchange Act*" means the United States Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"*Fair Market Value*" of Shares or other property, as the case may be, means the cash price that a Third Party would pay to acquire all of such Shares (computed on a fully diluted basis after giving effect to the exercise of any and all outstanding conversion rights, exchange rights, warrants and options) or other property in an arm's-length transaction, assuming with respect to the Fair Market Value of Shares, that the Company was being sold in a manner reasonably designed to solicit all possible participants and permit all interested Persons an opportunity to participate and to achieve the best value reasonably available to the Stockholders at the time, taking into account all existing circumstances, including, without limitation, the terms and conditions of all agreements (including this Agreement) to which the Company is then a party or by which it is otherwise benefited or affected, determined, unless otherwise specified, as set forth in Section 6.10.

2

"***Fiscal Year***" means (i) the period commencing upon the date hereof and ending on December 31, 2008 or (ii) any subsequent twelve-month period commencing on January 1 and ending on December 31.

"***Form S-4***" or "***Form S-8***" means Form S-4 or Form S-8, as appropriate, under the Securities Act or any successor forms thereto.

"***GAAP***" means United States generally accepted accounting principles as in effect from time to time.

"***Governmental Authority***" means any United States or non-United States federal, national, supranational, state, provincial, local or similar government, governmental, regulatory or administrative authority, branch, agency or commission or any court, tribunal, or arbitral or judicial body.

"***Industry***" means the retail sales industry, regardless of what channel through which such sales occur.

"***Initial Public Offering***" means the first underwritten public offering of the Common Stock pursuant to a registration statement filed under the Securities Act.

"***Law***" means any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or order of any Governmental Authority.

"***Majority Vote***" means, with respect to any matter to be voted on by the Board of Directors, the written approval of, or the affirmative vote by, a majority of the Directors serving on the Board of Directors. For the avoidance of doubt, this definition refers to a majority of the entire board, not a majority of a quorum.

"***Management Incentive Plan***" means the management incentive plan of the Company pursuant to which eligible members of the senior management of the Company may be granted equity compensation.

"***Mutually Designated Appraiser***" means an investment banking firm jointly designated by the investment banking firms initially appointed by the interested parties to determine Fair Market Value pursuant to Section 6.10. The Mutually Designated Appraiser shall be an investment bank of international standing and may not be an Affiliate of any Stockholder or have performed any significant work for any Stockholder or any Affiliate of any Stockholder within the prior two years.

"***New Securities***" means any Common Stock, whether now authorized or not, and rights, options or warrants to purchase Common Stock, and securities of any type whatsoever that are, or may become, convertible into or exchangeable or exercisable for Common Stock.

"***Notice Date***" means the date that is ten days after the date of an event requiring a determination of Fair Market Value pursuant to Section 6.10.

3

"*Other Shares*" means, at any time, those shares of Common Stock which do not constitute Registrable Shares or Primary Shares.

"*Permitted Transferee*" means, with respect to any Stockholder, (i) any Affiliate of such Stockholder, (ii) a donee of Shares who is a member of the family of such Stockholder or any trust for the benefit of any such family member, (iii) a transferee of Shares who receives such Shares by will or the laws of descent and distribution, (iv) any general partner of such Stockholder or (v) in the case of Capricorn, any limited partner of Capricorn listed on Schedule 1.1 hereto, provided, however, that any Permitted Transferee that receives Shares pursuant to this clause (v) of this definition shall be prohibited from making further transfers pursuant to clauses (i) or (iv) of this definition.  For purposes of this definition, the word "family" shall include any spouse, lineal ancestor or descendant, brother or sister.

"*Person*" means an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"*Primary Shares*" means, at any time, the authorized but unissued shares of Common Stock or shares of Common Stock held in the treasury of the Company.

"*Prospectus*" means the prospectus included in any Registration Statement, including any amendment or prospectus subject to completion, and any such prospectus as amended or supplemented by any prospectus supplement with respect to the terms of the offering of any portion of the Registrable Shares and, in each case, by all other amendments and supplements to such prospectus, including post-effective amendments, and in each case including all material incorporated by reference therein.

"*Registrable Shares*" means at any time, and with respect to any Stockholder, the shares of Common Stock held by, or issuable to, such Stockholder.  As to any particular Registrable Shares, once issued, such Registrable Shares shall cease to be Registrable Shares (a) when an offering of such Registrable Shares has been registered under the Securities Act, the Registration Statement in connection therewith has been declared effective and such Registrable Shares have been disposed of pursuant to and in the manner described in such effective Registration Statement; (b) when such Registrable Shares are sold or distributed to the public through a broker, dealer or market maker pursuant to Rule 144; or (c) when such Registrable Shares have ceased to be outstanding.

"*Registration Date*" means the date upon which the Registration Statement filed by the Company to effect its Initial Public Offering shall have been declared effective by the SEC.

"*Registration Statement*" means any registration statement of the Company that covers an offering of any of the Registrable Shares, and all amendments and supplements to any such Registration Statement, including post-effective amendments, in each case including the Prospectus contained therein, all exhibits thereto and all material incorporated by reference therein.

4

"*Representative*" means with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"*Rule 144*" means Rule 144 promulgated under the Securities Act, as such rule may be amended from time to time, or any successor rule thereto.

"*SEC*" means the United States Securities and Exchange Commission.

"*Securities*" means "securities" as defined in Section 2(1) of the Securities Act and includes, with respect to any Person, such Person's capital stock or other equity interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such Person's capital stock or other equity or equity-linked interests, including phantom stock and stock appreciation rights.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"*Shares*" means, as of a certain date, the issued and outstanding shares of Common Stock as of such date including any shares of Common Stock issued in connection with the exercise of any Warrants.

"*Subsidiary*" means, with respect to any Person, any other Person controlled by such first Person, directly or indirectly, through one of more intermediaries.

"*Supermajority Vote*" means, with respect to any matter to be voted on by the Board of Directors, a Majority Vote, which Majority Vote must also include the affirmative vote of at least one Capricorn Director or the individual holding the office of the Chief Executive Officer of the Company serving as director.

"*Third Party*" means any Person other than a Stockholder or a Permitted Transferee of a Stockholder.

"*Transfer*" means, in respect of any Shares, property or other assets, any sale, assignment, hypothecation, lien, encumbrance, transfer, distribution or other disposition thereof or of a participation therein, or other conveyance of legal or beneficial interest therein, including rights to vote and to receive dividends or other income with respect thereto, or any short position in a security or any other action or position otherwise reducing risk related to ownership through hedging or other derivative instruments, whether voluntarily or by operation of Law, or any agreement or commitment to do any of the foregoing.

"*Transferee*" means any Person that is a transferee of all or a portion of a Stockholder's Shares.

"*Warrants*" means the warrants to purchase Common Stock issued as of the date of this Agreement..

Section 1.2    <u>Table of Definitions</u>.  The following terms have the meanings set forth in the Sections set forth below:

| Definition | Location |
| --- | --- |
| Acceptance Notice | 6.5(c) |
| Agreement | Preamble |
| Annual Budget | 4.2(a) |
| Approved Budget | 4.2(a) |
| Board of Directors | 3.2(a) |
| Capricorn Counsel | 7.2(c)(ii) |
| Chairman | 3.2(a) |
| Committee Counsel | 7.2(c)(ii) |
| Common Stock | Preamble |
| Company | Preamble |
| Conflict | 3.8(a) |
| Corporate Opportunities Group | 7.4(a)(i) |
| Co-Sale Non-Electing Shares | 6.6(b) |
| Co-Sale Notice | 6.6(a) |
| Co-Sale Participant | 6.6(a) |
| Co-Sale Period | 6.6(a) |
| Director | 3.2(a) |
| Drag Transaction | 6.7(b) |
| Drag-Along Notice | 6.7(c) |
| Drag-Along Participant | 6.7(a) |
| Drag-Along Transferring Stockholder(s) | 6.7(a) |
| First Offer | 6.5(b), 6.5(b) |
| Holders | Preamble |
| Information | 7.2(c)(vi) |
| Initial Budget | 4.2(a) |
| Inspectors | 7.2(c)(vi) |
| Issuance Notice | 7.1(b) |
| Offer Notice | 6.5(a) |
| Offer Period | 6.5(c) |
| Offer Price | 6.5(a), 6.5(a) |
| Offer Recipients | 6.5(a) |
| Offered Shares | 6.5(a) |
| Offering Stockholder | 6.5(a) |
| Potential Majority Owner | 6.8(a) |
| Prospective Seller | 6.8(a) |
| Prospective Transferee | 6.9 |
| Records | 7.2(c)(vi) |
| Registration Expenses | 7.2(d) |
| Stockholders | Preamble |
| Subscription Notice | 7.1(c) |
| Transfer Notice | 6.6(a) |
| Transferred Shares | 6.6(a) |

| Definition | Location |
|------------|----------|
| Transferring Stockholder | 5.6(a) |
| Unsubscribed Shares | 7.1(c) |
| Warrantholder | Preamble |

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES
## OF THE STOCKHOLDERS

Each Stockholder, severally but not jointly, represents and warrants to the Company and each other Stockholder as follows:

Section 2.1    Organization and Qualification.    If such Stockholder is not a natural person, such Stockholder (a) is duly incorporated or organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and has all necessary power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted and (b) is duly qualified or licensed as a foreign corporation to do business, and in good standing, in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its business makes such qualification or licensing necessary, except for any such failures to be so qualified or licensed and in good standing that would not prevent or materially hinder the performance of the actions contemplated by this Agreement.

Section 2.2    Authority.    If such Stockholder is not a natural person, such Stockholder has all necessary power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby, and the execution, delivery and performance by such Stockholder of this Agreement and the consummation by such Stockholder of the transactions contemplated hereby have been duly and validly authorized by all requisite action on its part.  This Agreement has been duly executed and delivered by such Stockholder and constitutes the legal, valid and binding obligation of such Stockholder, enforceable against such Stockholder in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Section 2.3    No Conflict.    The execution, delivery and performance by such Stockholder of this Agreement do not and will not (a) conflict with or violate its certificate of incorporation or bylaws or equivalent organizational documents, if applicable, (b) conflict with or violate any Law applicable to such Stockholder or by which any property or asset of such Stockholder is bound or affected or (c) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, require any consent of any Person pursuant to, or give to any Person any rights pursuant to, any contract, agreement or arrangement by which such Stockholder is bound, except, in the case of the foregoing clauses (b) or (c), for any such conflicts, violations, breaches, defaults or other occurrences that would not prevent or materially hinder the performance of the actions contemplated by this Agreement.

