IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - -  x
                              :
In re:                        :  Chapter 11
                              :
Mrs. Fields' Original         :  Case No. 08-11953 (___)
Cookies, Inc., et al.,¹       :
                              :  Jointly Administered
              Debtors.        :
                              :
- - - - - - - - - - - - - -  x
```

## DECLARATION OF MICHAEL R. WARD IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST-DAY ORDERS

I, Michael R. Ward, hereby declare that the

following is true to the best of my knowledge, information,

and belief:

1.   I am the Interim Co-Chief Executive Officer

of Mrs. Fields Famous Brands, LLC, and the Executive Vice

President and Chief Legal Officer of each of the Debtors (as

defined below). I am authorized to submit this Declaration

---

¹    The Debtors and the last four digits of their taxpayer
     identification numbers are: Mrs. Fields' Original Cookies, Inc.
     (2899); Mrs. Fields Famous Brands, LLC (6938); Mrs. Fields
     Financing Company, Inc. (4100); Mrs. Fields Franchising, LLC
     (4068); Mrs. Fields Gifts, Inc. (3404); The Mrs. Fields' Brand,
     Inc. (6966); Mrs. Fields Cookies Australia (8672); TCBY Systems,
     LLC (7081); TCBY International, Inc. (2845); TCBY of Texas, Inc.
     (4436); PTF, LLC (6953); PMF, LLC (6954); GACCF, LLC (4081); GAMAN,
     LLC (6961). The address for each of the Debtors is 2855 East
     Cottonwood Parkway, Suite 400, Salt Lake City, Utah, 84121.

in support of the Debtors' chapter 11 petitions and the first-day pleadings described herein.[2]

2. I am familiar with the Debtors' day-to-day operations, business affairs, and books and records. I have also reviewed the Debtors' "First-Day Motions and Orders" and am familiar with the facts alleged therein and the relief requested thereby. Except as otherwise indicated, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisers that report to me in the ordinary course of my responsibilities as Interim Co-Chief Executive Officer of Mrs. Fields Famous Brands, LLC, and Executive Vice President and Chief Legal Officer of each of the Debtors, and, if called as a witness, would testify thereto.[3]

**I.    BACKGROUND OF THE DEBTORS AND THE BANKRUPTCY CASES**

**A.   The Bankruptcy Cases**

3. On August 24, 2008 (the "Petition Date"), Mrs. Fields' Original Cookies, Inc. ("MFOC"), Mrs. Fields Famous

---

[2]    Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First-day Motion (defined below).

[3]    Certain of the disclosures herein relate to matters within the knowledge of other employees of the Debtors and are based on information provided by them.

2

Brands, LLC ("MFFB"), and certain of MFFB's direct and indirect subsidiaries (collectively, the "Subsidiary Debtors" and, collectively with MFOC and MFFB, the "Debtors") each commenced a case in this Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").

## B.   The Debtors' Business And Performance

4.   The Debtors are a well established franchisor in the premium snack food industry, featuring Mrs. Fields® and TCBY® as their core brands.  Through their franchisees' retail stores, the Debtors are one of the largest retailers of freshly baked, on-premises specialty cookies and brownies in the United States and the largest retailer of soft-serve frozen yogurt with live active cultures in the United States.

### 1.   The Mrs. Fields Business

5.   Debbi Fields opened her first store in Palo Alto, California in 1977.  The Mrs. Fields name quickly became associated with quality, freshly baked cookies "right out-of-the-oven" in a retail setting.  The Mrs. Fields brand name enjoys high consumer brand awareness.  By building on its legendary chocolate chip and white chocolate macadamia

nut cookies, the Mrs. Fields brand has developed a comprehensive product line that includes many of America's most beloved snack food treats.

6. The Debtors' Mrs. Fields brand operates in four distinct channels: (i) franchising, which includes franchised retail stores located mostly in malls; (ii) gifting, through an online and catalogue based direct sales business, that sells cookie and brownie gift assortments; (iii) branded retail, which includes packaged goods cookies sold through grocery stores, drug stores, convenience stores, and other merchants; and (iv) licensing, which generates revenues by licensing the Mrs. Fields brand name to manufacturers of boxed chocolates, gourmet popcorn, ice cream sandwiches, and other products.

7. The Debtors have recently focused on developing a new store design that highlights the Mrs. Fields brand. This new store design is intended to capture more customers in a typical mall environment by being more attractive and captivating. The Debtors' objectives through this design are to provide a contemporary version of Mrs. Fields, to reinforce existing indulgent brand equity,

and to grow sales in an effort to help make the Mrs. Fields
business model more attractive to franchisees.

## 2. The TCBY Business

8. The Debtors' TCBY brand is a frozen treats
product innovator. TCBY's great tasting frozen yogurt
concept is targeted to the health conscious public. TCBY
product milestones include (i) developing non-fat and
no-sugar added frozen treats; (ii) launching a line of
frozen yogurt and sorbet novelties; (iii) introducing
frozen yogurt to airports and travel plazas through a joint
venture agreement; and (iv) developing a soft-serve and
hardpack frozen yogurt product with more types of live active
cultures than any other yogurt brand. The Debtors intend
to continue to explore ways to grow the TCBY brand and take
advantage of yogurt's increasing appeal to today's health
conscious consumer.

9. The Debtors are also in the process of
testing an additional yogurt-focused concept -- Yovana ® --
currently located in two airport terminals. In fiscal year
2007, the Debtors introduced, through TCBY, a new line of
fruit and yogurt smoothies -- Beriyo ® -- now available
throughout the TCBY system. In addition, the Debtors

developed a new store design for TCBY stores that is intended not only to improve the store design and image for consumers, but also to improve the profitability and business model for franchisees. Over 100 franchisees completed the first phase of a remodel to incorporate this new design in their TCBY stores.

10. These new activities are designed to relaunch the TCBY brand, making the concept more relevant for consumers and more profitable for the franchisees. For example, the new store décor is contemporary and highlights TCBY's key point of difference — its high quality, real dairy yogurt. Beriyo smoothies target consumers' demand for nutritious fruit and yogurt smoothies and complements TCBY frozen yogurt treats. The Yovana concept introduces a menu that appeals to multiple day-parts and is built around premium yogurt prepared fresh daily in the store, drinkable fruit and yogurt smoothies, as well as frozen yogurt treats.

11. As of December 29, 2007, the Debtors' franchise systems operated through a network of 1,268 retail concept locations throughout the United States and in 21 foreign countries. The individual retail stores bearing the Debtors' names are not operated by the Debtors, but instead

are run by the Debtors' franchisees.  None of those franchisees are debtors in these bankruptcy cases.

### 3.  The Gifts and Branded Retail Business

12.  In addition, the Debtors operate a gifts and a branded retail business and have entered into licensing arrangements that attempt to leverage awareness of some of their core brands among their retail customer base.

13.  Through their gifts business segment, the Debtors market freshly baked Mrs. Fields cookies, brownies, candies, and other gift items on the internet and through telephone and catalogue sales.  In addition, the Debtors have partnerships with other large on-line retailers, have an online affiliate program with one of the largest pay-for-performance affiliate marketing networks on the internet, and have relationships with a number of large companies that use Mrs. Fields gifts to motivate employees and reward customers.

14.  Beginning in 2006, the Debtors undertook the management and operation of their branded retail business. Through the branded retail business, the Debtors sell shelf-stable Mrs. Fields products to various retail establishments, either directly or with the assistance of

third-party sales brokers. Specifically, the Debtors buy inventory from manufacturers with which the Debtors have contracted to make shelf-stable Mrs. Fields products and arrange for the distribution of such products for sale in various retail venues.

15. In fiscal year 2007, the gifts business segment generated approximately $31 million in sales of over 375 different gift items. In that same year, the branded retail business generated sales of approximately $20 million.