## ARTICLE III
## GOVERNANCE

Section 3.1    <u>Agreement to Vote</u>.  Each Stockholder agrees to vote all of its Shares, and the Company agrees to take all necessary measures, in order to carry out the agreements set forth in this Article III, and to prevent any action by the Company's Stockholders that is inconsistent with such agreements.

Section 3.2    <u>Board of Directors</u>.

(a)    Initially, the total number of directors (each, a "*Director*") on the board of directors (the "*Board of Directors*") shall be seven, of whom (i) four shall be designated by the Committee Stockholders, (ii) two shall be designated by Capricorn and (iii) one shall be the individual holding the office of the Chief Executive Officer of the Company from time to time. Thereafter, the number of directors may be determined from time to time as set forth in the Certificate of Incorporation of the Company.  The Board of Directors shall select one of the Committee Directors as the Chairman of the Board (the "*Chairman*"), who shall preside over meetings of the Board of Directors.

(b)    The number of Committee Directors shall be reduced so as not to exceed the number indicated upon the occurrence of each of the following events: (i) three Committee Directors from and after such time as the Committee Stockholders and their Permitted Transferees hold in the aggregate less than 34% of the outstanding Shares, (ii) two Committee Directors from and after such time as the Committee Stockholders and their Permitted Transferees hold in the aggregate less than 20% of the outstanding Shares and (iii) one Committee Director from and after such time as the Committee Stockholders and their Permitted Transferees hold in the aggregate less than 10% of the outstanding Shares.  In the event that the Committee Stockholders and their Permitted Transferees hold in the aggregate less than 5% of the outstanding Shares, the rights of the Committee Stockholders under this Section 3.2 shall terminate automatically and cease to have any further force or effect.

(c)    The number of Capricorn Directors shall be reduced by one at such time as Capricorn and its Permitted Transferees hold in the aggregate less than 10% of the outstanding Shares and, in the event that Capricorn and its Permitted Transferees hold in the aggregate less than 5% of the outstanding Shares, the rights of Capricorn under this Section 3.2 shall terminate automatically and cease to have any further force or effect.

Section 3.3    <u>Meetings</u>.

(a)    The Board of Directors shall meet no less frequently than quarterly at such place and time as shall be determined by the Chairman.  Special meetings of the Board of Directors, to be held at the offices of the Company (or such other place as shall be agreed by Majority Vote), shall be called at the direction of the Chairman or by three or more Directors, upon not less than five Business Days' notice given by the Chairman, the President or the Secretary of the Company (which officer shall give such notice if properly directed to do so as aforesaid) or by a Director.  Emergency meetings of the Board of Directors may be held at the offices of the Company (or such other place as shall be agreed by Majority Vote) and called at

8

the direction of the Chairman or by any Director, upon not less than three Business Days' telephone notice (to be confirmed by written notice, fax, e-mail or electronic transmission) given by the Chairman, the President or the Secretary of the Company or a Director, specifying in reasonable detail the nature of such emergency. For purposes of this Section 3.3, the term "emergency meeting" shall include only meetings called for the sole purpose of addressing an action taken by less than the requisite Directors in violation of Section 3.7 of this Agreement.

(b)      With respect to quarterly and other regular meetings of the Board of Directors, not less than five Business Days before each such meeting, the Chairman shall deliver to each Director, together with the notice of each such meeting, an agenda specifying in reasonable detail the matters to be discussed at the applicable meeting. Any Director that wishes to have any additional matter discussed at any such meeting shall give to the Secretary of the Company and each other Director, not less than two Business Days prior to any such meeting, notice of each matter he or she so wishes to discuss.

(c)      Any Director may participate in any meeting of the Board of Directors by telephone and arrangements will be made to ensure that any Directors so participating by telephone may hear and be heard by all other Directors participating in the meeting.

Section 3.4      Quorum. The presence of that number of Directors representing a majority of the outstanding Shares shall constitute a quorum. A quorum must exist at all times of a meeting, including the reconvening of any meeting that has been adjourned, for any action taken at such meeting to be valid. Except as otherwise specified in this Agreement, all decisions of the Board of Directors shall be taken by a majority of the Directors present at a meeting at which a quorum exists for such decision or action to be valid. Notwithstanding the foregoing, for any action requiring a Supermajority Vote, there shall not be a quorum unless at least one Capricorn Director or the individual holding the office of the Chief Executive Officer of the Company serving as a director is present at the time such action is approved.

Section 3.5      Nomination and Election of Directors. The Stockholders' initial nominees for the Board of Directors shall be as set forth on the attached Exhibit B, which the Stockholders hereby act by written consent to elect. Hereafter, the Stockholders shall make the nominations to which they are entitled not later than 30 days prior to each annual meeting of the Company's stockholders, and the Board of Directors shall be elected at such meeting or by unanimous written consent in accordance herewith.

Section 3.6      Removal of Directors; Vacancies.

(a)      The Committee Stockholders and Capricorn may at any time remove any Director designated by such Stockholder(s) pursuant to Section 3.2, with or without cause, and upon written request of such Stockholder(s), the other Stockholders agree to vote and otherwise take all actions necessary to remove such Director and to elect any replacement Director designated by the Committee Stockholders or Capricorn, as applicable. Unless the Committee Stockholders or Capricorn shall otherwise request in writing, no Stockholder shall take any action to cause the removal of any Directors designated by the Committee Stockholders or Capricorn, as applicable.

9

(b)    In the event a vacancy occurs on the Board of Directors as a result of the retirement, removal, resignation or death of a Committee Director or Capricorn Director, the remaining Directors and the Company shall cause such vacancy to be filled by a person designated by the Committee Stockholders or Capricorn, as applicable, the retirement, removal, resignation or death of whose designee or nominee created the vacancy. Notwithstanding the foregoing, in the event a vacancy occurs on the Board of Directors as a result of the retirement, removal, resignation or death of a Director designated pursuant to Section 3.2, and a Stockholder (or Stockholders, as the case may be) no longer has the right to nominate a replacement for such Director pursuant to the applicable subsection of Section 3.2, such vacancy shall be filled by the remaining members of the Board of Directors, in accordance with the Company's bylaws. Any Director elected pursuant to this Section 3.6 shall serve until the next annual election of Directors.

Section 3.7    Approval Required. The Board of Directors shall have authority with respect to all aspects of the operation of the Company. Without limiting the generality of the foregoing, the Company shall not take any of the actions listed in Section 3.7(a) or Section 3.7(b), below, except pursuant to the affirmative vote of that number of Directors described in such Section.

(a)    The Company shall not take any of the following actions except pursuant to a Supermajority Vote:

(i)    the amendment of the provisions of the constituent documents of the Company in a manner adverse to Capricorn or its Permitted Transferees or to any Capricorn Director, provided, however, the parties agree that any amendment to the provisions of the constituent documents of the Company that effects all Stockholders equally shall be deemed not to be adverse to Capricorn or its Permitted Transferees or to any Capricorn Director;

(ii)    the continuing of the Company under the laws of another jurisdiction;

(iii)    the entering into or amendment by the Company of any agreement, arrangement or transaction with any Stockholder or its Permitted Transferees or any Affiliate of the Company or any Stockholder or its Permitted Transferees, other than compensation agreements with Company management not exceeding payments of $1,000,000 to any individual in any fiscal year; or

(iv)    the conduct by the Company of any business other than, or the engagement by the Company in any transaction not substantially related to, the Industry.

For the avoidance of doubt, any transaction, event or occurrence listed in Section 3.7(b) hereof and approved in accordance with such Section shall be deemed not to be a violation of this Section 3.7(a).

(b)    The Company shall not take any of the following actions except pursuant to a Majority Vote:

10

(i)      the adoption of any Annual Budget or any material revision or amendment thereto;

(ii)     other than as specifically provided in an Approved Budget, the incurrence, issuance, assumption, guarantee or refinancing of any indebtedness if the aggregate amount of such indebtedness and all other outstanding indebtedness of the Company not theretofore approved under this clause (ii) exceeds $5,000,000, exclusive of indebtedness outstanding under the Company's then existing working capital facility in an amount but not to exceed the available amount under the Company's working capital facility in effect at the Effective Date;

(iii)    transactions with Third Parties outside the ordinary course of business including, but not limited to, mergers and acquisitions or substantial disposals;

(iv)     the authorization, issuance, sale, acquisition, repurchase or redemption by the Company of any Shares or other equity interest (or option, warrant, conversion or similar right with respect to any equity interest) in or of the Company, excluding any issuance of shares of Common Stock to eligible participants pursuant to the Management Incentive Plan;

(v)      the entering into any agreement, arrangement or transaction concerning the sale or other disposition of any or all of the shares of the common stock of NexCen Brands, Inc. beneficially owned by the Company, or the use of the proceeds of such sale or disposition;

(vi)     the entering into any agreement, arrangement or transaction concerning the sale or other disposition of the interests in, or all or substantially all the assets of, TCBY Systems, LLC, or the use of the proceeds of such sale or disposition;

(vii)    the declaration, making or payment of any dividend, distribution or transfer (whether in cash, securities or other property) to the Stockholders;

(viii)   the entering into by the Company of any agreement, contract or arrangement pursuant to which the Company is obligated to pay or entitled to receive payments in excess of $1,000,000 over the term of such contract;

(ix)     the selection or replacement of the Auditors of the Company;

(x)      unless required by law or a change in GAAP, the making of any material change in the accounting methods of the Company;

(xi)     material changes to compensation of senior management and any equity compensation proposed other than as contemplated by the Management Incentive Plan;

(xii)    the commencement or settlement of any litigation for an amount in excess of $1,000,000 in any such commencement or settlement or series of related commencements or settlements;

11

(xiii)    the creation of or investment in any Subsidiary of the Company or the entering of any partnership, consortium, joint venture or other similar enterprise;

(xiv)    (A) the dissolution, liquidation or winding up of the Company or (B) the commencement of a voluntary proceeding seeking reorganization or other similar relief; or

(xv)    the entering into of any contract, arrangement, understanding or other similar agreement with respect to any of the foregoing (i)-(xiv).