16. Given the nature of the gifts and branded retail business, the Debtors realize the majority of revenue for such business segment in the fourth quarter of each year. In order to preserve the value of these critical business segments, the Debtors believe that it is important to have this restructuring completed before the holiday shopping season begins in earnest.

**4.     The Debtors' Employees**

17. As of the Petition Date, the Debtors employed 188 people, of whom ninety-seven were salaried employees and ninety-one were hourly employees. Additionally, the Debtors employed nine independent contractors to perform functions

that otherwise would be performed by employees. In addition, the Debtors typically employ seasonal labor in connection with their gifts segment in the fourth quarter in response to increased demand around the holidays. None of the Debtors' employees are covered by collective bargaining agreements.

18. As noted above, all of the Debtors' employees are employed by the Debtors' corporate operations. None of the Debtors operate individual stores, which stores are owned and operated by the Debtors' franchisees. Accordingly, such franchisees, none of which are Debtors in these bankruptcy cases, employ store-level employees.

**5. The Debtors' Business Performance**

19. The Debtors' sales and contribution from franchisees' store operations are highly seasonal, but their various brands experience counteracting overall seasonal effects. The Mrs. Fields stores, primarily located in malls, tend to mirror customer traffic flow trends in malls, which increase significantly during the fourth quarter, primarily between Thanksgiving and the end of the calendar year. Holiday gift purchases also are a significant factor in increased sales in the fourth quarter. However, TCBY stores

experience their strongest sales periods during the warmer months from late Spring through early Fall, which helps to balance the impact of seasonality on the Debtors' operations.

20. Although the Debtors were not subject to the information disclosure requirements of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78a, et seq., through the Petition Date MFFB voluntarily filed annual, quarterly, and current reports and other information with the U.S. Securities and Exchange Commission (the "SEC") pursuant to certain contractual obligations. On August, 18, 2008, MFFB filed its Form 10-Q with the SEC for the second quarter of 2008, containing the Debtors' unaudited consolidated financial statements as of June 28, 2008, which reflected revenues of approximately $29 million year to date, assets of approximately $135 million, and liabilities of approximately $261 million.

## C. The Debtors' Capital And Debt Structure

### 1. The Debtors' Corporate Structure

21. As set forth on the organizational chart attached herteo as Exhibit A, MFFB, a Delaware limited liability company, is a wholly-owned subsidiary of MFOC, a

Delaware corporation. MFOC is the direct or indirect parent (through MFFB) of each of the Subsidiary Debtors. All business operations are carried out by MFFB and the Subsidiary Debtors.

22. MFOC, in turn, is a wholly-owned subsidiary of Mrs. Fields' Holding Company, Inc. ("MFH"), and MFH is a wholly-owned subsidiary of Mrs. Fields' Companies, Inc. ("MFC"). The majority shareholders of MFC are two affiliated private investment management firms: Capricorn Investors III, L.P. ("Capricorn") and Capricorn Investors II, L.P.

23. Other than Mrs. Fields Gifts, Inc., Mrs. Fields Cookies Australia, and TCBY International, Inc., all of which are Utah corporations, and TCBY of Texas, Inc., an Arkansas corporation, the remainder of the Subsidiary Debtors are incorporated or organized in Delaware. The Debtors' principal executive offices are located at 2855 East Cottonwood Parkway, Suite 400, Salt Lake City, Utah 84121.

24. MFFB was formed in March 2004 in connection with the reorganization of certain entities and segments that are under the common control of MFC. In a related series of transactions, MFFB formed or acquired from MFOC new single

member domestic limited liability companies that are
disregarded entities for U.S. federal income tax purposes
for each of the Debtors' major brands, including Subsidiary
Debtors Mrs. Fields Franchising, LLC and TCBY Systems,
LLC.  These subsidiaries hold certain assets of, and act as
the franchisor for, their respective brands.  As part of
these transactions, MFOC also made a capital contribution
to MFFB of all of its interests in several other Subsidiary
Debtor entities, including Mrs. Fields Gifts, Inc. (which
operates the Debtors' gifts business).

## 2.  The Senior Secured Notes

25.  Pursuant to that certain indenture dated as
of March 16, 2004, by and among MFFB and Subsidiary Debtor
Mrs. Fields Financing Company, Inc. ("MFFC"), as issuers,
certain of the Subsidiary Debtors as guarantors, and the Bank
of New York, as trustee, as such indenture may have been
amended, supplemented, or otherwise modified from time to
time, and all related agreements and documents (the
"Indenture"), the Debtors issued in aggregate principal
amount of (i) $80.7 million of 9 percent senior secured notes
due 2014 (the "9 percent Senior Secured Notes") and
(ii) $115.0 million of 11½ percent senior secured notes due

12

2014 (together with the 9 percent Senior Secured Notes, the "Senior Secured Notes").

26.     The Senior Secured Notes are secured by first priority lien upon substantially all of MFFB's, MFFC's and the Subsidiary Debtors' assets and are pari passu in right of payment and priority with respect to the collateral securing the Senior Secured Notes. As of the Petition Date, the entire $195.7 million principal amount of the Senior Secured Notes remains outstanding, plus accrued and unpaid interest, fees, costs, and charges provided for under the Indenture.

### 3.     The MFOC Note

27.     MFOC and Capricorn are also parties to that certain 16.5% Amended and Restated Promissory Note issued by Mrs. Fields' Original Cookies, Inc., to Capricorn (the "MFOC Note"). As of the Petition Date, MFOC owed Capricorn $6,478,030 plus applicable fees, charges, costs, and interest accrued but unpaid as of such date. MFOC's obligations under the MFOC Note are not secured.

### 4.     General Unsecured and Trade Debt

28.     In addition, the Debtors are parties to numerous commercial relationships with third-parties,

including but not limited to customers, suppliers, landlords, equipment lessors, and utilities. As of the Petition Date, the Debtors estimate that such creditors are owed approximately $4.5 million.

## D.  Events Leading To Commencement Of The Chapter 11 Cases And The Plan

29.  As set forth above, the Debtors are highly leveraged.  In addition to a high debt level, the Debtors face the prospects of continued net losses primarily due to their need to make large interest payments on the Senior Secured Notes, which total approximately $20.5 million annually.  Accordingly, the Debtors have entered into these bankruptcy cases in order to improve their financial position through a restructuring of their debt.

### 1.  Asset Sales

#### a.  Sale of Pretzel Brands

30.  On August 7, 2007 (the "Pretzel Closing Date"), MFFB and its wholly owned Subsidiary Debtors, PTF, LLC and PMC, LLC, formally Pretzel Time Franchising, LLC and Pretzelmaker Franchising, LLC, respectively, (collectively "Pretzels"), completed a sale of certain assets, consisting primarily of identifiable intangible assets of Pretzels, to a subsidiary of NexCen Brands, Inc. ("NexCen Brands"), for

a total purchase price of $29.3 million (the "Pretzel Sale"),
consisting of $22.0 million in cash and 997,671 shares of
NexCen Brands common stock (the "NexCen Pretzel Shares")
valued at $7.35 per share on the Pretzel Closing Date.

####  b.    Sale of GAC Brands

31.    On January 29, 2008 (the "GAC Closing Date"),
MFFB and its wholly owned subsidiaries, Great American
Cookies Company Franchising, LLC and Great American
Manufacturing, LLC (collectively, "GAC") completed the sale
of substantially all of the assets of GAC to a subsidiary
of NexCen Brands, for a total purchase price of approximately
$93.6 million (the "GAC Sale"), consisting of $89.0 million
in cash (before deduction for $6.7 million of the sale
proceeds that the Company was required to pay to GAC
franchisees at closing) and 1,099,290 shares of NexCen
Brands common stock (the "NexCen GAC Shares") valued at $4.23
per share on the GAC Closing Date.