Section 3.8    Conflict of Interest.

(a)    Each Director, based on his or her knowledge and reasonable judgment at such time, shall disclose to the Board of Directors any actual, apparent, or potential financial interest, competitive interest, or other conflict of interest ("*Conflict*") such Director has in any matter or transaction presented for information, consideration or approval of the Board of Directors immediately upon becoming aware of such Conflict, unless the nature and extent of such Conflict are known or readily apparent to the Board of Directors.  No Director shall be liable to the Company or the Stockholders if such Conflict has been disclosed to the Board of Directors and such Director has complied with any agreement between such Director and the Board of Directors as to resolution or avoidance of such Conflict.

(b)    Except as otherwise provided in this Agreement, no Director shall be disqualified from voting on, or shall be required to remove himself or herself from, the consideration of or voting on, any matter by reason of such Director's or any related Person's interest in such matter (it being understood that in approving or disapproving any matter, a Director may act to protect the interest of such Director or a related Person, as a Director or in any other capacity), so long as such Director disclosed such interest to, or such interest is reasonably apparent to, the other Directors.

Section 3.9    Director Compensation, Reimbursements and Insurance.    The Company shall (a) compensate directors for service on the Board of Directors in amounts and a manner commensurate with the director compensation provided by companies of a comparable size, which the Stockholders agree will initially be in conformity with Exhibit 3.9(a) hereto, (b) reimburse the Directors for any reasonable expenses incurred by the Directors on behalf of the Company upon presentation of written documentation therefor, in accordance with the Company's standard reimbursement procedures, and (c) maintain appropriate insurance for the benefit of directors commensurate with the insurance provided by companies of a comparable size, which the Stockholders agree will initially be in conformity with Exhibit 3.9(c) hereto.

Section 3.10    Audit Committee.  The Company shall establish and maintain an Audit Committee of the Board of Directors, which shall consist of three Directors; provided that, if and for so long as Capricorn holds at least 30% of the outstanding Shares, one of the three Directors shall be a Capricorn Director and the remaining two directors shall be Committee Directors.

Section 3.11    Compensation Committee.   The Company shall establish and maintain a Compensation Committee of the Board of Directors, which shall consist of three

12

Directors; provided that, if and for so long as Capricorn holds at least 30% of the outstanding Shares, one of the three Directors shall be a Capricorn Director and the remaining two directors shall be Committee Directors. . The Compensation Committee shall make recommendations to the full Board of Directors for such matters as management compensation, Company benefit plans and matters relating to Company option plans, if any.

### ARTICLE IV
### CAPITALIZATION; BUDGETS; FUNDING

Section 4.1     Initial Capitalization.

(a)     Exhibit A sets forth each Stockholder and the number of shares of Common Stock held by such Stockholder on the date hereof.

(b)     The President or Secretary shall amend Exhibit A from time to time to reflect the issuance of additional Shares to any Stockholder or the Transfer or issuance of any Shares to another Stockholder or any other Person; provided, that such Transfer is made in accordance with the provisions of this Agreement.

Section 4.2     Budgets.  Within 30 Business Days after the date hereof, the Board of Directors shall cause to be prepared and shall agree upon projected expenditure schedules and a projected operating budget for the Company for the remainder of the Fiscal Year ending December 31, 2008 (the "*Initial Budget*").  Beginning for the Fiscal Year ending December 31, 2009, and for each subsequent Fiscal Year, not later than 30 days prior to the beginning of such Fiscal Year, the Company's management  shall prepare and submit to the Board of Directors for approval projected expenditure schedules and a projected operating budget for such Fiscal Year (each, an "*Annual Budget*").  Each Annual Budget shall be in a form substantially similar to the Initial Budget.  The Initial Budget and any Annual Budget are referred to as an "*Approved Budget*."

Section 4.3     Status.     Notwithstanding anything to the contrary in this Agreement, it is the intent and desire of the parties that the Company be organized and operated as a corporation and specifically provide for no liability to stockholders (except to the extent, if any, required under local law), and that stockholders of the Company have no fiduciary duties or other obligations to one another in their respective capacities as stockholders.

### ARTICLE V
### FINANCIAL STATEMENTS

Section 5.1     Financial Statements and Other Information.  The Company shall make available to the Stockholders as soon as it is available the same information and same access to the Company's secure website as the information and access required to be provided to noteholders under Section 4.23 of the Company's Indenture, dated as of the date of this Stockholders Agreement, as such section is in effect as of the date of this Stockholders Agreement and whether or not notes remain outstanding under such Indenture.  The Company shall also prepare and provide to the Committee Stockholders and Capricorn and their respective Permitted Transferees, in each case for so long as they remain Stockholders, (a) within 20 days following each calendar month end a monthly management report, including a balance sheet, a

13

statement of cash flows and an income statement and an analysis of the information by business line, (b) within 30 days following the completion of each fiscal year, an updated and detailed projection covering each fiscal year in the three year period following such completed fiscal year, and (c) promptly following a request therefore, and other information concerning the Company, its operations or its assets or liabilities.

## ARTICLE VI
## RESTRICTIONS ON TRANSFER

Section 6.1    <u>Legends</u>.  The Company shall affix to each certificate evidencing Shares issued to Stockholders a legend in substantially the following form:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE PROVISIONS OF A STOCKHOLDERS AGREEMENT OF MRS. FIELDS' ORIGINAL COOKIES, INC., DATED AS OF _____, 2008 AS IT MAY BE AMENDED FROM TIME TO TIME, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER SET FORTH THEREIN.  A COPY OF SUCH AGREEMENT IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICES OF THE COMPANY.

THE SHARES ARE NOT REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), OR UNDER ANY STATE OR FOREIGN SECURITIES LAWS, IN RELIANCE UPON APPLICABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE 1933 ACT AND SUCH STATE AND FOREIGN SECURITIES LAWS.  THE SHARES HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE.  THE SHARES MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE 1933 ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS, OR UNTIL THE REGISTRATION OF SUCH SALE, TRANSFER OR OTHER DISPOSITION IS NOT REQUIRED UNDER THE 1933 ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS BECAUSE OF AVAILABLE EXEMPTIONS FROM SUCH REGISTRATION REQUIREMENTS."

Section 6.2    <u>Loss or Destruction of Share Certificates</u>.  In case of loss or destruction of a certificate representing Shares, no new certificate shall be issued in lieu thereof except upon satisfactory proof to the Company of such loss or destruction, and upon the giving to the Company of satisfactory security against loss by bond or otherwise.  Any such new certificate shall be plainly marked "Duplicate" upon its face.

Section 6.3    <u>Certain Restrictions on Transfer or Encumbrance</u>.

(a)    During the effectiveness of this Agreement, no Stockholder shall, directly or indirectly (through the transfer of capital stock of any Person that holds, or controls any Person that holds, any Shares) make or solicit any Transfer of any Shares beneficially owned by such Stockholder, other than any Transfer to a Permitted Transferee or any Transfer in

14

accordance with this Article VI, provided, however, that the conditions and restrictions upon the Transfer of Shares contained in this Agreement, including, without limitation, those contained in Sections 6.3, 6.5, 6.6, 6.7 and 6.8, shall not apply to a Transfer of Shares between Stockholders.

(b)     No Transfer of Shares to a Permitted Transferee shall be effective if a purpose or effect of such transfer shall have been to circumvent the provisions of this Section 6.3. Notwithstanding anything in Section 6.9 to the contrary, each Stockholder shall remain responsible for the performance of this Agreement by each Permitted Transferee of such Stockholder to which Shares are transferred. If any Permitted Transferee to which Shares are transferred pursuant to Section 6.3(a) ceases to be a Permitted Transferee of the Stockholder from which it acquired such Shares pursuant to such provision, such Person shall reconvey such Shares to such transferring Stockholder immediately before such Person ceases to be a Permitted Transferee of such transferring Stockholder so long as such Person knows of its upcoming change of status immediately prior thereto. If such change of status is not known until after its occurrence, the former Permitted Transferee shall make such transfer to such transferring Stockholder as soon as practicable after the former Permitted Transferee receives notice thereof.

Section 6.4     Improper Transfer or Encumbrance.

(a)     Any attempt not in compliance with this Agreement to make any Transfer of all or any portion of a Stockholder's Shares shall be null and void and of no force and effect, the purported transferee shall have no rights or privileges in or with respect to the Company, and the Company shall not give any effect in the Company's records to such attempted Transfer.

(b)     In the case of a Transfer or attempted Transfer of any Shares or other interest in the Company contrary to the provisions of the Agreement, the parties engaging or attempting to engage in such Transfer shall indemnify and hold harmless the Company and each of the Stockholders from all Losses that such indemnified Persons may incur (including, without limitation, incremental tax liability and lawyers' fees and expenses) in enforcing the provisions of this Agreement.

Section 6.5     Rights of First Offer.

(a)     If at any time prior to the completion of an Initial Public Offering, a Stockholder (the "*Offering Stockholder*") desires to effect a Transfer of any or all of its Shares to a Third Party, the Offering Stockholder shall deliver to the Company and each Stockholder beneficially owning aggregate shares in excess of 5% of all of the issued and outstanding shares of Common Stock as of the date thereof (collectively, excluding the Company, the "*Offer Recipients*") written notice (the "*Offer Notice*"), stating such Offering Stockholder's intention to effect such a Transfer, the number of Shares to be subject to such Transfer (the "*Offered Shares*"), and any other material terms and conditions of the proposed Transfer.