32.    The proceeds of the Pretzel Sale and the GAC
Sale were not paid to the Debtors.  In addition to the
deduction noted above, of the $111.0 million in aggregate
cash consideration received from the Pretzel Sale and the
GAC Sale, the Old Notes Trustee currently holds

approximately $93.4 million in restricted cash. The Old

Notes Trustee has taken the position that, under the terms

of the Old Notes Indenture, such cash is only permitted to

be used (i) to purchase "replacement assets" or to invest

in the business, (ii) for transaction costs related to such

sales, or (iii) for a "net proceeds offer" required by the

Old Notes Indenture. In addition, of the aggregate 2,096,961

shares of NexCen Shares received from such sales, 1,699,840

shares remain in an escrow for possible use to satisfy

indemnity claims arising out of the sales. Such shares were

valued at $7.35 per share for the shares received in the

pretzel business sale and valued at $4.23 per share for the

shares received from the sale of the Great American Cookies

business. The closing sale price per share of a NexCen Brands

common stock on August 12, 2008 was $0.42. Given the proposed

restructuring described in the Disclosure Statement, MFFB

does not intend to make either of the "net proceeds offers"

required by the Old Notes Indenture.

## 2. **Going Concern Opinion**

33. On March 28, 2008, MFFB filed its 2007 Annual

Report on Form 10-K with the SEC, wherein it disclosed that

as a result of, among other things, recurring net losses,

16

negative cash flows from operations and a net member's deficit at December 29, 2007, it had received a letter from its auditors stating that the matters "raise[d] substantial doubt about its ability to continue as a going concern."

34. As noted above, the Debtors operate numerous franchises. However, the sale of such franchises is regulated by various state laws as well as by the Federal Trade Commission. The Federal Trade Commission requires that franchisors make extensive disclosure in a franchise disclosure document to prospective franchisees but does not require registration. In addition, a number of states require annual registration of the uniform franchise prospectus with state authorities or other disclosure in connection with franchise offers and sales.

## 3. Potential Out-of-Court Restructuring

35. The Pretzel and GAC Sales coincided with the Debtors' pursuit of various actions to improve their operating cash flow, results of operations, and overall liquidity position. Blackstone Advisory Services was hired to assist the Debtors in reviewing their alternatives as part of its strategic review process.

36.     In connection with these efforts, the
Debtors began to explore restructuring options with a core
group of holders of Senior Secured Notes at the end of the
first quarter of 2008.   The discussions culminated in the
entry, on June 2, 2008, by MFFB, MFFC, and MFOC, into a
binding restructuring term sheet (the "Term Sheet") with
certain unaffiliated investors holding in excess of 78% in
face amount of the Senior Secured Notes (the "Ad Hoc
Noteholder Committee").

37.     The Term Sheet provided for the
restructuring of the Senior Secured Notes through an
out-of-court exchange offer backed by a prepackaged chapter
11 filing, should the requisite number of tenders for the
exchange offer not be satisfied. On June 3, 2008, the members
of the Ad Hoc Noteholder Committee also entered into support
agreements with MFOC, MFFB, and MFFC (the "Support
Agreements"). The Support Agreements provided that the
signatories thereto would support the restructuring as set
forth in the Term Sheet.

38.     Certain provisions of the Term Sheet,
primarily relating to conditions for continued Ad Hoc
Noteholder Committee support were amended on July 15, 2008

and again on August 13, 2008 (the "Amended Term Sheet"). In addition, the Support Agreements were amended on August 13, 2008 (the "Amended Support Agreements") to reflect the support of the Ad Hoc Noteholder Committee, MFFB, MFOC, MFH (the holder of the MFOC Equity Interests), and Capricorn (the holder of the MFOC Note Claims) for the consummation of the proposed restructuring of the Senior Secured Notes through the Plan (as defined below). Each of the Amended Term Sheet and Amended Support Agreements were filed as exhibits to MFFB's Current Report on Form 8-K, filed on August 15, 2008.

**E.    The Plan**

39.    The terms of the restructuring agreed to by the Debtors and the Ad Hoc Noteholder Committee are memorialized in the Joint Prepackaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code of Mrs. Fields' Original Cookies, Inc. and Certain Subsidiaries, filed concurrently herewith (the "Plan").

40.    The Plan provides for the restructuring of the Debtors' liabilities to the holders of Senior Secured Notes (the "Noteholders") in a manner designed to maximize available recoveries to various creditors and equity holders, protect and preserve the going concern value of the Debtors'

businesses, and deleverage and enhance the financial
viability of the reorganized Debtors on a consensual basis.
The following summarizes the classification and treatment
through the Plan of those voting classes containing the
principal impaired claims against the Debtors (each as
defined and described in the Plan):

| | |
|---|---|
| **Class 3 (Secured Notes Claims)** | Impaired – Class 3 would be impaired by the Plan. Each Holder of an Allowed Secured Notes Claim would be entitled to vote on the Plan. On the Effective Date, in exchange for their Allowed Secured Notes Claims against each of the Debtors, Holders of Allowed Secured Notes Claims will receive, on a Pro rata basis, (i) the Noteholder Cash, (ii) the New Notes, and (iii) 87.5% of the New Common Equity issued and outstanding as of the Effective Date.<br><br>Estimated Recovery: 86.5% |

| | |
|---|---|
| **Class 5 (MFOC Note Claims)** | <u>Impaired</u> – Class 5 would be impaired by the Plan. The Holder of an Allowed MFOC Note Claim would be entitled to vote on the Plan. On the Effective Date, in exchange for its Allowed MFOC Note Claim, Capricorn, as the Holder of an Allowed MFOC Claim, will receive (i) 12.5% of the New Common Equity issued and outstanding as of the Effective Date, (ii) the Warrant, and (iii) a payment in the amount of $1.049 million.<br><br><u>Estimated Recovery</u>: 96.4% |
| **Class 8A (MFOC Equity Interests)** | <u>Impaired</u> – Class 8A would be impaired by the Plan. The Holder of the Allowed MFOC Equity Interest would be entitled to vote on the Plan. MFH, as the Holder of all of the MFOC Equity Interests, will receive no recovery under the Plan other than the releases and injunctive relief described in Sections 11.3 and 11.6 of the Plan.<br><br><u>Estimated Recovery</u>: 0% |

41. The Debtors have considered the available alternatives to the proposed restructuring and deleveraging of their capital structure under the Plan. However, the Debtors believe that their creditors and interest holders will obtain a greater recovery under the Plan than would be available under a traditional, non-prepackaged chapter 11 reorganization plan or a liquidation under chapter 7.

42. In connection with the Plan, the Debtors prepared a disclosure statement (the "Disclosure Statement"), describing, inter alia, the proposed reorganization and its effects on holders of Claims against and Interests in the Debtors. The Debtors determined that soliciting acceptances and rejections of the Plan before the Petition Date would significantly shorten the duration of these bankruptcy cases, thereby increasing their chances for a successful reorganization, and simplifying and reducing the cost of the administration of their cases.

43. On August 15, 2008, the Debtors commenced their solicitation of acceptances of the Plan by disseminating the Disclosure Statement, the Plan, and ballots to the holders of Secured Notes Claims, the MFOC Note Claim, and MFOC Equity Interests (each as defined in the Plan), who are the only parties entitled to vote on the Plan.[4] The Debtors established September 15, 2008, as the deadline (the "Voting Deadline") for receipt of votes accepting or rejecting the Plan.

---

[4]     The Debtors did not solicit votes on the Plan from holders of Claims or Interests classified in Classes 1, 2, 4, 6, 7, 8B, or 8C, each of which either was deemed to have accepted or rejected the Plan pursuant to section 1126(f) or (g) of the Bankruptcy Code, respectively.

44. Pursuant to the terms of the Disclosure Statement, the Debtors reserved the right to commence these Chapter 11 Cases upon receiving votes in favor of the Plan representing 66 2/3% in aggregate amount of outstanding Senior Secured Notes. The requisite acceptances were received and, accordingly, the Debtors filed their chapter 11 petitions on the Petition Date, prior to the occurrence of the Voting Deadline.