(b)     Upon receipt of the Offer Notice, the Company will have 10 days from receipt of the Offer Notice to elect to purchase all or a portion of the Offered Shares, which number of Offered Shares and price per Offered Share (to be paid in cash) shall be determined by the Board of Directors (the "*Company Price*"), and otherwise on the terms and conditions described in the Offer Notice (the "*Company Offer*"). The Company shall make the Company

15

Offer, if any, by sending written notice of the Company Offer to the Offering Stockholder and the Offer Recipients indicating the number of Offered Shares to be purchased and the Company Price, and the Company shall then be obligated to purchase such number of Offered Shares on the terms and conditions set forth in the Offer Notice and as set forth herein.

(c)     Upon receipt of written notice of the Company Offer, the Offer Recipients will have 10 days from receipt of the Company Offer to elect to purchase all or a portion of the Offered Shares a price per Offered Share (to be paid in cash) (each such price, a *"Recipient Price"*), and otherwise on the terms and conditions described in the Offer Notice (each a *"Recipient Offer"*). Each of the Offer Recipients shall, within 10 days from receipt of the Company's notice pursuant to Section 6.5(b) (the *"Offer Period"*), indicate to the Offering Stockholder the number of Offered Shares it elects to purchase and the Recipient Price, by sending irrevocable written notice of such acceptance (an *"Acceptance Notice"*) to the Offering Stockholder. Each Offer Recipient that delivers an Acceptance Notice shall be obligated to purchase such number of Offered Shares on the terms and conditions set forth in the Acceptance Notice and as set forth herein.

(d)     The Offering Stockholder shall have 60 days from the expiration of the Offer Period to Transfer the Offered Shares to a Third Party for cash and on the terms and conditions set forth in the Offer Notice. If the Offering Stockholder elects to Transfer any Offered Shares, the Offering Stockholder shall first Transfer such Offered Shares to the Person (whether the Company, an Offer Recipient or a Third Party) offering the highest price per Offered Share at the price offered by such Person; if any Offered Shares remain and the Offering Stockholder elects to Transfer any Offered Shares, the Offering Shareholder shall next Transfer such Offered Shares to the Person offering the next highest price per Offered Share at the price offered by such Person; and so on. For the avoidance of doubt, the Offering Stockholder shall not be obligated to Transfer any Offered Shares at any price, however, if it elects to Transfer any Offered Shares, it must do so in accordance with the preceding sentence.

(e)     Each Offer Recipient who delivers a Recipient Offer to the Offering Stockholder at the same Recipient Price shall be entitled to purchase, on the terms set forth in the Offer Notice, such Offer Recipient's pro rata portion of the Offered Shares being Transferred at that price by the Offering Stockholder, which pro rata portion shall be equal to the product of (i) the number of Offered Shares to be sold at such Recipient Price and (ii) a fraction, the numerator of which is the number of Shares beneficially owned by such Offer Recipient and the denominator of which is the aggregate number of Shares beneficially owned by such Offer Recipients. For the avoidance of doubt, if the Company Price is the same as any Recipient Price, the all of the shares the Company elected to purchase shall be Transferred to the Company before any such shares are allocated to such Offer Recipient.

(f)     In the event that an Offering Stockholder shall not have Transferred all of the Offered Shares within 60 days after the expiration of the Offer Period in accordance with this Section 6.5, then the provisions of this Section 6.5 shall again apply, and such Offering Stockholder shall not thereafter Transfer or offer to Transfer such Shares without again complying with this Section 6.5.

(g)    Upon written request of any Stockholder, the Company shall provide a list of those Stockholders owning at 5% or more of the issued and outstanding Shares of the Company. The Offering Stockholder may rely upon such list prepared by the Company to determine the identity of the Offer Recipients. In addition, the Company shall regularly update its Share register to reflect all sales and transfers of Shares.

Section 6.6    Right of Co-Sale on Transfers by Stockholders.

(a)    If at any time prior to the completion of an Initial Public Offering a Stockholder or group of Stockholders (in either case, the "*Transferring Stockholder*") proposes to Transfer 10% or more of the issued and outstanding shares of Common Stock to a Third Party in any transaction or series of related transactions (whether for cash, securities or a combination of both), each other Stockholder beneficially owning aggregate shares in excess of 5% of all of the issued and outstanding shares of Common Stock as of the date thereof (a "*Co-Sale Participant*") shall have the right to participate in the Transfer in the manner set forth in this Section 6.6, it being agreed for these purposes that if a Warrantholder elects to exercise its Warrants in order to participate in such Transfer, such exercise shall be subject to the completion of such Transfer. At least 30 days prior the proposed date of any such Transfer, the Transferring Stockholder shall deliver to the Company and each Co-Sale Participant notice (the "*Transfer Notice*") stating (i) the name of the proposed Transferee, (ii) the number of Shares proposed to be Transferred (the "*Transferred Shares*"), (iii) the proposed purchase price therefor and (iv) the other material terms and conditions of the proposed Transfer, including the proposed Transfer date. Such notice shall be accompanied by a written offer from the proposed Transferee to purchase the Transferred Shares. In the event any portion of the purchase price per Share to be paid by the proposed Transferee is to be paid in non-cash consideration, the value of any such non-cash consideration per Share shall be the Fair Market Value thereof as determined by the Board of Directors. Each Co-Sale Participant may Transfer to the proposed Transferee identified in the Transfer Notice such Co-Sale Participant's pro rata portion, calculated in accordance with Section 6.6(b), of the Transferred Shares by giving written notice (a "*Co-Sale Notice*") to the Transferring Stockholder and the Company within the 30 day period after the delivery of the Transfer Notice (the "*Co-Sale Period*"), which notice shall state that such Co-Sale Participant elects to exercise its rights of co-sale under this Section 6.6 and shall state the maximum number of Shares sought to be Transferred.

(b)    Each Co-Sale Participant's pro rata portion of the Transferred Shares shall, on any transfer date, be equal to the product of (i) the number of Transferred Shares and (ii) a fraction, the numerator of which is the number of Shares beneficially owned by such Co-Sale Participant and the denominator of which is the aggregate number of Shares beneficially owned by all Co-Sale Participants and the Transferring Stockholder as of such date. In the event any such Co-Sale Participant elects to exercise its co-sale rights with respect to less than all of its pro rata portion of Transferred Shares (such remaining securities, the "*Co-Sale Non-Electing Shares*"), the Co-Sale Participants (other than holders of Co-Sale Non-Electing Shares) shall be entitled to sell additional Shares equal in the aggregate to the number of Co-Sale Non-Electing Shares, pro rata in accordance with the respective number of Shares held by each Co-Sale Participant, up to the maximum number of Shares elected for sale by the respective Co-Sale Participant as set forth in its Co-Sale Notice. The proposed Transferee shall not be obligated to purchase a number of Shares exceeding that set forth in the Transfer Notice and in the event such

17

Transferee elects to purchase less than all of the additional Shares sought to be Transferred by the Co-Sale Participants, the number of Shares to be Transferred by the Transferring Stockholder and each such Co-Sale Participant shall be reduced on a pro rata basis. The Transferring Stockholder shall, within five days after the expiration of the Co-Sale Period, notify each Co-Sale Participant that has elected to exercise its rights of co-sale hereunder as to the number of Shares of such Co-Sale Participant to be included in the sale pursuant to the above allocation.

(c)　　　Each Co-Sale Participant, in exercising its right of co-sale hereunder, may participate in the Transfer by delivering to the Transferring Stockholder at the closing of the Transfer of the Transferred Shares certificates representing the Shares to be Transferred by such Co-Sale Participant, duly endorsed for transfer or accompanied by stock powers duly executed in blank or in favor of the applicable purchaser. At such closing, the purchaser shall remit directly to each Co-Sale Participant, by wire transfer if available and if requested by such Co-Sale Participant, the consideration for such Co-Sale Participant's Shares sold pursuant thereto. In connection with the transaction contemplated by this Section 6.6, each Co-Sale Participant will agree to make the same customary representations, covenants, indemnities and agreements as the Transferring Stockholder so long as they are made severally and not jointly and the liabilities thereunder are borne on a pro rata basis based on the consideration to be received by each Stockholder, not to exceed such Co-Sale Participant's proceeds from the sale; provided, that any representation made by a Co-Sale Participant shall relate only to such Co-Sale Participant and its Shares.

(d)　　　The closing of the sale of the Shares owned by the Transferring Stockholder and all Co-Sale Participants who have elected to sell Shares shall be held simultaneously at such place and on such date as determined by the Transferring Stockholder and the proposed purchaser, but in no event later than 60 days after expiration of the Co-Sale Period. If within 60 days after the expiration of the Co-Sale Period, the Transferring Stockholder has not completed the disposition of its Shares and those of the electing Co-Sale Participants in accordance herewith, the sale to the proposed purchaser shall be prohibited and any attempt to consummate such sale shall be treated as a violation of Section 6.3 and subject to Section 6.4; provided, that nothing shall prevent a Transferring Stockholder from seeking to consummate another proposed sale to such purchaser, subject to the terms and conditions of this Section 6.6.

(e)　　　For the avoidance of doubt, (i) any Transfer by a Transferring Stockholder as to which co-sale rights would apply under this Section 6.6 would be subject to Section 6.5, (ii) compliance with Section 6.5 and this Section 6.6 may be effected concurrently, (iii) a Co-Sale Participant shall be deemed to have waived its right of co-sale hereunder if it either fails to give notice within the time period prescribed in Section 6.6(a) or if such Co-Sale Participant purchases Shares in exercising its right of first refusal pursuant to Section 6.5 and (iv) the co-sale rights of Co-Sale Participants shall apply to any sale to the Company or the other Stockholders pursuant to Section 6.5.

Section 6.7　　Drag-Along Right.

(a)　　　If, at any time prior to the completion of an Initial Public Offering one or more Stockholders (the "*Drag-Along Transferring Stockholder(s)*") desire to Transfer Shares representing more than 50% the issued and outstanding shares of Common Stock, on a fully

18

diluted basis, and constituting all of the Shares owned by such Stockholder(s) to a Third Party in a single transaction and, solely for so long as Section 3.7 requires such approval, such Transfer has been approved by Majority Vote pursuant to such Section, then if requested by the Drag-Along Transferring Stockholder(s), each other Stockholder (a *"Drag-Along Participant"*) shall be required to sell all of the Shares held by it.