45. In particular, I understand that as of 5:00 p.m. on August 22, 2008, Financial Balloting Group LLC conducted a preliminary tabulation of ballots received to date. As of that date -- which was just one week after the solicitation process began -- 17 accepting votes (and no rejecting votes) had been received from holders of Class 3 Secured Note Claims, which holders represent approximately 79% of the amount of debt in such class. Further, an accepting ballot was received (albeit by facsimile) from the sole holder of the Class 5 MFOC Note Claim. Similarly, the holder of the Class 8 MFOC Equity Interests already has accepted the Plan.

46. The acceptances received with respect to the Class 5 MFOC Note Claim and the Class 8A MFOC Equity Interests

are sufficient to confirm the Plan under sections 1125(g),
1126(b)-(d) and 1129 of the Bankruptcy Code. Moreover, the
Debtors believe that the acceptances received with respect
to Class 3 Secured Notes Claims also will be sufficient at
the Voting Deadline to confirm the Plan under sections
1125(g), 1126(b)-(c) and 1129 of the Bankruptcy Code. In
particular, the Debtors' prospects for confirmation are
evidenced by the fact that that (i) the so-called "amount"
requirement of section 1126(c) was satisfied prior to the
Petition Date and (ii) each of the entities holding Class
3 Secured Notes Claims that has voted on the Plan to date,
has voted in favor of the Plan.

47.    Notwithstanding the commencement of these
chapter 11 cases, the Voting Deadline remains unchanged to
afford all parties entitled to vote on the Plan who have not
yet voted an opportunity to review the Plan and Disclosure
Statement and cast ballots if they so choose.

## II.  FIRST-DAY MOTIONS AND ORDERS

48.    In furtherance of the restructuring efforts
embodied in the Plan, the Debtors filed these bankruptcy
cases and expect to file a number of first-day motions and

proposed orders (the "First-Day Motions and Orders"),[5] each as listed on the attached Exhibit B. I have reviewed each of the First-Day Motions and Orders (and the exhibits attached thereto) and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First-day Motions (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with a minimum interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in achieving the Debtors' successful reorganization through the Plan. Moreover, I believe that, for the reasons set forth in the First-day Motions, the relief requested therein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## A. Administrative Motions

49. The Debtors have filed four "administrative" motions seeking (i) to have the bankruptcy cases jointly administered, (ii) to retain Epiq Bankruptcy Solutions, LLC, as the claims and noticing agent, (iii) to retain Financial

---

[5] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the relevant First-day Motion and/or First-day Order.

25

Balloting Group LLC as special noticing and balloting agent, and (iv) to extend the time for filing Schedules and permanently waive any requirement to file such Schedules upon the confirmation of the Plan.

50. Joint Administration. The Debtors are requesting that their bankruptcy cases be administered jointly by this Court under the bankruptcy case of MFOC. MFOC is the direct or indirect parent of each of the Subsidiary Debtors, as set forth on the organizational chart attached hereto as Exhibit A. I believe that the joint administration of these bankruptcy cases and the relief requested in the motion seeking joint administration will assist the Debtors, their estates, parties in interest, and this Court by, among other things, avoiding the unnecessary time and expense of duplicative motions, applications, orders, and other pleadings.

51. Retention of EBS. The Debtors also seek authority to retain Epiq Bankruptcy Solutions, LLC ("EBS"), as the claims and noticing agent in these bankruptcy cases. I understand that such appointment is required by the rules of this Court. Moreover, such relief is prudent in light of the thousands of creditors, potential creditors, and

parties in interest to which certain notices will be sent. Accordingly, I believe that the most effective and efficient manner by which to give notice and address any claims filed in these bankruptcy cases is to engage an independent third party to act as an agent of the Court.

52. Retention of FBG. In light of the filing of the Plan and the initiation of certain solicitation procedures prior to the Petition Date, the Debtors also determined to retain Financial Balloting Group LLC ("FBG"), as special noticing and balloting agent for the Court. Included among the numerous creditors that will receive notice of these bankruptcy cases are the holders of the Senior Secured Notes. The Senior Secured Notes are publicly traded securities.

53. In accordance with the terms of the FBG Agreement, FBG performed prepetition balloting and solicitation services for the Debtors and ultimately effected the prepetition mailing of the solicitation materials to the persons and entities entitled to vote on the Plan. The Debtors have numerous public securities holders to whom certain additional notices will be sent. I believe that the specialized knowledge required for

27

distributing materials to holders of public securities makes it impracticable for the Debtors to undertake the task of sending notices without assistance. Accordingly, the Debtors have determined to seek approval for the retention of FBG to assist the Debtors in distributing required notices to their public securities holders and to assist the Debtors in performing other Plan-related solicitation services, such as consultation and vote tabulation services.

54. Extension of Time for Filing Schedules. Finally, the Debtors have requested authority to extend the time for filing the Schedules. I understand that generally, a debtor is required to file Schedules in order to permit parties in interest to understand and assess the debtor's assets and liabilities and thereafter negotiate and confirm a plan of reorganization.

55. In this case, in light of the filing and solicitation of the Plan, the information already in the Disclosure Statement, filings that the Debtors have made with the SEC, and other filings that have been or will be made with the Court, the purposes of filing the Schedules have been fulfilled by other means. Nor, in light of what I understand the costs and expenses of preparing and filing

28

the Schedules would be, can the requirement that Schedules
be prepared and filed be justified in this instance. In short,
to require the Debtors to file the Schedules would be
duplicative, unnecessarily burdensome to the Debtors'
estates, and serve only to delay these bankruptcy cases.

## B. Motions To Continue Certain Banking And Business Practices

56. The Debtors have filed two motions to
continue their ordinary course banking practices, as noted
in items 7 and 8 on Exhibit B attached hereto. In that regard,
I understand that the Debtors maintain approximately 40 bank
accounts at the following banks: Bank of America, N.A.
("BofA"), Wells Fargo Bank, N.A. ("Wells Fargo"),
Commonwealth Bank of Australia ("Commonwealth"), JP Morgan
Chase Bank, N.A. ("JPMC"), Compass Bank ("Compass"), and
Citizens State Bank Waverly ("CSB Waverly"), through which
the Debtors managed cash receipts and disbursements for the
Debtors' entire corporate enterprise (the "Bank Accounts").
I believe that all of the Bank Accounts are in financially
stable banking institutions with FDIC insurance (up to the
applicable limit per Debtor per financial institution), for
accounts in the United States. Such accounts make up an

established cash management system that the Debtors must maintain in order to ensure smooth collections and disbursements in the ordinary course.

57. I believe that the cash management procedures that the Debtors use are ordinary and essential business practices and are similar to those used by other large commercial enterprises. The Debtors' cash management system is highly automated and computerized, permitting the Debtors to manage centrally all of their cash flow needs. Moreover such system includes the necessary accounting controls to enable the Debtors to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. I believe that the Debtors will continue to maintain detailed records reflecting all transfers of funds.

58. In my opinion, closing the existing Bank Accounts and opening new accounts inevitably would result in delays and impede the Debtors' ability to ensure as smooth a transition into chapter 11 as possible. Similarly, requiring the Debtors to alter their current cash management system and existing business forms would, in my opinion, unnecessarily jeopardize the Debtors' efforts to

successfully reorganize in a timely and efficient manner. Therefore, in my opinion, it is essential that the Debtors be permitted to maintain their existing Bank Accounts and, if necessary, open new accounts, wherever they are needed, irrespective of whether such banks are designated depositories in the District of Delaware, and otherwise maintain their current Business Forms. Moreover, it is critical that the relief requested in such motions be granted at the first-day hearing in order to avoid the immediate and irreparable harm that otherwise might result if the Debtors were compelled to begin undertaking any change to their cash management system at this stage of the bankruptcy cases.