(b)     The consideration to be received by each Drag-Along Participant in the transaction contemplated by Section 6.7(a) (the *"Drag Transaction"*) shall be the same form and amount of consideration per Share to be received by the Drag-Along Transferring Stockholder(s), and the terms and conditions of such sale shall be the same as those upon which the Drag-Along Transferring Stockholder(s) sells its Shares. If any Stockholders are given an option as to the form and amount of consideration to be received, all Stockholders will be given the same option.

(c)     The Drag-Along Transferring Stockholder(s) shall provide written notice (the *"Drag-Along Notice"*) to each Drag-Along Participant of any proposed Drag Transaction not less than 30 days prior to the consummation of the Drag Transaction. The Drag-Along Notice shall set forth the consideration to be paid by the purchaser for the Shares in the Drag Transaction, the name of the proposed purchaser and the other material terms of the Drag Transaction. In the event any portion of the purchase price per Share is to be paid by the proposed purchaser is to be paid in non-cash consideration, the value of any such non-cash consideration per Share shall be the Fair Market Value thereof as determined by the Board of Directors. The Drag-Along Notice shall be accompanied by a written offer from the proposed Transferee to purchase the Shares of the Drag-Along Transferring Stockholder(s) and the Drag-Along Participants.

(d)     In connection with the Drag Transaction, each Drag-Along Participant will agree to make the same customary representations, covenants, indemnities and agreements as the Drag-Along Transferring Stockholder(s) so long as they are made severally and not jointly and the liabilities thereunder are borne on a pro rata basis based on the consideration to be received by each Stockholder; not to exceed such Drag-Along Participant's proceeds from the sale; provided, that any representation made by a Drag-Along Participant shall relate only to such Drag-Along Participant and its Shares.

(e)     At least 10 days prior to the anticipated consummation of the Drag Transaction, each Drag-Along Participant shall deliver to the Company to hold in escrow pending transfer of the consideration in respect thereof and the consummation of the Drag Transaction in accordance with its agreed terms and conditions (i) certificates representing the Shares to be Transferred by such Drag-Along Participant, duly endorsed for transfer or accompanied by stock powers duly executed in blank or in favor of the applicable purchaser and (ii) a limited power-of-attorney authorizing the Company to take all actions necessary to Transfer such securities in such Drag Transaction. In the event that a Drag-Along Participant should fail to deliver such certificates and power-of-attorney, the Company shall cause the books and records of the Company to show that such Shares are bound by the provisions of this Section 6.7 and that the Transfer of such Shares to the purchaser in such sale may be effected without such Drag-Along Participant's consent or surrender of its Shares.

(f)    The closing of the Drag Transaction shall be held at such place and on such date as determined by the Drag-Along Transferring Stockholder(s) and the proposed purchaser, but in no event later than 60 days after delivery of the Drag-Along Notice required to be delivered pursuant to Section 6.7(c). Upon the consummation of the Drag Transaction, the purchaser shall remit directly to each Drag-Along Participant, by wire transfer if available and if requested by the Drag-Along Participant, the consideration for such Drag-Along Participant's Shares sold pursuant thereto.    If within 75 days after the Drag-Along Transferring Stockholder(s)' delivery of the Drag-Along Notice, the purchaser in the Drag Transaction has not purchased all of the Shares to be sold in the Drag Transaction, the sale to such proposed purchaser shall be prohibited and any attempt to consummate such sale shall be treated as a violation of Section 6.3 and subject to Section 6.4. The Drag-Along Transferring Stockholder(s) shall return to the Drag-Along Participants the Share certificates, stock powers and limited powers of attorney delivered pursuant to Section 6.7(e); provided, that nothing shall prevent a Drag-Along Transferring Stockholder from seeking to consummate another proposed sale to such purchaser, subject to the terms and conditions of this Section 6.7.

(g)    For the avoidance of doubt, any Transfer by one or more Drag-Along Transferring Stockholders that exercise their drag along rights under this Section 6.7 would not be subject to Section 6.5, provided, however, that all Stockholders were given the opportunity to submit a bid to act as the purchaser under the transaction constituting the Drag Transaction on in accordance with Section 6.5.

Section 6.8    Minority Transfer Rights.

(a)    In the event that following completion of a proposed Transfer of Shares, whether to a Stockholder, a Permitted Transferee of a Stockholder or to a Third Party, and whether arising pursuant to any of the rights set forth in this Article VI or otherwise, the purchaser together with its Affiliate(s) will control more than 50% of the issued and outstanding Shares, the prospective seller (the "*Prospective Seller*") and the potential majority owner (the "*Potential Majority Owner*") shall each so notify the other Stockholders immediately on becoming so aware. Each of the other Stockholders shall then be entitled, upon written notice delivered to the Prospective Seller and the Potential Majority Owner within 15 days of receipt of the notice referred to in the preceding sentence, to require the Potential Majority Owner to purchase all, but not less than all, of their Shares upon the terms and conditions set forth in this Section 6.8. Such purchase shall be completed within 30 days of receipt of the notice delivered by such electing Stockholders to the Prospective Seller and the Potential Majority Owner.

(b)    The purchase of Shares pursuant to this Section 6.8 shall be at a price per Share equal to the greater of (i) the price per Share to be received by the Potential Seller, and (ii) the Fair Market Value of such Shares.

(c)    The Prospective Seller shall not complete the proposed Transfer of its Shares unless and until, simultaneously with such Transfer, the Potential Majority Owner shall purchase the Shares of the other electing Stockholders specified in each such electing Stockholder's notice on the terms set forth in Section 6.8(b). In the event that any Transfer is completed without the Potential Majority Owner purchasing any such Shares, the other electing Stockholders shall be entitled to require the Prospective Seller to purchase any such Shares not

purchased by the Potential Majority Owner on the terms and conditions set forth in Section 6.8(b), and until such purchase has been completed, the Transfer by the Prospective Seller to the Potential Majority Owner shall be treated as a violation of Section 6.3 and subject to Section 6.4.

Section 6.9    Transferees to Execute Agreement.  Each Stockholder agrees that it will not, during the term of this Agreement, directly or indirectly, make any Transfer of all or any portion of the Shares beneficially owned by such Stockholder unless prior to the consummation of any such Transfer, the Person to whom such Transfer is proposed to be made (a "**Prospective Transferee**"), if not a Stockholder (a) executes and delivers this Agreement to the Company and each Stockholder and (b) except in the case of a Prospective Transferee that is a recognized institutional investor or a Permitted Transferee, delivers to the Company an opinion of counsel, in form and substance reasonably satisfactory to the Company, to the effect that the execution of this Agreement by such Prospective Transferee renders this Agreement a legal, valid and binding obligation of such Prospective Transferee enforceable against such Prospective Transferee in accordance with its terms, and with respect to such other matters as the Board of Directors may reasonably request.  Upon the execution and delivery by such Prospective Transferee of this Agreement and, if required, the delivery of the opinion of counsel referred to in clause (b) of the preceding sentence, such Prospective Transferee shall be deemed a "Stockholder" for purposes of this Agreement and shall have the rights and be subject to the obligations of a Stockholder under this Agreement with respect to the Shares owned by such Prospective Transferee.

Section 6.10    Fair Market Valuation Methodology.  Where the provisions of this Agreement indicate that the "Fair Market Value" is to be determined, each Stockholder will take all actions reasonably necessary to determine the Fair Market Value in accordance with the following.  Absent agreement prior to the Notice Date by the Stockholders participating in the event requiring a determination of Fair Market Value as to the Fair Market Value, then, by the Notice Date, each Stockholder participating in such event shall designate an investment banking firm of recognized international standing to determine the Fair Market Value (or, if there are more than two Stockholders participating in such event, one investment banking firm of recognized international standing selected by the Stockholder that initiates the appraisal request (or takes the action necessitating that the Fair Market Value be determined) and one investment banking firm of recognized international standing selected by the mutual agreement of the other Stockholders participating, or if they cannot agree, by the Stockholder beneficially owning the largest number of Shares among such other Stockholders).  Within 30 days after appointment, each investment banking firm shall determine its initial view as to the Fair Market Value and consult with one another with respect thereto.  Within 45 days after the Notice Date, each investment banking firm shall determine its final view as to the Fair Market Value and shall deliver such final view to each Stockholder participating in the appraisal process.  If the difference between the higher of the respective final views of the two investment banking firms and the lower of the respective final views of the two investment banking firms is less than 10% of the higher of the respective final views, then the Fair Market Value determined shall be the average of those two views.  If the difference between the higher of the respective final views of the two investment banking firms and the lower of the respective final views of the two investment banking firms is equal to or greater than 10% of the higher of the respective final views, the participating Stockholders shall instruct the investment banking firms jointly to

21

designate a Mutually Designated Appraiser. The Mutually Designated Appraiser shall be designated within 60 days from the Notice Date (or, if later, within 15 days following the determination of the final views of the two investment banking firms as described above) and shall, within 15 days of such designation, determine its final view as to the Fair Market Value by selecting either the higher of the respective final views of the two investment banking firms or the lower of the respective final views of the two investment banking firms. The Company shall provide reasonable access to each of the designated investment banking firms to Stockholders of management of the Company and to the books and records of the Company so as to allow such investment banking firms to conduct due diligence examinations in scope and duration as are customary in valuations of this kind. Each of the Stockholders and any Permitted Transferee (on its own behalf and on behalf of its respective Affiliates) agree to cooperate with each of the investment banking firms and to provide such information as may reasonably be requested. Costs of the appraisals shall be borne by the Stockholder that initiates the appraisal request (or takes the action necessitating that the Fair Market Value be determined), on the one hand, and by the other Stockholders participating in the relevant event, pro rata in accordance with their ownership of Shares, on the other hand. Notwithstanding the foregoing, in the event a Stockholder does not appoint an investment banking firm within the time periods specified above, such Stockholder shall have waived its rights to appoint an investment banking firm and the determination of the Fair Market Value shall be made solely by the investment banking firm of the Stockholder who did appoint an investment banking firm. Notwithstanding the foregoing, in the case of property consisting of securities traded in the public markets, the Fair Market Value of such securities will be equal to the average of the closing price of such security for the five-day trading period immediately preceding the date on which such valuation is required.