**C.    Payment Of Employee Obligations And Related Taxes**

59.    The Debtors have also filed two motions seeking authority to pay certain payroll obligations, items 1 and 6 on Exhibit B. The relief requested in such motions is critical to the Debtors' successful reorganization in these bankruptcy cases.

60.    Specifically, through such motions, the Debtors request authority to pay wage and benefit obligations to their valued Employees. I understand that the emergency motion requesting relief prior to a first-day

31

hearing has been filed to ensure that the Debtors can fund their payroll account with ADP on or before Wednesday, August 27, 2008, and thereby allow payroll to be disbursed on Friday, August 29, 2008, as scheduled. This motion was filed in the event that the Court was unable to hold a first-day hearing sufficiently in advance of such funding to provide the Debtors and ADP sufficient time to fund and make disbursements from such account.

61. As set forth in such motions, the Debtors employ in excess of 180 people on whom the Debtors rely for the performance of numerous services. To minimize any personal hardship that such valued and skilled Employees might encounter if wages and other benefits were not paid in a timely manner, and to maintain the morale of the Employees during this critical time, I believe that it is critical to pay all prepetition obligations owed to the Employees and to continue all Employee Benefits. Similarly, the failure to pay other entities identified in these motions, would likely disrupt the Debtors' business operations, thereby unnecessarily undermining the Debtors' reorganization efforts in these bankruptcy cases.

62.    The Debtors estimate that no Employee is owed
more than $10,950 for prepetition wages, salaries, or
commissions.  Accordingly, I have been informed that the
Employees would be entitled to a priority claim for such
unpaid wage obligations.  I further understand that the
failure to maintain workers' compensation insurance could
result in administrative or legal proceedings against the
Debtors and/or their officers and directors.  Moreover, I
believe that the Debtors must pay all amounts due to
Employees or that such Employees may terminate their
employment with the Debtors at this critical early stage of
these bankruptcy cases.  At a minimum, failure to pay such
obligations would negatively impact Employee morale and
cause significant disruption to the Debtors' business.
Further, under the circumstances of these cases where
Employees will be paid in full under the Plan -- which I
understand may be confirmed in just over a month -- it is
clear that any benefit to the Debtors or their estates gained
by reducing cash outflows is heavily outweighed by the
consequences of non-payment.  For these reasons and for the
reasons set forth in the specific First-Day Motions and
Orders, the relief requested in such motions must be approved

at the first-day hearing in these bankruptcy cases (or sooner,
depending on the timing of such "first-day" hearing) in order
to avoid immediate and irreparable harm to the Debtors and
their estates.

**D.    Motions For Payment Of Other Critical Prepetition
        Business Expenses In The Ordinary Course of Business**

63.    The Debtors have requested first-day
consideration of a number of motions seeking authority
(i) to pay allowed prepetition claims of the Utility
Companies and provide a form of adequate assurance of
postpetition performance to such utilities (item 9 on
Exhibit B); (ii) to pay certain taxes (item 10 on Exhibit
B); (iii) to maintain existing insurance policies and
programs (item 11 on Exhibit B); (iv) to continue to honor
existing customer programs and pay prepetition and
postpetition claims arising under such programs in the
ordinary course (item 12 on Exhibit B); and (v) to pay general
unsecured claims in the ordinary course (item 13 on Exhibit
B).

64.    Payment of Utility Companies.    The Debtors
have requested authority to (i) pay the Utility Companies
for all undisputed prepetition claims in the ordinary course

34

and (ii) provide adequate assurance to such utilities of the Debtors' postpetition performance of their obligations to such utilities in the form of (i) the Utility Escrow Account, in an amount equal to the total of approximately two weeks' of utility expenses for the Debtors, (ii) the Additional Adequate Assurance Procedures, and (iii) payment in full of undisputed prepetition claims of the Utility Companies in the ordinary course of business.

65.     Specifically, in connection with the operation of their businesses and the management of their properties, the Debtors obtain the Utility Services from the Utility Companies covering a number of utility accounts. The services provided by the Utility Companies are crucial to the continued operations of the Debtors. As of the Petition Date, the Debtors estimate that the total amount of unpaid invoices from the Utility Companies did not exceed $60,000.

66.     Any interruption to the services provided by the Utility Companies would, in my opinion, be detrimental to the Debtors' businesses and seriously impede the Debtors' ability to efficiently emerge from these chapter 11 cases in the time period proposed by the Debtors. I believe that maintaining this time frame for confirmation is important

to maintaining the value of the Debtors' estates and ensuring the full recovery on claims proposed for unsecured creditors under the Plan. Accordingly, the first-day relief requested in the utility motion is necessary to avoid the immediate and irreparable harm that would result if the Debtors were unable to comply with section 366 of the Bankruptcy Code and the Utility Companies terminated their services.

67. I have reviewed the Additional Adequate Assurance Procedures proposed in the motion and believe that the Additional Adequate Assurance Procedures balance the protections that I have been informed are afforded the Utility Companies under section 366 of the Bankruptcy Code and the Debtors' need for continuous and uninterrupted Utility Services.

68. The Debtors expect that funds generated from their operations, as well as the use of cash collateral, will be sufficient to pay postpetition utility obligations in the ordinary course of business. In addition, pursuant to the Plan, the Debtors intend to pay allowed unsecured prepetition claims in full. Accordingly, the Debtors have requested authority to pay such undisputed prepetition claims of the Utility Companies in an amount not to exceed

$60,000. I believe that such relief is appropriate under the circumstances of these bankruptcy cases and in light of the relatively short timetable for these chapter 11 cases (the Debtors anticipate confirming the Plan within the first thirty-five days of these bankruptcy cases).

69. Payment of Taxing Authorities. In addition, the Debtors, in the ordinary course of their business, incur various tax liabilities, including, among others, Sales and Use Taxes. Sales and Use Taxes accrue daily as the Debtors sell their products and merchandise or consume goods. Sales and Use Taxes are calculated based upon statutorily mandated percentages. The Debtors then remit payment to the Taxing Authorities on a monthly basis for Debtor MFOC and on a quarterly basis for Debtor Mrs. Fields Gifts, Inc. ("MF Gifts"). Debtors MFOC and MF Gifts remit payment based on actual Sales and Use Taxes owing, not on estimated Sales and Use Taxes.

70. As of the Petition Date, the Debtors owe approximately $10,000 on account of aggregate Sales and Use Taxes. In addition, I am aware of a periodic payment of $620,000 due to certain of the Taxing Authorities in the near term. Such payment is due for taxes incurred as a result

37

of the GAC Sale, which sale closed prior to the Petition Date. I believe that prior to the Petition Date, the Debtors were current on their tax obligations.

71.   I understand that failure to pay the Taxes might cause the Taxing Authorities to take precipitous action, including increasing the scope and number of tax audits and instituting a flurry of lien filings or lift stay motions.  Accordingly, rather than create such unnecessary administrative expenses and burdens, the Debtors have requested authority to pay those Taxes that they believe will be due and payable between the Petition Date and the expected date of confirmation of the Plan.  I further believe that absent relief at the first-day hearing in these cases, the Debtors will suffer immediate and irreparable harm by being compelled, among other things, to address tax audits, and various motions from the Taxing Authorities that are unnecessary in light of the Debtors' pursuit of the Plan. This, in turn, would irreparably harm the Debtors' estates by consuming the valuable and limited time available to the Debtors and this Court, thereby delaying confirmation of the Plan.

72. Payment of Insurers. I further understand that under applicable law and the guidelines established by the Office of the United States Trustee that the Debtors are required to maintain necessary insurance during these bankruptcy cases. The Insurance Policies include coverage for workers compensation, automobile claims, fiduciary liability claims, claims for losses due to crime, directors' and officers' liability claims, certain general and excess liability claims, and various property-related liabilities. The third party claims that are covered by the Insurance Policies are neither unusual in amount nor in number in relation to the extent of the business operations conducted by the Debtors. I believe that maintaining such policies and thereby insuring the Debtors and their estates against risk is in the best interests of the Debtors and their estates.