## ARTICLE VII
## OTHER AGREEMENTS

Section 7.1    Right to Purchase New Securities.

(a)    The Company hereby grants to each Stockholder (excluding the Warrantholder prior to exercising its right to purchase Shares pursuant to the Warrants) the right to purchase its pro rata portion of all or any part of any New Securities that the Company may, from time to time, propose to sell or issue, which pro rata portion shall be equal to the product of (i) the New Securities that the Company proposes to issue at such time and (ii) such Stockholder's Applicable Percentage; provided, that the rights hereunder shall not apply to (A) New Securities issued pursuant to the Management Incentive Plan or (B) New Securities issued in connection with the conversion/exercise of the Warrants. Prior to the exercise of its right to purchase Shares pursuant to the Warrants, the Warrantholder shall have no rights pursuant to this Article VII.

(b)    The Company shall give written notice of a proposed issuance or sale described in Section 7.1(a) to the Stockholders within five Business Days following any meeting of the Board of Directors at which any such issuance or sale is approved and at least 15 days prior to the proposed issuance or sale. Such notice (the "*Issuance Notice*") shall set forth the material terms and conditions of such proposed transaction, including the name of any proposed purchaser(s), the proposed manner of disposition, the number of Shares proposed to be issued, the proposed issuance date and the proposed purchase price per Share. Such notice shall also be

accompanied by any written offer from the prospective purchaser, if applicable, to purchase such New Securities.

(c)    At any time during the 15-day period following the receipt of an Issuance Notice, each Stockholder shall have the right to elect to purchase its pro rata portion, as set forth in Section 7.1(a), of the number of New Securities to be issued at the purchase price per Share set forth in the Issuance Notice and upon the other terms and conditions specified in the Issuance Notice by sending irrevocable written notice to the Company (a *"Subscription Notice"*), which notice shall state that such Stockholder elects to exercise its rights hereunder and shall state the maximum number of New Securities sought for purchase, including the number of New Securities such Stockholder would elect to purchase if one or more other Stockholders do not elect to purchase their full pro rata portion of New Securities.  In the event any Stockholder elects to purchase less than all of the New Securities it is entitled to purchase in accordance with Section 7.1(a) (such remaining securities, the *"Unsubscribed Shares"*), the Unsubscribed Shares shall be allocated among the Stockholders that have elected to purchase their full pro rata portion of New Securities, pro rata in accordance with the respective number of Shares held by each such Stockholder, up to the maximum number of Shares elected for purchase by the respective Stockholder as set forth in its Subscription Notice.  If needed, such allocation shall be made in stages so that if in any stage a Stockholder reaches an allocation of the full number of Shares specified in such Stockholder's Subscription Notice but there are some Unsubscribed Shares remaining unallocated, there will be a subsequent stage for allocations to the remaining Stockholders who have not yet reached the maximum numbers of Shares specified in such Stockholders' Subscription Notices.  The Company shall, within five days after the date Subscription Notices were due to be received pursuant to this Section, notify each Stockholder that has elected to purchase New Securities as to the number of New Securities to be purchased by such Stockholder pursuant to the above allotments, and such Stockholder shall then be obligated to purchase such number of New Securities on the terms and conditions set forth in the Issuance Notice.

(d)    The purchase of the New Securities by all electing Stockholders shall be consummated concurrently with the consummation of the issuance or sale described in the Issuance Notice; provided, that the closing of any purchase by any Stockholder may be extended beyond the closing of the transaction described in the Issuance Notice to the extent necessary to obtain required governmental approvals and other required approvals.

(e)    If effective acceptances have not been received by the Company from the Stockholders (in the aggregate) pursuant to Section 7.1(c) in respect of all of the New Securities to be issued, the Company shall be free to complete the proposed issuance or sale of the New Securities described in the Issuance Notice with respect to which Stockholders failed to exercise the option set forth in this Section 7.1 on terms no less favorable to the Company than those set forth in the Issuance Notice (except that the amount of securities to be issued or sold by the Company may be reduced); provided, that (i) such issuance or sale is closed within 90 days after the Subscription Notices were due to be received pursuant to Section 7.1(c) and (ii) the price at which the New Securities are sold shall be equal to or higher than the purchase price described in the Issuance Notice.  In the event that the Company has not sold such New Securities within such 90-day period, the Company shall not thereafter issue or sell any New Securities, without first again offering such securities to the Stockholders in the manner provided in this Section 7.1.

23

Section 7.2    Registration Rights.

(a)    Piggyback Registration. If the Company at any time proposes for any reason to register Primary Shares or Other Shares under the Securities Act (other than on Form S-4 or Form S-8), it shall promptly give written notice to each Stockholder of its intention to register the Primary Shares or Other Shares and, upon the written request of any Stockholder (given within 10 Business Days after delivery of any such notice to such Stockholder by the Company) to include in such registration Registrable Shares of such Stockholder (which request shall specify the number of Registrable Shares proposed to be included in such registration), the Company shall use its best efforts to cause all such Registrable Shares requested to be included in such registration to be included on the same terms and conditions as the Primary Shares or Other Shares otherwise being sold in such registration; provided, however, that if the managing underwriter advises the Company that the inclusion of all Registrable Shares or Other Shares proposed to be included in such registration would interfere with the successful offering and sale (including pricing) of Primary Shares proposed to be offered and sold by the Company, then the number of Primary Shares, Registrable Shares and Other Shares proposed to be included in such registration shall be included in the following order: (i) first, the Primary Shares; (ii) second, the Registrable Shares requested to be included in such registration pursuant to the terms of this Section 7.2, pro rata based upon the number of Registrable Shares owned by each such Stockholder at the time of such registration; and (iii) third, the Other Shares.

(b)    Holdback Agreement. If the Company at any time shall register an offering and sale of shares of Common Stock under the Securities Act in an underwritten offering (i) pursuant to an Initial Public Offering or (ii) pursuant to any other registration under the Securities Act (other than on Form S-4 or Form S-8), no Stockholder shall sell, make any short sale of, grant any option for the purchase of, or otherwise Transfer any Securities of the Company (other than (A) those Registrable Shares included in such registration pursuant to Sections 7.2(a), or (B) subject to the consent of the underwriters, to a Permitted Transferee) without the prior written consent of the Company (which, if given, shall be given pro rata to all Stockholders at the same time) for a period as shall be determined by the managing underwriters, which period cannot begin more than seven days prior to the effectiveness of such Registration Statement and cannot last more than 90 days (180 days in the case of the Initial Public Offering) after the effective date of such Registration Statement.

(c)    Preparation and Filing. If and whenever the Company is under an obligation pursuant to the provisions of this Agreement to use its best efforts to effect the registration of an offering and sale of any Registrable Shares, the Company shall, as expeditiously as practicable:

(i)    use its best efforts to cause a Registration Statement that registers such offering of Registrable Shares to become and remain effective for a period of 180 days or until all of such Registrable Shares have been disposed of (if earlier);

(ii)    furnish to each of the legal counsel (the *"Committee Counsel"*) selected by the Committee Stockholders and the legal counsel (the *"Capricorn Counsel"*)selected by Capricorn, at least five Business Days before filing a Registration Statement that registers such Registrable Shares, a Prospectus relating thereto and any

24

amendments or supplements relating to such Registration Statement or Prospectus, along with copies of all such documents proposed to be filed (it being understood that such five Business Day period need not apply to successive drafts of the same document proposed to be filed so long as such successive drafts are supplied to such counsel in advance of the proposed filing by a period of time that is customary and reasonable under the circumstances), and use its reasonable best efforts to reflect in each such document, when so filed with the SEC, such comments as the Stockholders whose Registrable Shares are to be covered by such Registration Statement may reasonably propose;

(iii)    notify each of the Committee Counsel and Capricorn Counsel promptly in writing of (A) any comments by the SEC with respect to such Registration Statement or Prospectus, or any request by the SEC for the amending or supplementing thereof or for additional information with respect thereto; (B) the issuance by the SEC of any stop order suspending the effectiveness of such Registration Statement or Prospectus or any amendment or supplement thereto or the initiation of any proceedings for that purpose; and (C) the receipt by the Company of any notification with respect to the suspension of the qualification of such Registrable Shares for sale in any jurisdiction or the initiation or threatening of any proceeding for such purposes;

(iv)    furnish to each seller of such Registrable Shares such number of copies of a summary Prospectus or other Prospectus, including a preliminary Prospectus, in conformity with the requirements of the Securities Act, and such other documents as such seller of Registrable Shares may reasonably request in order to facilitate the public offering and sale or other disposition of such Registrable Shares;

(v)    notify on a timely basis each seller of such Registrable Shares at any time when a Prospectus relating to such Registrable Shares is required to be delivered under the Securities Act within the appropriate period mentioned in Section 7.2(c)(ii) of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing and, at the request of such seller, prepare and furnish to such seller a reasonable number of copies of a supplement to or an amendment of such Prospectus as may be necessary so that, as thereafter delivered to the offerees of such shares, such Prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing;

(vi)    make available for inspection by any seller of such Registrable Shares, any underwriter participating in any disposition pursuant to such Registration Statement and any attorney, accountant or other agent retained by any such seller or underwriter (collectively, the "*Inspectors*"), all pertinent financial, business and other records, pertinent corporate documents and properties of the Company (collectively, the "*Records*"), as shall reasonably be necessary to enable such Inspectors to exercise their due diligence responsibility, and cause the Company's officers, directors and employees to supply all information (together with the Records, the "*Information*") reasonably requested by any such Inspector in connection with such Registration Statement; provided, however, that any of the Information which the

25

Company determines in good faith to be confidential, and of which determination the Inspectors are so notified, shall not be disclosed by the Inspectors unless (A) the disclosure of such Information is necessary to avoid or correct a misstatement or omission in the Registration Statement; (B) the release of such Information is ordered pursuant to a subpoena or other order from a court of competent jurisdiction; (C) such Information has been made generally available to the public; or (D) the seller of Registrable Shares agrees that it will, upon learning that disclosure of such Information is sought in a court of competent jurisdiction, give notice to the Company and allow the Company, at the Company's expense, to undertake appropriate action to prevent disclosure of the Information deemed confidential;

(vii)    list such Registrable Shares on any national securities exchange on which any shares of the Common Stock are listed or, if the Common Stock is not listed on a national securities exchange, use its best efforts to qualify such Registrable Shares for quotation on the automated quotation system of the NASDAQ National Market System or such other national securities exchange as the holders of a majority of such Registrable Shares included in such registration shall request; and

(viii)    use its best efforts to take all other steps necessary to effect the registration of such Registrable Shares contemplated hereby.