73. Accordingly, through their first-day motions, the Debtors request authority to (i) continue their existing Insurance Policies on a month-to-month basis; (ii) pay all premiums and brokers' fees (including premiums and fees for prepetition periods) arising under or in connection with the Insurance Policies, obtained through the

Insurance Carriers; and (iii) reimburse the Insurance Carriers for any deductible and self-insured retention amounts previously paid by such Insurance Carriers

74. The Debtors believe that they are current on such obligations but, nonetheless, seek such relief out of an abundance of caution and for any payments that may become due for prepetition periods. Prior to the Petition Date, the Debtors financed their premiums in accordance with the Financing Agreement. The Financing Agreement expires on September 17, 2008, and the Debtors made their last payment under the Financing Agreement on August 19, 2008. Instead of renewing the Financing Agreement, however, in light of the expected brevity of these cases, the Debtors have decided to continue the Insurance Policies on a monthly basis until the Plan's effective date and, accordingly, pay, on a monthly basis, related premiums and costs directly to the Insurance Carriers through Graham, resulting in a costs savings estimated at over $2,000 per month for the Debtors and their estates.

75. In light of the critical need to maintain the coverage afforded by the Insurance Policies without interruption, I believe that the first-day relief requested

40

with respect to the insurance coverage, including the payment of all deductibles, self-insured retentions, and fees owed to third parties is necessary to avoid immediate and irreparable harm to the Debtors and their estates. Moreover, the relief requested in such first-day motion is merely an extension of the treatment provided in the Plan and an acceleration of the distributions that holders of general unsecured claims, including the Insurance Companies and any third-parties entitled to fees in connection with such policies or the Debtors' efforts to continue such policies, would otherwise receive on Plan consummation. Therefore, granting the relief requested should have no effect on the relative distribution of estate assets.

76. Payment of Customer Obligations. An essential aspect of the Debtors' ongoing efforts to preserve their businesses and the value of their estates during these bankruptcy cases is the maintenance of existing relationships with the Customers. Prior to the Petition Date, the Debtors were parties to certain agreements with credit card companies and processors, including Paymentech, pursuant to which the Debtors are able to accept credit card payments, subject to certain adjustments, returns,

promotional fees, and refunds. As of the Petition Date, I

have been informed that approximately $8,000 is owed in

prepetition fees to credit card companies and processors.

In addition, the Debtors, prior to the Petition Date, and

in the ordinary course of their business, provided their

customers with certain benefits in the form of the Customer

Programs and, as a result thereof, incurred from customers,

without limitation, the Customer Obligations and the

Customer Claims. Such obligations took the form of store

and on-line gift cards, coupons, gift deposits, the Refunds,

and trade promotions. Moreover, certain of the Customers

had claims against one or more of the Debtors as of the

Petition Date as a result of the Customer Programs, including

contingent prepetition claims against the Debtors for

refunds, returns, exchanges, price adjustments, and other

credit balances relating to goods sold to the Customers in

the ordinary course of business prior to the Petition Date.

77. Payment of obligations owed under the

various Customer Programs, irrespective of whether such

obligations arose before or after the Petition Date is

critical in light of the nature of the Debtors' business

operations. Specifically, honoring the obligations under

42

the Customer Programs, and continuing the Customer Programs
on a postpetition basis, is necessary to maintain sales
volume, customer satisfaction, and goodwill.

78.  I believe that any failure to offer
incentives and promotions similar to those offered by
competitors is likely to have a material adverse impact on
the Debtors' ability to attract new customers and maintain
existing ones and jeopardize the Debtors' valuable business
relationships with their existing Customers.  I further
believe that even a short delay by the Debtors in continuing
their Customer Programs could cause serious and irreparable
harm to valuable customer relationships and, in turn, to the
Debtors' estates.  Accordingly, approval of the requested
authority to honor all valid claims and obligations under
the Customer Programs and continue the Customer Programs
uninterrupted postpetition, is necessary to avoid immediate
and irreparable harm.

79.  Payment of General Unsecured Claims.

Finally, in light of the filing of the Plan, the proposed
treatment of undisputed general unsecured claims under the
terms of the Plan, and the procedures to solicit such Plan
that were started prior to the Petition Date and to date have

resulted in the Debtors' receipt of votes sufficient to
satisfy the "amount" requirement for Class 3 -- as well as
votes sufficient for the acceptance by Classes 5 and 8A of
the Plan -- the Debtors have requested that the Court
authorize the payment of the General Unsecured Claims in the
ordinary course of the Debtors' business.

80.   I believe that the Debtors must maintain and
develop the many relationships with, among others, the
important parties who supply goods and provide services to
the Debtors and further that payment of the General Unsecured
Claims in the ordinary course is critical if the Debtors are
to minimize disruption in what are expected to be very brief
bankruptcy cases.   Accordingly, the Debtors request
authority to continue to pay, as they come due in the ordinary
course of business the General Unsecured Claims, including
but not limited to claims of the Suppliers and Shippers.   As
of the Petition Date, I believe that the amount of such claims
totaled no more than $3.0 million.

81.   If General Unsecured Claims are not paid in
the ordinary course of business, I believe that some of the
Debtors' Suppliers and Shippers likely will be reluctant to
continue doing business with the Debtors, or may not provide

the Debtors with acceptable credit terms. This, in turn, would likely have serious, negative implications for the Debtors' businesses.

82. For example, I am aware that the Debtors depend significantly on Countryside Baking, Inc., which supplies product to the Mrs. Fields franchise system and gifting business, and on Oak State Products, Inc., which supplies product for the branded retail business. Moreover, the Debtors depend upon two main Suppliers for production of their TCBY branded yogurt products -- Scott Brothers Dairy, Inc., and Yarnell Ice Cream Company, Inc. -- without which I believe the TCBY branded business would suffer dramatic disruption.

83. In addition, I believe that the Debtors' reliance on a limited number of Suppliers and Shippers creates particular risks of delays and interruptions in supplies and deliveries as well as diminished control over quality and lack of adequate raw material capacity. Any disruption in supplies and deliveries or diminished raw material quality will, in my opinion, have a negative material impact on the Debtors' business. Specifically, I am aware that the Shippers, among other things, distribute

and transport merchandise from the Debtors' warehouse distribution center for their gifting business and to and from the warehouse facilities used in their branded retail business. In my opinion, the services provided by these common carriers are critical to the day-to-day operations of the Debtors' retail business. Because of the filing of these chapter 11 cases, and because of the Debtors' practice of paying Shippers after the performance of services, certain Shippers who hold goods for delivery to or from the Debtors may refuse to release such goods pending payment for their services, thereby disrupting the Debtors' operations.

84. I believe that the relief requested in such motion must be approved at the first-day hearing in order to avoid immediate and irreparable harm to the Debtors and their estates. Specifically, I have been informed that if the prepetition shipping charges are not paid, many of the Shippers may refuse to perform additional services for the Debtors, causing the Debtors to incur additional expenses (such as premium shipping costs) to replace the Shippers, which amounts will likely exceed the amount of unpaid prepetition shipping charges that the Debtors request permission to pay hereunder. In addition, I am aware that

the Debtors hold only limited quantities of goods at a given time and that if shipments are not made promptly and regularly, the Debtors may risk having inadequate product to service their customers, which would frustrate customer expectations and cause a loss of goodwill. I believe that such an outcome could be potentially devastating to the Debtors' reorganization efforts. Among other things, I believe that, in such a case, the Debtors would likely suffer a detrimental impact on their efforts to continue developing a strong brand identity and a loyal customer base.