(d)    Expenses. All expenses incident to the Company's performance of or compliance with this Section 7.2, including without limitation (i) all registration and filing fees, and any other fees and expenses associated with filings required to be made with any stock exchange and the SEC; (ii) all fees and expenses of compliance with state securities or "blue sky" laws (including fees and disbursements of counsel for the underwriters or Stockholders in connection with "blue sky" qualifications of the Registrable Shares and determination of their eligibility for investment under the laws of such jurisdictions as the managing underwriters may designate); (iii) all printing and related messenger and delivery expenses (including expenses of printing certificates for the Registrable Shares in a form eligible for deposit with The Depository Trust Company) and of printing prospectuses, all fees and disbursements of counsel for the Company and of all independent certified public accountants of the issuer (including the expenses of any special audit and "cold comfort" letters required by or incident to such performance); (iv) Securities Act liability insurance if the Company so desires or the underwriters so require; (v) all fees and expenses incurred in connection with the listing of the Registrable Shares on any securities exchange and all rating agency fees; (vi) all reasonable fees and disbursements of the Committee Counsel and the Capricorn Counsel to represent such Persons in connection with such registration; (vii) all fees and disbursements of underwriters customarily paid by the issuer or sellers of Securities, excluding underwriting discounts and commissions and transfer taxes, if any, and fees and disbursements of counsel to underwriters (other than such fees and disbursements incurred in connection with any registration or qualification of Registrable Shares under the securities or "blue sky" laws of any state); and (viii) fees and expenses of other Persons retained by the Company (all such expenses being herein called "***Registration Expenses***"), will be borne by the Company, regardless of whether the Registration Statement becomes effective. In addition, the Company will, in any event, pay its internal expenses (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any audit and the fees and expenses of any Person, including special experts, retained by the Company.

26

(e)    Indemnification.

(i)    In connection with any registration of any offering and sale of Registrable Shares under the Securities Act pursuant to this Agreement, the Company shall indemnify and hold harmless the seller of such Registrable Shares, each underwriter, broker or any other Person acting on behalf of such seller, each other Person, if any, who controls any of the foregoing Persons within the meaning of the Securities Act and each Representative of any of the foregoing Persons, against any losses, claims, damages or liabilities, joint or several, to which any of the foregoing Persons may become subject, whether commenced or threatened, under the Securities Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in the Registration Statement under which such Registrable Shares were registered, any preliminary Prospectus or final Prospectus contained therein, any amendment or supplement thereto or any document incident to registration or qualification of any offering and sale of any Registrable Shares, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading or, with respect to any Prospectus, necessary to make the statements therein in light of the circumstances under which they were made not misleading, or any violation by the Company of the Securities Act or state securities or "blue sky" laws applicable to the Company and relating to action or inaction required of the Company in connection with such registration or qualification under such state securities or "blue sky" laws, and the Company shall promptly reimburse such seller, underwriter, broker, controlling Person or Representative for any legal or other expenses incurred by any of them in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the Company shall not be liable to any such Person to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in said Registration Statement, preliminary Prospectus, amendment thereto, or any document incident to registration or qualification of any Registrable Shares in reliance upon and in conformity with written information furnished to the Company through an instrument duly executed by such Person, or a Person duly acting on their behalf, specifically for use in the preparation thereof; provided, further, however, that the foregoing indemnity agreement is subject to the condition that, insofar as it relates to any untrue statement or allegedly untrue statement in, or omission or alleged omission made in any preliminary Prospectus but eliminated or remedied in the final Prospectus (filed pursuant to Rule 424 of the Securities Act), such indemnity agreement shall not inure to the benefit of any indemnified party from whom the Person asserting any loss, claim, damage, liability or expense purchased the Registrable Shares which are the subject thereof, if a copy of such final Prospectus had been timely made available to such indemnified person and such final Prospectus was not delivered to such Person with or prior to the written confirmation of the sale of such Registrable Shares to such Person.

(ii)    In connection with any registration of an offering and sale of Registrable Shares under the Securities Act pursuant to this Agreement, each seller of Registrable Shares shall indemnify and hold harmless (in the same manner and to the same extent as set forth in Section 7.2(e)(i)) the Company, each underwriter or broker involved in such offering, each other seller of Registrable Shares under such Registration Statement, each Person who controls any of the foregoing Persons within the meaning of the Securities Act and any

27

Representative of the foregoing Persons with respect to any untrue statement or allegedly untrue statement in or omission or alleged omission from such Registration Statement, any preliminary Prospectus or final Prospectus contained therein, any amendment or supplement thereto or any document incident to registration or qualification of any such offering and sale of Registrable Shares, if such statement or omission was made in reliance upon and in conformity with written information furnished to the Company or such underwriter through an instrument duly executed by such seller or a Person duly acting on such Seller's behalf specifically for use in connection with the preparation of such Registration Statement, preliminary Prospectus, final Prospectus, amendment or supplement; provided, however, that the maximum amount of liability in respect of such indemnification shall be limited, in the case of each seller of Registrable Shares, to an amount equal to the net proceeds actually received by such seller from the sale of Registrable Shares effected pursuant to such registration.

(iii)    Promptly after receipt by an indemnified party of notice of the commencement of any action involving a claim referred to in the preceding paragraphs of this Section 7.2(e), such indemnified party will, if a claim in respect thereof is made against an indemnifying party, give written notice to the latter of the commencement of such action (provided, however, that an indemnified party's failure to give such notice in a timely manner shall only relieve the indemnification obligations of an indemnifying party to the extent such indemnifying party is materially prejudiced by such failure). In case any such action is brought against an indemnified party, the indemnifying party will be entitled to participate in and to assume the defense thereof, jointly with any other indemnifying party similarly notified to the extent that it may wish, with counsel reasonably satisfactory to such indemnified party, and after notice from the indemnifying party to such indemnified party of its election to assume the defense thereof, the indemnifying party shall not be responsible for any legal or other expenses subsequently incurred by the indemnified party in connection with the defense thereof; provided, however, that if any indemnified party shall have reasonably concluded that there may be one or more legal or equitable defenses available to such indemnified party which are in addition to or in conflict with those available to the indemnifying party, or that such claim or litigation involves or could have an effect upon matters beyond the scope of the indemnity agreement provided in this Section 7.2, the indemnifying party shall not have the right to assume the defense of such action on behalf of such indemnified party and such indemnifying party shall reimburse such indemnified party and any Person controlling such indemnified party for that portion of the fees and expenses of any one lead counsel (plus appropriate special and local counsel) retained by the indemnified party that are reasonably related to the matters covered by the indemnity agreement provided in this Section 7.2.

(iv)    If the indemnification provided for in this Section 7.2(e) is held by a court of competent jurisdiction to be unavailable to an indemnified party with respect to any loss, claim, damage or liability referred to herein, then the indemnifying party, in lieu of indemnifying such indemnified party hereunder, shall contribute to the amounts paid or payable by such indemnified party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the indemnified party on the other hand in connection with the statements or omissions that resulted in such loss, claim, damage or liability as well as any other relevant equitable considerations; provided, however, that the maximum amount of liability in respect of such contribution shall be limited, in the case of each seller of Registrable Shares, to an amount equal to the net proceeds

actually received by such seller from the sale of Registrable Shares effected pursuant to such registration. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. No Person guilty of fraud shall be entitled to indemnification or contribution hereunder.

(v)    The indemnification and contribution provided for under this Agreement will remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party and will survive the transfer of Registrable Shares.

(f)    Underwriting Agreement.

(i)    Notwithstanding the provisions of this Section 7.2, to the extent that the Stockholders selling Registrable Shares in a proposed registration shall enter into an underwriting or similar agreement that contains provisions covering one or more issues addressed in this Section 7.2, the provisions contained in this Section 7.2 addressing such issue or issues shall be of no force or effect with respect to such registration, but this provision shall not apply to the Company if the Company is not a party to the underwriting or similar agreement.

(ii)    No Stockholder may participate in any registration hereunder that is underwritten unless such Stockholder agrees (A) to sell such Stockholder's Registrable Shares proposed to be included therein on the basis provided in any underwriting arrangements acceptable to the Company and (B) as expeditiously as possible, to notify the Company of the occurrence of any event concerning such Stockholder as a result of which the Prospectus relating to such registration contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(g)    Information by Holder. Each holder of Registrable Shares to be included in any registration shall furnish to the Company and the managing underwriter such written information regarding such holder and the distribution proposed by such holder as the Company or the managing underwriter may reasonably request in writing and as shall be reasonably required in connection with any registration, qualification or compliance referred to in this Agreement.

Section 7.3    Further Assurances.    Each of the Stockholders hereto shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws to consummate and make effective the transactions contemplated hereunder, including, without limitation, using reasonable efforts to obtain all licenses, permits, consents, approvals, authorizations, qualifications and orders of the competent Governmental Authorities. Each of the parties shall cooperate with the other parties when required in order to effect the transactions contemplated hereunder. In case at any time after the date hereof, any further action is necessary or desirable to carry out the purposes of this Agreement, the proper officers and directors of each of the parties shall use their commercially reasonable efforts to take all such action.

Section 7.4    <u>Waiver of Fiduciary Duties; Corporate Opportunities</u>.