85. Nor do I believe that the Debtors' estates and creditors would suffer any adverse impact as a result of granting the relief requested in such motion. As noted throughout this Declaration, the Plan proposes to pay claims like those held by Shippers and Suppliers in the ordinary course of business. Moreover, I am aware that any delays in payment of Shippers with respect to goods that are in the possession of the Shippers as of the Petition Date may result in the assertion, under applicable law, of possessory liens upon the Debtors' property in the possession of such parties, leaving the Debtors with no alternative but to pay the Shippers in full in any event in order to effect the release

of any liens securing payment of such charges. Accordingly,
granting the relief requested in such motion at the first-day
hearing in these bankruptcy cases is necessary to avoid
immediate and irreparable harm.

**E.   Use of Cash Collateral**

86.   The Debtors also have requested approval of
their use of cash collateral of the Noteholders on an interim
basis, pending a final hearing on such request, which final
hearing the Debtors have also requested be scheduled (item
15 on Exhibit B).   I understand that the Indenture Trustee
and the Ad Hoc Noteholders Committee have consented to the
use of Cash Collateral upon the terms and conditions set
forth in the Interim Order.   I further understand that
without such consent the Debtors would not have sufficient
funding for working capital to fund their reorganization
through these chapter 11 cases.

87.   I believe that use of the Cash Collateral
will provide the Debtors with the additional necessary
capital with which to operate their businesses and pay for
the expenses identified in the Budget.   I have reviewed the
Budget and believe that such expenses include, but are not

48

limited to, employee payroll and other benefits, rent, and other expenses related to the Debtors' business operations.

88. While the Debtors believe that the use of Cash Collateral will be sufficient to fund their operations through these chapter 11 cases, they have requested and are in discussions with various lenders regarding the provision of working capital financing to the extent additional liquidity is required to facilitate their exit from chapter 11.

89. The Debtors currently have extremely limited funds. Accordingly, absent use of the Cash Collateral, I do not believe that the Debtors would be able to fund day-to-day operating expenses, including payments to employees, and generally to sustain the Debtors' business operations and thereby maximize estate value. I believe that, absent sufficient funds to support the Debtors' business operations, the Debtors' reorganization prospects would be imperiled. Therefore, I believe that authorization to use Cash Collateral pending the Final Hearing is in the best interests of the Debtors' estates and creditors. Unless the Debtors have access to the Cash Collateral, I believe that the value of the Prepetition Secured Parties' collateral

will be seriously diminished. Accordingly, I believe that
such authorization is necessary to avoid immediate and
irreparable harm to the Debtors and their estates. I further
believe that the use of Cash Collateral on the terms set forth
in the proposed Interim Order provides the Prepetition
Secured Parties with adequate protection, while providing
the Debtors with the necessary liquidity to operate their
businesses during these bankruptcy cases. Such relief,
therefore, is, in my opinion, in the best interest of the
Debtors, their estates, their creditors, and all parties in
interest.

90. The terms of the use of the Cash Collateral
as provided in the Interim Order are, in my opinion, fair
and reasonable, and were negotiated at arms' length and in
good faith, with all parties represented by experienced
counsel. I further believe that the Indenture Trustee and
the Ad Hoc Noteholders Committee are consenting to the use
of their Cash Collateral in good faith, and that the terms
of the use of Cash Collateral and are in the best interests
of the Debtors, their estates, and all creditors of the
estates.

**F. Plan Solicitation Procedures**

91. As noted above, the Debtors began their solicitation of the Plan and Disclosure Statement prior to the Petition Date (item 14 on Exhibit B), and have established a voting deadline of September 15, 2008. In connection with the solicitation process, the Debtors are seeking approval of the Scheduling Order which, if approved, will (a) set the date for the Confirmation Hearing, (b) establish an objection deadline and objection procedures with respect to confirmation of the Plan, (c) approve the form, manner, and sufficiency of notice of the Confirmation Hearing, and (d) direct the U.S. Trustee (as defined below) not to convene the Section 341 Meeting if the Plan is confirmed within ninety (90) days after the Petition Date. I further understand that the Debtors also have requested approval of the Confirmation Order that approves the Disclosure Statement and the Solicitation Procedures and confirms the Plan.

92. I believe that that it is in the best interests of the Debtors' estates, creditors, and parties in interest to hold the Confirmation Hearing as soon as practicable, consistent with what I have been informed are

51

the timing requirements of Bankruptcy Rule 3017. In order
to avoid frustrating the purposes of the Plan and to preserve
the bargained-for recoveries in these cases, it is
imperative, in my view, that the Debtors' time in chapter 11
be minimized.

93. I believe that the schedule proposed by the
Debtors affords creditors, interest holders, and all other
parties in interest ample notice of the confirmation
proceedings, particularly in light of the solicitation to
impaired parties instituted prior to the Petition Date.
I understand that all other parties in interest -- which
parties are not entitled to vote on the Plan -- will receive
notice of their treatment in these chapter 11 cases and will
be provided an opportunity to obtain a copy of the Plan and
Disclosure Statement with sufficient time to evaluate such
documents prior to the proposed Confirmation Hearing.

94. Moreover, the Plan represents the
culmination of a lengthy and detailed negotiation process
between and among the Debtors, the Ad Hoc Noteholders
Committee and the holders of claims and interests in Classes
5 and 8A over a more than six-month period. The Disclosure
Statement is the product of a collaborative effort between

the Debtors and the Ad Hoc Noteholders Committee, and reflects comments received from the members of such committee and its counsel.

95. Further, I understand that holders of Secured Note Claims that are not members of the Ad Hoc Noteholders Committee were sent solicitation packages (including the Plan and Disclosure Statement) over a week prior to the Petition Date. Moreover, the Ad Hoc Noteholder Committee retained sophisticated counsel to represent the noteholders' interests in negotiations with the Debtors, including with respect to the formulation of the Plan and Disclosure Statement.

96. I have been informed that section 341(a) of the Bankruptcy Code requires the Office of the United States Trustee (the "U.S. Trustee") to convene and preside at a meeting of creditors, and that section 341(b) of the Bankruptcy Code authorizes the U.S. Trustee to convene a meeting of equity security holders. I believe that in the light of the provisions of the Plan, and in light of the preliminary votes received by FBG with respect to the Plan (as set forth below), cause exists for the Court to direct

the U.S. Trustee not to convene a 341 Meeting if the Plan is confirmed within ninety days after the Petition Date.

97. Specifically, the Debtors intend to proceed expeditiously to confirm the Plan and emerge from chapter 11 as quickly as possible. I understand (as set forth below) that the only impaired classes of creditors entitled to vote on the Plan -- creditors holdings claims in Classes 3, 5, and 8A under the Plan -- already have voted to accept the Plan or, in the case of Class 3, already have satisfied the amount requirement and have provided no indication that the numerosity requirement will not also be satisfied by the Voting Deadline.

98. With respect to other impaired classes under the Plan, holders of Intercompany Claims in Class 6 either have agreed to such treatment, or are the Debtors or their direct or indirect subsidiaries. Moreover, the Debtors do not believe that there are any holders of claims in Class 7 (Section 510(b) Claims).

99. In addition, I have reviewed the Affidavit of Service and Preliminary Vote Certification of Financial Balloting Group LLC, dated August 22, 2008 (the "FBG Affidavit"), filed concurrently herewith. From my review

of the FBG Affidavit and from my knowledge of the Debtors' business records, I understand that FBG distributed the Plan and Disclosure Statement, along with appropriate ballots, to the holders of Class 3 Secured Note Claims (as defined in the Plan), the holder of the Class 5 MFOC Note (as defined in the Plan), and the holder of the Class 8 MFOC Equity Interests (as defined in the Plan), or each of their respective nominees, on August 15, 2008. I further understand that the Solicitation Packages (as defined in the FBG Affidavit) distributed by FBG provided for a Record Date (as defined in the Plan) of August 6, 2008, and a Voting Deadline (as defined in the Plan) of September 15, 2008.