(a)    This Agreement is not intended to, and does not, create or impose any fiduciary duty on any of the Stockholders hereto or their respective Affiliates. Further, each Stockholder hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Law, and in doing so, recognizes, acknowledges and agrees that the duties and obligations of the Stockholders to one another and to the Company are only as expressly set forth in this Agreement. Additionally, each Stockholder acknowledges that the other Stockholders and the Affiliates of such Stockholders own and/or manage other businesses, including businesses that may compete with the Company or the other Stockholders. Except as otherwise provided in this Agreement without any accountability to the Company or any Stockholder by virtue of this Agreement:

(i)    Each Stockholder and its Affiliates, and their respective officers, directors, shareholders, partners, stockholders, agents and employees (collectively, a "***Corporate Opportunities Group***"), shall not in any way be prohibited or restricted from engaging or investing in, independently or with others, any business opportunity of any type or description, including, without limitation, those business opportunities that might be the same or similar to the Company Business;

(ii)    Neither the Company nor any Stockholder or such Stockholder's Corporate Opportunities Group shall have any right in or to such other business opportunities of any other Stockholder or such other Stockholder's Corporate Opportunities Group or to the income or proceeds derived therefrom;

(iii)    No Stockholder or its Corporate Opportunities Group shall be obligated to present any business opportunity to the Company or any other Stockholder or such other Stockholder's Corporate Opportunities Group, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company, or if presented to any other Stockholder or other Stockholder's Corporate Opportunities Group, could be taken by such Persons; and

(iv)    Each Stockholder and its Corporate Opportunities Group shall have the right to hold any such business opportunity for its own account or to recommend such opportunity to Persons other than the Company, any other Stockholder or any Person in such other Stockholder's Corporate Opportunities Group.

Section 7.5    <u>Transactions Between the Company and the Stockholders or Their Affiliates</u>. No transaction between the Company, on the one hand, and any Stockholder or its Affiliates, on the other hand, shall be entered into or conducted, and no material terms thereof shall be changed or waived, unless the terms of such transaction or any such proposed change or waiver are disclosed to each of the Stockholders not involved (whether directly or through an Affiliate) in such transaction and are approved by each such uninvolved Stockholder beneficially owning aggregate shares in excess of 5% of all of the issued and outstanding shares of Common Stock as of the date thereof; <u>provided</u>, that no such disclosure or approval hereunder shall be required with respect to transactions with any Stockholder or its Affiliates that have been

approved by Supermajority Vote. No determination by the Company as to the pursuit by the Company of any legal remedy in respect of any transaction between the Company, on the one hand, and any Stockholder or its Affiliates, on the other hand, shall be made without approval of each such disinterested Stockholder.

Section 7.6    Public Announcements. The Stockholders shall consult with each other before issuing, and shall provide each other the opportunity to review and comment upon, any press release or other public statement with respect to this Agreement or the transactions contemplated hereby, and shall not issue any such press release or make any such public statement prior to obtaining the other parties' written approval, which approval shall not be unreasonably withheld, except that no such approval shall be necessary to the extent disclosure may be required by applicable Law or any listing agreement of any Stockholder (or any Affiliate thereof).

## ARTICLE VIII
## GENERAL PROVISIONS

Section 8.1    Termination. This Agreement shall terminate upon the execution of a written agreement to such effect either by (a) all parties hereto who are Stockholders at the time of such execution or (b) Capricorn and all Committee Members who remain Stockholders at the time of such execution; provided, that no termination of this Agreement shall affect the right of any party to recover damages or collect indemnification for any breach of the representations, warranties or covenants herein that occurred prior to such termination. In addition, the rights and obligations of each Stockholder under this Agreement shall terminate as to such Stockholder upon the Transfer of all Shares owned by such Stockholder in accordance with this Agreement.

Section 8.2    Fees and Expenses. Except as otherwise provided herein, all fees and expenses incurred in connection with or related to this Agreement and the transactions contemplated hereby shall be paid by the party incurring such fees or expenses.

Section 8.3    Amendment and Modification. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing signed on behalf of each party and otherwise as expressly set forth herein; provided, that Section 2.1 shall be deemed amended from time to time to reflect the adjustment of ownership of Shares resulting from any Transfer or any new issuance thereof, in each case that is made in accordance with the provisions hereof.

Section 8.4    Waiver. No failure or delay of any party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereunder are cumulative and are not exclusive of any rights or remedies which they would otherwise have hereunder. Any agreement on the part of any party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such party.

31

Section 8.5    Notices. All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by facsimile, upon written confirmation of receipt by facsimile, e-mail or otherwise, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier service or (c) on the earlier of confirmed receipt or the fifth Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered, if to the Company, to the address set forth below, or if to any Stockholder, to the addresses set forth in the attached Exhibit A, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

_____

Attention:    _____
Facsimile:    _____

Section 8.6    Interpretation. When a reference is made in this Agreement to a Section, Schedule, Article or Exhibit such reference shall be to a Section, Schedule, Article or Exhibit of this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement or in any Exhibit are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth herein. The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified.

Section 8.7    Entire Agreement. This Agreement (including the Exhibits and Schedules hereto) constitutes the entire agreement, and supersedes all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings among the parties with respect to the subject matter of this Agreement. Notwithstanding any oral agreement or course of action of the parties or their Representatives to the contrary, no party to this Agreement shall be under any legal obligation to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each of the parties.

Section 8.8    No Third-Party Beneficiaries. Except as provided in Article VII and in the last sentence of this Section, nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person other than the parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature under or by reason of this Agreement. Notwithstanding anything to the contrary herein, the Company shall be a third party beneficiary of the terms of this Agreement.

Section 8.9    Governing Law. This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the internal laws of the State of Delaware,

without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of such state.

Section 8.10    Submission to Jurisdiction.  Each of the parties irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement brought by any other party or its successors or assigns shall be brought and determined in the Court of Chancery of the State of Delaware, the courts of the United States of America for the District of Delaware and appellate courts thereof, and each of the parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby.  Each of the parties agrees not to commence any action, suit or proceeding relating thereto except in the courts described above in Delaware, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in Delaware as described herein. Each of the parties further agrees that notice as provided herein shall constitute sufficient service of process and the parties further waive any argument that such service is insufficient. Each of the parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the courts in Delaware as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

Section 8.11    Assignment; Successors.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any party without the prior written consent of the other parties, and any such assignment without such prior written consent shall be null and void, except in connection with any Transfer of Shares permitted under Article VI.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns.

Section 8.12    Enforcement.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, each of the parties shall be entitled to specific performance of the terms hereof, including an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the Court of Chancery of the State of Delaware, the courts of the United States of America for the District of Delaware and appellate courts thereof, this being in addition to any other remedy to which such party is entitled at law or in equity.  Each of the parties hereby further waives (a) any defense in any action for specific performance that a remedy at law would be adequate and (b) any requirement under any law to post security as a prerequisite to obtaining equitable relief.

33

Section 8.13    Currency.    All references to "dollars" or "$" or "US$" in this Agreement refer to United States dollars, which is the currency used for all purposes in this Agreement.

Section 8.14    Severability.    Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

Section 8.15    Waiver of Jury Trial.    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.16    Counterparts.    This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party.

Section 8.17    Facsimile Signature.    This Agreement may be executed by facsimile signature and a facsimile signature shall constitute an original for all purposes.

Section 8.18    Time of Essence.    Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.

Section 8.19    No Presumption Against Drafting Party.    Each of the parties hereto acknowledges that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the drafting party has no application and is expressly waived.

**[Signature Page Follows]**

34

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement or have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**MRS. FIELDS' ORIGINAL COOKIES, INC.**

By: _____
Name: _____
Title: _____

**PLAINFIELD SPECIAL SITUATIONS
MASTER FUND LIMITED**

By: _____
Name: _____
Title: _____

**GSC PARTNERS CDO FUND II, LIMITED**

    **By:  GSCP (NJ), LP, in its capacity as
    Collateral Manager**

By: _____
Name: _____
Title: _____

**RIVER RUN MANAGEMENT, L.L.C.**

By: _____
Name: _____
Title: _____

**H PARTNERS MANAGEMENT LLC**

By: _____
Name: _____
Title: _____

*Signature Page to the Stockholders Agreement of
Mrs. Fields' Original Cookies, Inc.*

**CARLYLE STRATEGIC PARTNERS, L.P.**

By: CSP General Partner, L.P.
By: TC Group CSP, L.L.C.

**CARLYLE STRATEGIC PARTNERS II, L.P.**

By: CSP II General Partner, L.P.
By: TC Group CSP II, L.L.C.

By: _____
Name: _____
Title: _____

**CONTRARIAN CAPITAL MANAGEMENT, LLC**

By: _____
Name: _____
Title: _____

**PERRY PARTNERS INTERNATIONAL INC.**
**BY: PERRY CORP., ITS INVESTMENT**
**MANAGER**

**PERRY PARTNERS LP**
**BY: PERRY CORP., ITS INVESTMENT**
**MANAGER**

By: _____
Name: _____
Title: _____

*Signature Page to the Stockholders Agreement of*
*Mrs. Fields' Original Cookies, Inc.*

**CAPRICORN INVESTORS III, L.P.**

By: _____

Name: _____

Title: _____

**SCHEDULE 1.1**

CAPRICORN LIMITED PARTNERS

# EXHIBIT A

STOCKHOLDERS

| | Address | Common Stock Ownership | |
| --- | --- | --- | --- |
| | | Number of Shares | Percentage of Class |
| **Committee Stockholders** | | | |
| Plainfield Special Situations Master Fund Limited | | | |
| GSC Partners CDO Fund II, Limited | | | |
| River Run Management, L.L.C. | | | |
| H Partners Management LLC | | | |
| Carlyle Strategic Partners, L.P. | | | |
| Carlyle Strategic Partners II, L.P. | | | |
| Contrarian Capital Management, LLC | | | |
| Perry Partners International Inc. | | | |
| Perry Partners International LP | | | |
| **Capricorn** | | | |
| Capricorn Investors III, L.P. | 30 East Elm Street Greenwich, CT 06830 | | |

**Other Stockholders**

**EXHIBIT B**

DESIGNEES TO THE BOARD OF DIRECTORS

### Committee Stockholders Designees

[Committee Designee 1]

[Committee Designee 2]

[Committee Designee 3]

[Committee Designee 4]

### Capricorn Designees

[Capricorn Designee 1]

[Capricorn Designee 2]