100. I further understand that as of 5:00 p.m. on August 22, 2008, FBG conducted a preliminary tabulation of ballots received to date. As of that date -- which was just one week after the solicitation process began -- 17 accepting votes (and no rejecting votes) had been received from holders of Class 3 Secured Note Claims, which holders represent approximately 79% of the amount of debt in such class. Further, an accepting ballot was received (albeit by facsimile) from the sole holder of the Class 5 MFOC Note Claim.

Similarly, the holder of the Class 8 MFOC Equity Interests already has accepted the Plan.

101.    Absent approval of the solicitation procedures proposed by the Debtors, the establishment of the prompt hearing on confirmation of the Plan requested by the Debtors, and the requested postponement and automatic abrogation, if the Plan is confirmed within 90 days of the Petition Date, of any requirement to convene the meeting otherwise required by section 341 of the Bankruptcy Code, I believe that the Debtors and their estates will be immediately and irreparably harmed. Specifically, I believe that any significant delay in approval of the Plan could unwind the settlement embodied therein. This, in turn, in my opinion would (i) delay the reorganization of the Debtors, (ii) cause the Debtors to needlessly incur additional administrative expenses, (iii) cause unnecessary unrest among the Debtors' creditors, employees, customers, and other parties in interest in these bankruptcy cases, and (iv) damage the ongoing businesses of the Debtors and the value of the Debtors' estates. Accordingly, the Debtors' request for approval of the solicitation procedures and

other related relief at the first-day hearing is appropriate

in this instance.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:    Salt Lake City, Utah
        August 24, 2008

MRS. FIELDS' ORIGINAL COOKIES, INC.,
et al.,
Debtors and Debtors-in-Possession


/s/ Michael R. Ward
Michael R. Ward
Authorized Signatory

EXHIBIT A

Corporate Organizational Chart

# Mrs. Fields' Original Cookies, Inc.
## Organizational Structure



Debtor ☐
Non-Debtor ☐

Mrs. Fields' Original Cookies, Inc.  (DE)

PM Ontario, Inc.

Mrs. Fields Cookies (Canada) Ltd.

Mrs. Fields Famous Brands, LLC  (DE)

Mrs. Fields Financing Company, Inc.  (DE)

Mrs. Fields Franchising, LLC  (DE)

PTF, LLC  (DE)

PMF, LLC  (DE)

GACCF, LLC  (DE)

GAMAN, LLC  (DE)

The Mrs. Fields' Brand, Inc.  (DE)

TCBY Systems, LLC  (DE)

Mrs. Fields Gifts, Inc.  (UT)

Mrs. Fields Cookies Australia  (UT)

TCBY International, Inc.  (UT)

TCBY of ____, Inc. [1]

TCBY of Texas, Inc.  (AR)

[1] Represents several location specific subsidiaries (e.g. TCBY of Aruba, Inc.)

EXHIBIT B

First-Day Motions and Orders

## EXHIBIT B
## INDEX OF FIRST DAY MOTIONS AND ORDERS

1. Emergency Motion of Debtors for Order under 11 U.S.C. §§ 105, 363, 507, 1107, and 1108 (I) Authorizing Debtors' Banks to Honor Prepetition Checks for Payment of Prepetition Payroll Obligations, (II) Prohibiting Banks From Placing Holds on Employee Accounts on Account of Payroll Amounts, and (III) Authorizing Debtors to Fund the Prepetition Employee Obligations Pending a First-Day Hearing

2. Application of Debtors for Order under 11 U.S.C. §§ 302 and 342(c)(1), Fed. R. Bankr. P. 1005, 1015, and 2002, and Del. Bankr. LR 1015-1 Directing Joint Administration of Cases and Waiving Requirements of 11 U.S.C. §§ 105 and 342(c)(1) and Fed. R. Bankr. P. 1005 and 2002(n)

3. Application of Debtors for Order under 28 U.S.C. § 156(c) and Del. Bankr. LR 2002-1(f) Appointing Financial Balloting Group LLC as Special Noticing and Balloting Agent of the Bankruptcy Court

4. Application of Debtors for Order under 28 U.S.C. § 156(c) and Del. Bankr. L.R. 2002-1(f) Appointing Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent of the Bankruptcy Court

5. Motion of Debtors for Order Extending Time to File Schedules and Statements and Permanently Waiving Requirement to File Same upon Confirmation of Plan

6. Motion of Debtors for Order under 11 U.S.C. §§ 105, 363, 507, 541, 1107, and 1108 and Fed. R. Bankr. P. 6003 (I) Authorizing (A) Payment of Prepetition Employee Obligations and (B) Continuation of Employee Benefit Plans and Programs Postpetition, (II) Confirming Debtors' Authority to Pay Withholding and Payroll-Related Taxes, and (III) Directing all Banks to Honor Checks for Payment of Prepetition Employee Obligations

7.     Motion of Debtors for Order under 11 U.S.C.
       §§ 105(a), 363, 364, and 503(b)(1) and Fed. R.
       Bankr. P. 6003 Authorizing Continued Use of
       Existing (A) Bank Accounts, (B) Business Forms, and
       (C) Cash Management System

8.     Motion of Debtors for Order under 11 U.S.C. § 345
       and Del. Bankr. L.R. 2015-2(b) Waiving Investment
       and Deposit Requirements

9.     Motion of Debtors for Order under 11 U.S.C. §§ 105, 363, 366, ]
       Utility Companies for Additional Assurance of
       Payment, and (III) Scheduling a Hearing With
       Respect to Contested Adequate Assurance of Payment
       Requests, and (IV) Authorizing the Debtors to Pay
       Prepetition Claims of Utility Companies in the
       Ordinary Course of Business

10.    Motion of Debtors for Order under 11 U.S.C. §§ 105,
       506, 507, 541, and 1129 and Fed. R. Bankr. P. 6003
       Confirming Authority to Pay Prepetition Sales,
       Use, Trust Fund, and Other Taxes and Related
       Obligations

11.    Motion of Debtors for Order under 11 U.S.C. §§ 105,
       363, 1107, and 1108 and Fed. R. Bankr. P. 6003
       Authorizing Debtors to (I) Maintain Existing
       Insurance Policies and Pay all Policy Premiums and
       Brokers' Fees Arising Thereunder or in Connection
       Therewith and (II) Reimburse Insurance Carriers for
       Deductible and Self-Insured Retention Amounts

12.    Motion of Debtors for Order under 11 U.S.C. §§ 105,
       363, 507, 1107 and 1108 and Fed. R. Bankr. P. 6003
       Authorizing Debtors to Honor Certain Prepetition
       Obligations to Customers and to Continue Customer
       Programs Postpetition

13.    Motion of Debtors for Order under 11 U.S.C. §§ 105,
       363, 1107, and 1108 and Fed. R. Bankr. P. 6003
       Authorizing Payment of Prepetition General
       Unsecured Claims in Ordinary Course of Business

14. Motion of Debtors for (I) Order (A) Scheduling
Combined Hearing for Approval of Disclosure
Statement and Solicitation Procedures and
Confirmation of Plan, (B) Approving Objection
Deadline and Procedures with Respect Thereto,
(C) Approving Form, Manner, and Sufficiency of
Notice of Combined Hearing and (D) Directing the
United States Trustee not to Convene a Meeting of
Creditors or Equity Security Holders; and
(II) Order (A) Approving Solicitation Procedures
and Disclosure Statement and (B) Confirming Plan

15. Motion of Debtors for Order under 11 U.S.C. §§ 105,
361, 362, 363, and 552 and Fed. R. Bankr. P.
4001(b) for Entry of Interim and Final Orders
(I) Authorizing Limited Use of Cash Collateral
(II) Granting Adequate Protection to Secured
Noteholders and (III) Scheduling a Final Hearing on
the Motion